UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

TAMMY L. THOMSEN, Personal
Representative of the Estate of DALE L.
THOMSEN, Deceased,

Plaintiff,

v.

NAPHCARE, INC., an Alabama
Corporation; WASHINGTON COUNTY,
a government body in the State of Oregon;
PAT GARRETT, in his capacity as
Sherriff for Washington County;
ROBERT DAVIS, an Individual; DON
BOHN, an Individual; ERIN LARSEN, an
Individual; LISA WAGNER, an
Individual; JULIE RADOSTITZ, MD, an
Individual; MELANIE MENEAR, an
Individual; KATHY DEMENT, an
Individual; RACHEL ECLEVIA, an
Individual; KATIE BLACK, an
Individual; ANDREA JILLETTE, an
Individual; MORGAN HINTHORNE, an
Individual; RACHEL STICKNEY, an
Individual; and JOHN/JANE DOES 1–10,

Defendants.

Case No. 3:19-CV-00969-AC

OPINION AND
ORDER

ACOSTA, Magistrate Judge:

*Introduction*

Plaintiff Tammy L. Thomsen ("Plaintiff"), the Personal Representative of the Estate of Dale L. Thomsen ("Thomsen"), filed this lawsuit against Defendants Naphcare, Inc. ("Naphcare"), Washington County, and assorted Naphcare and Washington County employees and administrators, alleging a variety of claims under 42 U.S.C. § 1983 ("Section 1983") and Oregon law arising from Thomsen's death while in custody at the Washington County jail (the "Jail"). Currently before the court is Plaintiff's Motion to Compel ("Motion") (Pl.'s Mot. to Compel, ECF No. 55 ("Mot.")), which seeks Defendant Naphcare's production of a variety of documents responsive to Plaintiff's First Request for Production. For the reasons that follow, Plaintiff's Motion is GRANTED, in part, and DENIED, in part.

*Background*

Since 1998, Washington County (the "County") has contracted with third-party medical providers to deliver medical services to detainees and inmates housed in the Jail. (Compl., ECF No. 1 ("Compl."), ¶ 19.) Following the death of a Jail detainee in 2014, the County abandoned its previous medical provider and contracted with Naphcare, a privately-owned company that provides medical care in jails and prisons nationwide. (*Id.*; Second Am. Decl. of Tim Jones in Supp. of Mot. to Defer or Den. Mot. for Summ. J., ECF No. 28 ("Jones Am. Decl."), at 2.) Naphcare's contract with the County provided that Naphcare agreed to handle all aspects of medical care in the Jail, including providing quality and accessible healthcare to all detainees and inmates, implementing all policies and procedures, providing a medical detoxification program for drug and alcohol addicted inmates and detainees, and monitoring individuals in the throes of detox.

(Compl. ¶ 19.) Naphcare also agreed to comply with requisite standards established by the National Commission on Correctional Health Care ("NCCHC"). (*Id.*)

On June 25, 2017, Thomsen was arrested by Hillsboro Police and booked into the Jail. (Compl. ¶ 21.) A Naphcare RN, Defendant Kathy Dement ("Dement") conducted Thomsen's intake medical screening, and noted he appeared to have no mental health issues such as delusional thought processes or hallucinations. (Paulson Decl. 2, Ex. 8.) Rather, he was clean, well-groomed, cooperative, and oriented as to person, place, and time. (*Id.*) Dement also checked his vital signs, which were normal. (Paulson Decl. 2, Ex. 28, at 1.) When asked, Thomsen denied a previous history of drug or alcohol abuse, denied the possibility of detox while in custody, and denied any previous medical conditions or concerns. (Paulson Decl. 2, Ex. 8; Decl. of Dain Paulson in Supp. of Pl.'s Mot. to Compel, ECF No. 57 ("Paulson Decl. 1"), Ex. 12, at 1–2.) Thomsen was subsequently housed in the general population, and given clearance to perform work within the Jail. (Decl. of Dain Paulson in Supp. of Pl.'s Resp. to Defs.' Mot. for Protective Order, ECF No. 80 ("Paulson Decl. 2"), Ex. 8, at 1; Ex. 10.)

That evening, Plaintiff contacted the Jail to relay that Thomsen previously had experienced a brain injury, and suffered from a seizure disorder and from alcoholism. (Compl. ¶ 22; Paulson Decl. 2, Ex. 3.) Plaintiff made additional attempts to apprise Jail staff of Thomsen's condition in the days that followed, warning he would need medical attention when he inevitably began to detox. (*Id.* ¶¶ 23–24.) Drug or alcohol withdrawal is a common occurrence in the Jail. (*See* Dep. Of Kathy Dement, RN[1] 17:21–23 (confirming that roughly 80% of inmates or detainees entering the Jail are at risk of suffering drug or alcohol withdrawal while in custody); *see also* Dep. of

---

[1] A portion of the Deposition of Kathy Dement, RN is attached to the Paulson Declaration 2 as Exhibit 5 (ECF No. 80-5).

PAGE 3 – OPINION AND ORDER

Former Undersheriff Jeff Mori[2] 17:19–18:9 (noting that signs of intoxication, withdrawal, and altered mental status are "almost exclusively presentations in the jail setting" because "[a]lmost everybody that gets lodged in [the Jail] is under some form of chemical altered state of consciousness")). It is unclear whether Plaintiff's concerns were relayed to Naphcare medical personnel.

In the early morning hours of June 28, 2017, deputy Jeff Smith ("Smith") reported that Thomsen was hallucinating. (Paulson Decl. 2, Ex. 13, at 1.) Deputy Smith requested that Defendant Katie Black ("Black"), a Licensed Practical Nurse employed by Naphcare, evaluate Thomsen because he was "not acting normal." (Paulson Decl. 2, Ex. 14.) Black observed that Thomsen was ambulatory, but "very hyper verbal and anxious," continually calling deputy Smith "Jim" and asking him to "tell Debbie I'm going to be late." (Paulson Decl. 2, Ex. 16.) She also noted that Thomsen had elevated blood pressure and a rapid pulse. (*Id.*) Accordingly, Black sent an alert to the Nurse's Queue to signal a follow-up on Thomsen's abnormal vital signs, and scheduled him to be seen by a mental health representative to assess his confused state. (*Id.*) However, as a result of an error in the scheduling system used by Naphcare, the request for a mental health evaluation was not seen until the following business day. (Paulson Decl. 2, Ex. 18.) Deputy Smith's contemporaneous report of the incident indicates that "medical" determined Thomsen was not detoxing, but ordered him to be moved to a single cell. (Paulson Decl. 2, Ex. 13.)

By approximately 7:30 a.m. on June 28, 2017, Thomsen had become disruptive, talking to himself and kicking the door of his cell. (Paulson Decl. 2, Exs. 12, 20.) Thomsen appeared

---

[2] A portion of the Deposition of Former Undersheriff Jeff Mori is attached to the Paulson Declaration 2 as Exhibit 4 (ECF No. 80-4).

confused and angry, complaining that he had been kidnapped and mistaking a blanket tied around his waist for a shirt. (Dep. of Deputy Thomas Kind[3] 24:9–14; Dep. of Deputy Jerry Nance[4] 21:17–21; Paulson Decl., Ex. 12.) Deputies subsequently moved Thomsen into a holding cell in the Jail's intake area, where he continued "yelling obscenities from his cell, while . . . ram[ming] and kick[ing] the cell door." (Paulson Decl., Ex. 22.) Thomsen's disruptive behavior continued unabated between 8:30 a.m. until 11:40 a.m. (*Id.*)

At approximately 11:48 a.m., the deputy on duty in the holding area noticed that Thomsen's yelling had ceased, and he was no longer banging on the door of his cell. (Paulson Decl., Ex. 26.) The deputy discovered that Thomsen had collapsed, and CPR and other resuscitation measures were administered by Jail staff until fire department personnel arrived. (*Id.*) Thomsen was transported to Tuality Hospital, where he was pronounced dead shortly after arrival. (Paulson Decl., Ex. 28, at 2.) The medical examiner listed Thomsen's cause of death as "cardiac arrest." (*Id.* at 3.)

On June 21, 2019, Plaintiff filed this lawsuit, alleging, among other things, that Naphcare personnel failed to recognize that Thomsen was suffering from alcohol withdrawal, failed to provide him with adequate treatment, and failed to transfer him to a hospital, resulting in his death. (Compl. ¶¶ 31–58.) Plaintiff also alleges Naphcare failed to properly train its employees and other Jail staff as to how to recognize, monitor, and treat withdrawal, and maintained policies, customs, or practices that created a substantial risk to the health and welfare of Jail detainees and inmates. (*Id.*) Plaintiff contends such failures were deliberately indifferent to Thomsen's serious medical

---

[3] A portion of the Deposition of Deputy Thomas Kind is attached to the Paulson Declaration 2 as Exhibit 20 (ECF No. 80-20).

[4] A portion of the Deposition of Deputy Jerry Nance is attached to the Paulson Declaration 2 as Exhibit 21 (ECF No. 80-21).

PAGE 5 – OPINION AND ORDER

need in violation of the Fourteenth Amendment, and wrongfully contributed to Thomsen's death. (*Id.*)

On August 14, 2019, Plaintiff served Naphcare with her First Requests for Production. (Decl. of Jennifer K. Oetter in Supp. of Defs.' Mot. for Protective Order, ECF No. 70 ("Oetter Decl."), Exs. 3.) Plaintiff's numerous requests sought to uncover a variety of details concerning Naphcare's general policies, procedures, and practices, the training and competency of Naphcare's medical staff, and the response to Thomsen's deteriorating condition while he was in custody at the Jail. Though Naphcare has produced documents responsive to Plaintiff's requests, Plaintiff filed the instant Motion on January 20, 2020, seeking production of documents withheld by Naphcare. Oral argument on the Motion was held on March 3, 2020.

*Legal Standards*

Federal Rule of Civil Procedure ("Rule") 26(b)(1) sets forth the general scope of permissible discovery, providing, in relevant part:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope discovery need not be admissible in evidence to be discoverable.

FED. R. CIV. P. 26(b)(1). The court must limit the extent of discovery if it determines that the discovery sought is outside the scope of Rule 26(b)(1), or if it is "unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive." FED. R. CIV. P. 26(b)(2)(C)(i); *Quaiz v. Rockier Retail Group, Inc.*, Case no. 3:16-cv-01879-SI, 2017 WL 960360, at *1 (D. Or. Mar. 31, 2017). The court also has discretion to limit the scope of discovery if "the burden or expense of the proposed discovery outweighs its

likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues." FED. R. CIV. P. 26(b)(2)(C)(iii.)

A party seeking discovery may move the court for an order compelling the production of requested documents. FED. R. CIV. P. 37(a)(3)(B). The party seeking to compel discovery is burdened with demonstrating the information he or she seeks is relevant under Rule 26(b)(1). *Sarnowski v. Peters*, Case No. 2:16-cv-00176-SU, 2017 WL 4467542, at *2 (D. Or. Oct. 6, 2017). The party opposing discovery "has the burden to show that discovery should not be allowed, and has the burden of clarifying, explaining, and supporting its objections." *DIRECTV, Inc. v. Trone*, 209 F.R.D. 455, 458 (C.D. Cal. 2002) (first citing *Blankenship v. Hearst Corp.*, 519 F.2d 418, 429 (9th Cir. 1975); then citing *Nestle Foods Corp. v. Aetna Cas. & Sur. Co.*, 135 F.R.D. 101, 104 (D.N.J. 1990)); *see also Yufa v. Hach Ultra Analytics*, No. 1:09-cv-3022-PA, 2014 WL 11395243, at *1 (D. Or. Mar. 4, 2014) ("If a party elects to oppose a discovery request, the opposing party bears the burden of establishing that the discovery is overly broad, unduly burdensome, or not relevant. Boilerplate, generalized objections are inadequate and tantamount to not making any objection at all." (citation and quotation omitted)). If a party objects to a discovery request, it is the burden of the party seeking discovery on a motion to compel to demonstrate why the objection is not justified. *Weaving v. City of Hillsboro*, No. CV-10-1432-HZ, 2011 WL 1938128, at *1 (D. Or. May 20, 2011).

*Discussion*

Plaintiff moves to compel Naphcare's production of documents responsive to Requests for Production 2, 4, 29, 38–39, 41–49, 53, and 66. (Mot., at 3–7.) The bulk of Plaintiff's Motion was

resolved on the record during oral argument, and the court writes separately to provide clarity and guidance with respect to certain aspects of its ruling.

I. <u>Lawsuits and Previous Judgments</u>

Plaintiff seeks to compel production of previous pleadings, judgments, and settlements by Naphcare in previous and current litigation. (Pl.'s Mem. of Law in Supp. of Mot. to Compel, ECF No. 56 ("Mem."), at 4–6.) Requests for Production 38 and 41–43 provide:

> Request No. 38 — Complete copies of all lawsuits filed against the Naphcare defendant, and related entities, as well as against any of the defendant in pending litigation individually for the ten (10) year period preceding [the date] Dale Thomsen's death which involved claims of negligent, improper and/or inappropriate medical care.
>
> Request No. 41 — Complete copies of all judgments entered against defendant Naphcare, and related entities, for the ten (10) year period predating the date of Dale Thomsen's death which involved claims of negligent, inadequate or inappropriate medical care and/or an award of punitive damages.
>
> Request No. 42 — Complete copies of all lawsuits filed against the Naphcare defendant, and related entities, involving 1983 claims and constitutional violations.
>
> Request No. 43 — Complete copies of all Judgments entered against the Naphcare defendant, and related entities, involving 1983 claims and constitutional violations.

(Oetter Decl., Ex. 3, at 15–16.) Naphcare objects that each request is vague, overbroad, and not reasonably calculated to lead to the discovery of admissible evidence. (Mot., at 4–5.) It observes that it provides healthcare services for over 80,000 inmates in fifty-three city and county jails and federal prisons, and operates separate dialysis units in thirteen states. (*Id.*) Further, Naphcare objects that Plaintiff's requests seek materials that are equally available to her because non-privileged information regarding previous lawsuits is a matter of public record. (*Id.*)

Plaintiff argues that records documenting previous litigation against Naphcare "are directly relevant" to the critical issue of whether Naphcare and its employees were deliberately indifferent, negligent, or grossly negligent to Thomsen's medical needs, and whether Naphcare's conduct is

PAGE 8 – OPINION AND ORDER

sufficiently "persistent and widespread" as to be considered a well-settled policy. (Mot., at 5.) In support of her arguments, Plaintiff cites *Pitkin v. Corizon Health, Inc.*, Case No. 3:16–cv–02233–AA, 2017 WL 6496565, at *5 (D. Or. Dec. 18, 2017), and *Lamon v. Adams*, No. 1:09–cv–00205–LJO–SKO PC, 2010 WL 4513405, at *2 (E.D. Cal. Nov. 2, 2010). Both cases are instructive here.

In *Pitkin*, a case which arose from the withdrawal-related death of a detainee while in custody at the Jail in 2014, the plaintiffs sought documents relating to "lawsuits and judgments . . . alleging negligence and Section 1983 violations or an award of punitive damages for the ten years prior" to the detainee's death. *Pitkin*, 2017 WL 6496565, at *5. Corizon, the County's previous medical services contractor, withheld responsive documents, using objections similar to those advanced by Naphcare. *Id.* Judge Aiken noted that the plaintiffs sought relief on a *Monell* theory of liability — which permits municipal and other local governments to be held accountable for constitutional deprivations stemming from an official governmental policy or longstanding custom — and determined that previous litigation against Corizon "concerning inmate deaths resulting from withdrawal of opiates or other drugs within the last ten years [was] relevant to establishing a policy or custom of depriving inmates of their constitutional rights." (*Id.* at *5–*6.) (citing *Monell v. Dep't of Soc. Servs. Of City of N.Y.*, 436 U.S. 658, 690 (1978)).

In *Lamon*, a plaintiff in State custody brought claims against several corrections officers and their supervisors alleging, among other things, that several named defendants had used excessive force against him. *Lamon*, 2010 WL 4513405, at *1. To support his claim, plaintiff sought all grievances, complaints, and related documents received by corrections staff that included allegations of unnecessary or excessive force used against inmates by the named defendants over a six-year period. *Id.* at *2. The defendants objected that the request was overbroad, arguing that every grievance filed against the named defendants within the previous six

years concerning the use of force likely was not relevant to plaintiff's case. *Id.* The court disagreed, reasoning that while previous instances of excessive force could not be used to prove excessive force was used against plaintiff, such instances could be used to demonstrate "'proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.'" *Id.* (quoting FED. R. EVID. 404(b)). Further, the court determined the complaints could lead to the discovery of admissible evidence, and noted other courts had "permitted discovery of prior administrative complaints or lawsuits when the previous complaints are sufficiently similar to the claims made in the complaint." *Id.* (citing *Cox v. McClellan*, 174 F.R.D. 32, 34 (W.D.N.Y. 1997)). Although sifting through previous inmate complaints to locate responsive documents was burdensome, the *Lamon* court ordered production of the documents in question because the plaintiff had no alternative method of obtaining the documents requested. *Id.* at *3–*4.

Here, Plaintiff seeks copies of all lawsuits filed against Naphcare in the past ten years involving claims arising under Section 1983, or alleging inadequate medical care, punitive damages, or constitutional violations. As *Pitkin* and *Lamon* make clear, prior litigation to which the defendant was party is relevant when such litigation involves claims similar to those alleged in the instant case, particularly when those claims require proof of long-standing policy or custom. But similar to the requests at issue in *Pitkin*, the broad sweep of Plaintiff's requests could include lawsuits brought against Naphcare that arose from conduct wholly unrelated to the conduct alleged here. Indeed, the essence of Plaintiff's case is Naphcare's failure to recognize and properly treat Thomsen's symptoms — particularly the described dramatic change in his mental status — and there is little to be learned about that failure from a previous lawsuit stemming from Naphcare's improper treatment of a detainee's broken foot. Plaintiff's requests therefore must be narrowed to include only those lawsuits relevant to the instant case. Additionally, an order requiring wholesale

production in response to Plaintiff's requests, regardless of the burden placed on Naphcare, is inappropriate here because the information Plaintiff seeks is not in Naphcare's sole possession, as was true in *Lamon*.

Accordingly, Naphcare must produce complete copies of all lawsuits and judgments entered against it where at least one allegation included a failure to recognize, a failure to treat, or a failure to properly treat an inmate or detainee who exhibited changes in mental status similar to those alleged here. The responsive time period is limited to the thirty-six months immediately preceding June 2017 through the present.

II. Financial Documents Relevant to Punitive Damages

Plaintiff seeks to compel production of several categories of financial documents, arguing Naphcare's financial worth is relevant to her request for punitive damages. (Mem., at 6–10.) Specifically, Requests for Production 44–48 provide:

> Request No. 44 — Complete copies of all Income Statements for the last five fiscal years for defendant Naphcare
>
> Request No. 45 — Complete copies of all Balance Sheets for the last five fiscal years and the most recent completed fiscal quarter. These should include an entry for "Cash and Cash Equivalents," as well as one for "Stockholders Equity."
>
> Request No. 46 — Complete copies of all Cash Flow Statements for the last five fiscal years and the most recent completed fiscal quarter
>
> Request No. 47 — Complete copies of [] any and all Advertising Expenditures, Research and Development Expenditures, and Capital Expenditures for the last five fiscal years.
>
> Request No. 48 — Complete copies of any and all documentation concerning total compensation for the president and/or chief executive officer of each defendant company for the most recently ended fiscal year.

(Oetter Decl., Ex. 3, at 16.) Naphcare objects that each request is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. (Mot.,

at 5–6.) Naphcare objects that to the extent Requests 44–48 seek financial information to appraise Naphcare's ability to pay punitive damages, "financial discovery is not permitted until plaintiff has made a prima facie showing of entitlement to recover punitive damages." (*Id.*)

Plaintiff contends that the majority of federal courts have allowed discovery regarding a claim for punitive damages even when state statutes require a *prima facie* showing before a party may plead punitive damages. (Mem., at 6–10.) Relying on *Pruett v. Erickson Air-Crane Co.*, 183 F.R.D. 248 (D. Or. 1998), Plaintiff argues that Naphcare's insistence that she must make a *prima facie* showing with respect to her claims for punitive damages before discovery is permitted is unworkable within the context of the Federal Rules of Civil Procedure (the "Rules"). (*Id.* at 8–9.) Naphcare responds that courts in this district have previously required a *prima facie* showing before allowing discovery with regard to punitive damages, and that such a showing is consistent with the Rules' emphasis on proportionality. (Defs.' Resp. to Pl.'s Mot. to Compel, ECF No. 65 ("Defs.' Resp."), at 7–10.) Naphcare further argues that Plaintiff's Motion should be denied because only current financial information is relevant to the issue of punitive damages, and Plaintiff's requests seek a range of financial information outside of that limited scope. (*Id.* at 8–9.)

In *Pruett*, the defendants moved to strike the plaintiff's request for punitive damages, arguing that a plaintiff cannot plead punitive damages in federal court without first making a *prima facie* showing in jurisdictions with state punitive damages statutes. *Pruett*, 183 F.R.D. at 249. Relying on the long-settled principle announced in *Hanna v. Plumer*, 380 U.S. 460 (1965), that state substantive law and federal procedural law govern federal courts sitting in diversity, Judge

Aiken conducted a detailed analysis to determine whether Oregon's punitive damages statute[5] (the "statute") conflicted with the Rules. *Id.* at 250 (citing FED. R. CIV. P. 1). Scrutinizing the statutory scheme, Judge Aiken observed that the statute forbade pleading punitive damages in the initial complaint, and instead required plaintiffs to request leave to amend with a sufficient evidentiary and factual showing to avoid a directed verdict. *Id.* The statute also required judges to hold hearings and issue opinions in compliance with predetermined time limits, and prohibited discovery on a defendant's ability to pay punitive damages until a sufficient showing was made. *Id.* In contrast, the Rules required pleadings to include "a short and plain statement of the claim showing that the pleader is entitled to relief;" require special damages to be specifically stated in the pleading; and allow for liberal discovery of any non-privileged material relevant to the subject matter of the case at hand. *Id.* (citing FED. R. CIV. P. 1, 8(b)(2), 9(g), 26(b)(1)). Judge Aiken thus determined the statute conflicted with Rules, noting in particular that the statute's prohibition on discovery directly conflicted with the Rules' "liberal discovery scheme," which allows for discovery of a defendant's ability to pay because such information is relevant to punitive damages claims and could otherwise encourage settlement. *Id.* at 251–52. Because the statute conflicted with the Rules in a number of ways, Judge Aiken held that Oregon's punitive damages statute does not apply in federal diversity cases. *Id.* at 252.

Despite Judge Aiken's thorough analysis in *Pruett*, Naphcare contends that other courts in this district have required a *prima facie* showing of entitlement to punitive damages before allowing discovery of financial information, and that this court should do the same. (Defs.' Resp., at 7.) Naphcare cites several cases from this district to support its argument, but only one decided

---

[5] At the time of the *Pruett* decision, Oregon's punitive damages statute was codified as OR. REV. STAT. § 18.535, but has since been renumbered as OR. REV. STAT. § 31.

PAGE 13 – OPINION AND ORDER

after *Pruett*. In that case, *EEOC v. U.S. Bakery*, No. CV 03–64–HA, 2003 WL 23538023, at *1 (D. Or. Nov. 20, 2003), the EEOC sought to compel the defendant's production of financial information, arguing the requested information was relevant because punitive damages had been requested. Though the Ninth Circuit had not addressed whether a party is entitled to discovery of financial records before making a *prima facie* showing it is entitled to punitive damages, Chief Judge Haggerty, relying on *Hangarter v. Paul Revere Life Insurance Company*, 236 F. Supp. 2d 1096 (N.D. Cal. 2002), denied the EEOC's motion with leave to renew if a *prima facie* showing was made. *Id.* at *3. *Hangarter*, however, explained only why evidence of a defendant's financial condition might be excluded at trial, and not on whether such information is discoverable. *U.S. Bakery* therefore does not detract from the persuasiveness of Judge Aiken's analysis in *Pruett*.

The court adopts the reasoning of *Pruett* and holds that a *prima facie* showing is not necessary before a party may conduct limited discovery concerning the opposing party's ability to pay punitive damages. Proportionality under the recent amendment to Rule 26 remains a central consideration, however. The court agrees with Naphcare that Plaintiff's requests are too broad, and therefore will not compel production of information unrelated to Naphcare's ability to pay punitive damages.

Publicly available information reveals Naphcare is a private, family-owned company. Financial documents typically prepared by such companies are financial statements provided to banks or other lenders to establish eligibility for a loan or line of credit, statements demonstrating the company's solvency, and tax returns. Accordingly, Naphcare must produce these documents

\\\\\
\\\\\
\\\\\
\\\\\

PAGE 14 – OPINION AND ORDER

for the current fiscal year, to the extent they exist, and such documents are subject to protective order and considered confidential.⁶

*Conclusion*

For the reasons stated above, Plaintiff's Motion to Compel (ECF No. 55) is GRANTED, in part. Naphcare must produce the documents discussed herein, no later than April 21, and all other documents by March 24, 2020, as ordered on the record during the March 3, 2020 hearing.

DATED this 24th day of March, 2020.

JOHN V. ACOSTA
United States Magistrate Judge

---

⁶ By this ruling, the court expresses no opinion and makes no determination whether, and the extent to which, additional financial information subsequently might be discoverable.

PAGE 15 – OPINION AND ORDER