# EXHIBIT 9

```
                UNITED STATES DISTRICT COURT

                   DISTRICT OF OREGON

                   PORTLAND DIVISION

TAMMY L. THOMSEN, Personal         )
Representative of the Estate of    )
DALE L. THOMSEN, Deceased,         )
                                   )
              Plaintiff,           )    Case No.
                                   )    3:19-cv-00969-AC
       vs.                         )
                                   )
NAPHCARE, INC., an Alabama         )
Corporation, et al.,               )
                                   )
              Defendants.          )
_____)



       VIDEOTAPED DEPOSITION OF SAMUEL FREEDMAN, MD

         Taken at the instance of the Defendants




                            August 25, 2022

                            9:13 a.m.

                            707 S.W. Washington Street

                            Portland, Oregon
```

EXHIBIT 9
Page 1 of 19

```
 1                VIDEOGRAPHER:  We are now on the video
 2   record.  Today's date is Thursday, August 25th, 2022,
 3   and the time is 9:13 a.m.  My name is David
 4   Prishchenko with Discovery Media Productions.  The
 5   court reporter is Dina Ranger, who will now swear or         09:13:18
 6   affirm witness.
 7
 8           (SAMUEL FREEDMAN, MD, called as a witness by
 9   the Defendants, being first duly sworn to tell the
10   truth, the whole truth and nothing but the truth, was
11   examined and testified as follows:)
12
13
14                       EXAMINATION
15
16   BY MS. OETTER:
17        Q.    Dr. Freedman, good morning.  My name is
18   Jennifer Oetter.  I'm one of the lawyers that
19   represents NaphCare.  I'm here today to take your
20   deposition.  Thank you for your time today.  You've          09:13:46
21   been identified by the plaintiffs as an expert in this
22   case.  You understand what that means, I assume?  Have
23   you been an expert in other cases?
24        A.    I do.
25        Q.    Okay.  I'm not going to go over all the           09:13:56
```

| | | |
|---|---|---|
| 1 | Q. | Okay. |
| 2 | A. | They couldn't find a replacement. |
| 3 | Q. | Okay.  Your CV says 2015, correct? |
| 4 | A. | Yeah. |
| 5 | Q. | 1998 to 2015? |
| 6 | A. | Uh-huh. |
| 7 | Q. | It also indicates that you were an owner and medical director of AllMed from September 2002 to 2015, yes? |
| 10 | A. | Yes. |
| 11 | Q. | If I'm interpreting your curriculum vitae correctly, the last time you worked in a hospital setting was 2011, is that accurate? |
| 14 | A. | I think it was a little later than that.  Might have been '13.  Because I passed the boards before I stopped, but I can't recall. |
| 17 | Q. | Why would your CV say 2011? |
| 18 | A. | I have no idea. |
| 19 | Q. | Did somebody else prepare this? |
| 20 | A. | Yes. |
| 21 | Q. | I've seen your curriculum vitae attached to other opinions and other declarations that you've authored in other cases.  Is there a reason you haven't updated it and made it accurate? |
| 25 | A. | Because I think that's accurate enough, and |

Timestamps: 09:57:22, 09:57:33, 09:57:59, 09:58:16, 09:58:32

```
1    my memory is probably less accurate than the paper.
2         Q.   Okay.  So if this says that the last time
3    you worked in the emergency department was 2011,
4    that's accurate?
5         A.   Accurate enough, yes.                         09:58:46
6         Q.   Okay.  When was the last time -- well, when
7    you left in 2011, were you working full-time?
8         A.   No.
9         Q.   What were you -- how many days a week were
10   you working?                                            09:58:58
11        A.   I was working weekends and holidays.
12        Q.   How many hours were you working on the
13   weekend?
14        A.   24.
15        Q.   So it was a 12 -- two 12-hour shifts?         09:59:06
16        A.   Yeah.
17        Q.   And same for holidays?
18        A.   Holidays -- depending on the holiday, 12 or
19   24.
20        Q.   How long was it your schedule that you were   09:59:17
21   working weekends and holidays?
22        A.   From 2003 'til I stopped.
23        Q.   So when you -- is the last time you worked
24   as a full-time emergency room physician at Tuality?
25        A.   Yes.                                          09:59:34
```

| | | |
|---|---|---|
| 1 | Q. | And that ended in 2005? |
| 2 | A. | Yes. |
| 3 | Q. | So from 2005, at least, through 2011, you |
| 4 | were weekends and holidays? | |
| 5 | A. | Yes. |
| 6 | Q. | Is that a .2 FTE, or do they even have a |
| 7 | number for that? | |
| 8 | A. | That wasn't my concern. |
| 9 | Q. | Okay. You don't know? |
| 10 | A. | No. |
| 11 | Q. | Okay. When was the last time you treated |
| 12 | or examined a patient? | |
| 13 | A. | In a formal setting or as a physician in |
| 14 | non-clinical settings? I've attended to people on | |
| 15 | airplanes, I've attended to emergencies on the street, | |
| 16 | I've attended to, most recently, a bat bite. So I see | |
| 17 | patients in that setting all the time. I haven't seen | |
| 18 | a patient in the formal setting since I stopped at | |
| 19 | Oregon City. | |
| 20 | Q. | Okay. What are your duties -- or what were |
| 21 | your duties as the medical director for AllMed? | |
| 22 | A. | AllMed was a company which was known as an |
| 23 | independent review organization. | |
| 24 | Q. | What does that mean? |
| 25 | A. | Patients and doctors are entitled by the |

Timestamps:
- 09:59:46
- 10:00:00
- 10:00:18
- 10:00:39
- 10:01:02

Page 32

| | | |
|---|---|---|
| 1 | A. | Yeah, the population substance abuse |
| 2 | problem has only grown greater since I began my | |
| 3 | career.  I think there's a lot more of it. | |
| 4 | Q. | Okay.  And I'm specifically referencing not |
| 5 | just all withdrawals, but alcohol withdrawal.  So your | 10:12:16 |
| 6 | belief is that while you were working on weekends from | |
| 7 | 2005 to 2011, you diagnosed alcohol withdrawal roughly | |
| 8 | six times a year? | |
| 9 | A. | Yeah.  Certainly every other month. |
| 10 | Q. | And of those patients, how many did you | 10:12:36 |
| 11 | diagnose delirium tremens? | |
| 12 | A. | Very few. |
| 13 | Q. | Have you ever worked in a jail correctional |
| 14 | health care setting? | |
| 15 | A. | I have not. | 10:12:46 |
| 16 | Q. | Have you ever been a part of a team that |
| 17 | accredited a jail's health care system? | |
| 18 | A. | I audited the Washington County Jail with |
| 19 | Dr. -- the late Dr. Jay Kravitz, at the request of the | |
| 20 | Washington County Health Department.  There's no | 10:13:02 |
| 21 | written work product that I have, and I don't recall | |
| 22 | the outcome. | |
| 23 | Q. | Do you remember what year you did that? |
| 24 | A. | It was during my time at Tuality. |
| 25 | Q. | Early? | 10:13:21 |

```
1      A.    No.
2      Q.    Late?
3      A.    Late.  Late.
4      Q.    And you were at Tuality from 1989 to 2005?
5      A.    Yes.                                              10:13:28
6      Q.    So do you think it was sometime in the
7  early 2000s?
8      A.    My guess is right before 2000.
9      Q.    Okay.  My question was slightly different.
10 And it was:  Have you ever been part of the team that       10:13:42
11 accredits a jail's health care system?
12     A.    No.
13     Q.    Have you ever been part of any institution
14 that provides such accreditation, as either an advisor
15 or in any other capacity?                                   10:13:53
16     A.    No.
17     Q.    I'm going to give these to you so I don't
18 get them mixed up with my stuff, but that's going to
19 be what we're marking as Exhibit 1.  You are here
20 pursuant to a notice and subpoena, and we appreciate        10:14:18
21 your time.
22           Did you bring everything with you, your
23 complete file related to this case, as we requested?
24     A.    Yes.
25     Q.    Thank you very much.                              10:14:29
```

Page 41

```
1    national certifying --
2        A.   I'd have to look it up.  Too many initials.
3        Q.   You reference them in here, the NCCHC,
4    correct?
5        A.   Yes.                                                  10:27:20
6        Q.   Do you know what that stands for?
7        A.   National Health -- no.
8        Q.   I'll represent to you that I believe it's
9    the National Committee on Correctional Health Care.
10       A.   Okay.                                                 10:27:29
11       Q.   Did you -- are you aware that the NCCHC
12   accredited the Washington County Jail while NaphCare
13   was the medical provider?
14       A.   No.
15       Q.   Did you ask about that or ask for any                 10:27:45
16   information about that?
17       A.   Accreditation processes --
18       Q.   That's not my question.  Did you ask for
19   it?
20       A.   I did not.                                            10:27:55
21       Q.   Okay.  In your capacity as an emergency
22   room provider, have you ever had anyone die from
23   withdrawal?  Alcohol withdrawal.  I'm sorry, let me
24   start over again.  That was a bad question.
25            In your capacity as an emergency room                 10:28:16
```

Page 50

| | | |
|---|---|---|
| 1 | provider, have you ever had anyone die from alcohol | |
| 2 | withdrawal? | |
| 3 |     A.    No. | |
| 4 |     Q.    Have you supervised anybody that you've | |
| 5 | seen document or conduct a peer -- peer review -- and | 10:28:26 |
| 6 | I don't want to know any of the particulars of that | |
| 7 | peer review.  This is just sort of a general question. | |
| 8 |     Have you reviewed any medical records in | |
| 9 | which someone was thought to have died from alcohol | |
| 10 | withdrawal? | 10:28:40 |
| 11 |     A.    No. | |
| 12 |     Q.    How would you expect it to be documented if | |
| 13 | somebody died from alcohol withdrawal? | |
| 14 |     A.    I would expect that it'd be clear | |
| 15 | historical evidence of heavy sustained alcohol use, | 10:28:57 |
| 16 | clear evidence that there was a cessation, an | |
| 17 | appropriate time frame until the symptoms occurred, | |
| 18 | and the symptoms of alcohol withdrawal to be present | |
| 19 | in the individual who was withdrawing. | |
| 20 |     Q.    Have you ever looked at an autopsy where | 10:29:27 |
| 21 | the medical examiner noted the cause of death to be | |
| 22 | complications associated with alcohol withdrawal? | |
| 23 |     A.    I don't think so. | |
| 24 |     Q.    I want to go down to the paragraph in your | |
| 25 | report that starts "NaphCare in Washington County." | 10:29:47 |

```
 1   withdrawal when they stop or reduce drinking?
 2        A.    Especially those that reduce.
 3        Q.    That wasn't my question, sir.  Do you agree
 4   with the statement in the UpToDate article that you                10:47:28
 5   cited that most people with alcohol use disorder do
 6   not experience significant withdrawal when they stop
 7   or reduce drinking?
 8        A.    I believe that -- I don't agree with that
 9   because the reduced population has a far better
10   outcome than the abrupt cessation population.                      10:47:41
11        Q.    Sir, I'm not talking about outcome.  I'm
12   talking about what percentage of people actually
13   experience clinical manifestations of withdrawal from
14   stopping or reducing drinking.  Do you agree with the
15   statement in this article?  And this is honestly a yes             10:47:58
16   or no question.
17        A.    No, I don't.
18        Q.    Okay.  What clinical presentation would you
19   expect to see with minor manifestations of alcohol
20   withdrawal?                                                        10:48:11
21        A.    Tremors, sweating, asking for alcohol.
22        Q.    Anything else?
23        A.    No.
24        Q.    How about anxiety, agitation, restlessness,
25   insomnia, diaphoresis, palpitations, headaches, and                10:48:24
```

Page 64

```
1    loss of appetite, nausea, and vomiting?
2         A.   Sure.
3         Q.   Do you agree with the statement in the
4    UpToDate article that you cited that minor
5    manifestations of alcohol withdrawal include anxiety,      10:48:38
6    agitation, restlessness, insomnia, tremor,
7    diaphoresis, palpitations, headache, alcohol craving,
8    and often loss of appetite, nausea and vomiting?
9         A.   Yes.
10        Q.   Which of those did Dale Thomsen demonstrate      10:48:55
11   in June of 2017?
12        A.   None.
13        Q.   Do you agree with the statement in this
14   UpToDate article that -- well, this article equates
15   delirium tremens with another phrase called withdrawal     10:49:27
16   delirium, correct?
17        A.   Yes.
18        Q.   But those terms are used interchangeably?
19        A.   Yes.
20        Q.   Do you agree with this statement:                10:49:36
21   Withdrawal delirium always follows earlier
22   manifestations of withdrawal?
23        A.   Yes.
24        Q.   You cited a portion of this UpToDate
25   article about family history.  Do you remember that?       10:50:03
```

Page 65

1  know your areas of focus, I can also focus my review
2  of the records.
3      Q.   Did you not think that your diagnosis of
4  alcohol withdrawal was going to be the area of focus
5  today?                                                          10:53:59
6      A.   My diagnosis of alcohol withdrawal has
7  nothing to do --
8      Q.   With the history he gave.
9      A.   Had nothing to do -- right.  His
10 presentation and the history was available, making              10:54:07
11 clear what he had and what took his life.
12     Q.   Your testimony is that your diagnosis of
13 alcohol withdrawal had nothing to do with the history
14 he gave, correct?
15     A.   Had little -- right.                                   10:54:18
16     Q.   Okay.  Do you agree with this statement in
17 the UpToDate article:  "Without treatment, symptoms of
18 alcohol withdrawal generally begin within six to 24
19 hours of the last drink or a sudden reduction in
20 alcohol consumption -- or chronic alcohol drinking."            10:54:45
21          Do you agree with that statement?
22     A.   I do.
23     Q.   Okay.  Do you agree with this statement:
24 Withdrawal delirium, also knows as delirium tremens or
25 DTs, is a rapid onset fluctuating disturbance in                10:55:12

|    |    |                                                                      |          |
|----|----|----------------------------------------------------------------------|----------|
| 1  | A. | It's --                                                              |          |
| 2  | Q. | Second to last page, before the references.                          |          |
| 3  | A. | Okay.  Well, I misspoke.                                             |          |
| 4  | Q. | Okay.  And it talks about obtaining history                          |          |

5  from family settings.  But the part that you left                              11:32:53

6  out -- you quoted it as "Obtaining history of family,"

7  blank, blank, blank, "familiar with the patient's

8  patterns of alcohol use is pivotal in establishing

9  alcohol withdrawal as a likely cause, particularly if

10 the patient presents with delirium."  And you wrote                             11:33:26

11 that as a period, end quote.

12        But what it actually says is, "particularly

13 if the patient presents with delirium and other

14 features of withdrawal, such as seizures, were not

15 witnessed."                                                                     11:33:41

16        So this statement is really referencing

17 getting a family history and how important that is if

18 the evidence of earlier withdrawal wasn't witnessed by

19 anybody, correct?

20   A.   No, that's not how I interpret it.                                       11:33:54

21   Q.   Well --

22   A.   A family history in the absence of a

23 history from the patient is a critical point, and you

24 could extend that to any interaction.  A history is

25 part of the patient care.  If the patient can't or                              11:34:09

1  was the training on what you were to do with that
2  information?"
3            Answer, "Typically we would tell the family
4  member we would notify medical."
5            Do you remember seeing that question and                    11:45:50
6  answer?
7       A.   I don't, but that's the right thing to do.
8       Q.   Okay.  Very good.  And do you remember him
9  explaining why he didn't do that in this case?
10      A.   I do not.                                                   11:46:00
11      Q.   Do you remember him describing what he did
12  after he received that information or the
13  conversations that he had or the reassurances that he
14  received?
15      A.   I do not.                                                   11:46:07
16      Q.   Okay.
17                 (Pause in the proceedings).
18      Q.   The next paragraph talks about NC -- starts
19  your conversations about contractual obligations to
20  meet national standards and the NCCHC standards.                     11:46:40
21  We've already covered that, you don't even know what
22  the acronym stands for.
23            Do you consider yourself an expert on
24  either the topic of contract supervision or meeting
25  NCCHC standards?                                                     11:46:55

Page 104

| | | |
|---|---|---|
| 1 | A. | In some small areas, yes. |
| 2 | Q. | What are you qualified to talk about in |
| 3 | terms of meeting contractual obligations? | |
| 4 | A. | I'm qualified to read the deposition of the |
| 5 | auditor and the auditor's reports and interpret his | 11:47:10 |
| 6 | remarks about his second and third audits, the | |
| 7 | outcomes that he observed. | |
| 8 | Q. | What makes you qualified to comment on |
| 9 | that? | |
| 10 | A. | I can read and understand many things. | 11:47:26 |
| 11 | Q. | So the ability to do that, in your opinion, |
| 12 | makes you qualified to do it?  You can read and | |
| 13 | understand it, so therefore you're qualified to offer | |
| 14 | an expert opinion on it? | |
| 15 | A. | Based on his expert opinion, I can speak to | 11:47:41 |
| 16 | what his opinion might have been. | |
| 17 | Q. | Okay.  So you believe -- is that the extent |
| 18 | of your qualification to offer an opinion on this | |
| 19 | topic is your ability to read and interpret what he | |
| 20 | said? | 11:47:53 |
| 21 | A. | With regard to contract performance, yes. |
| 22 | Q. | And that would include meeting or not |
| 23 | meeting NCCHC standards? | |
| 24 | A. | So the NC -- with regard to that, and maybe |
| 25 | they're NaphCare imperatives, in the section on | 11:48:06 |

Page 105

```
 1   clinical things, which I am prepared to speak about,
 2   whether this was delirium tremens or not, it says very
 3   clearly that people who are presenting as this guy
 4   does need to go to an acute care hospital and not be
 5   taken care of in the jail.  So I'm prepared to speak                  11:48:29
 6   with expertise about that part of their -- what would
 7   you call it -- policies and procedures.
 8        Q.   Do you believe that you're offered to
 9   expert opinion on -- to offer an expert opinion
10   regarding the topic that's in this paragraph, which is               11:48:45
11   whether or not the training offered by NaphCare met
12   NCCHC standards and their contractual obligations?
13        A.   I'm prepared, again, to interpret the part
14   of the contract which I read.
15        Q.   Based on just your ability to read and                     11:49:03
16   understand, correct, not any unique training or
17   expertise?
18        A.   That's correct.  I read -- and the reading
19   of the depositions of the various deputies.
20        Q.   Do you know if NaphCare and Washington                     11:49:17
21   County Jail were audited by the NCCHC?
22        A.   You asked that, I believe, before, and I do
23   not.
24        Q.   Do you know what the results were of those
25   audits?                                                              11:49:29
```

Page 106

```
1        A.    I do not.
2        Q.    Do you know if there were any deficiencies
3    identified in training?
4        A.    I do not.
5        Q.    Do you know if there were any deficiencies          11:49:34
6    identified in management of alcohol withdrawal?
7        A.    I do not.
8        Q.    Do you know if there were any deficiencies
9    identified in management of altered mental status?
10       A.    I do not.                                           11:49:44
11       Q.    Do you know if there were any deficiencies
12   identified in management of change in vital signs?
13       A.    I do not.
14       Q.    Do you agree that anybody that participated
15   in that audit on behalf of the NCCHC is more qualified        11:49:54
16   than you to comment on those topics?
17       A.    Probably.
18       Q.    And would you defer to those findings of
19   those people in realtime?
20       A.    I don't know what "realtime" means.                 11:50:08
21             MR. JONES:  On the issue of whether
22   they should be accredited?
23             MS. OETTER:  Yep.
24             THE WITNESS:  On the issue of whether
25   they can be accredited, sure.                                 11:50:17
```

Page 107

```
 1   going to ask you about, so I'm just going to hopefully
 2   breeze through this.
 3           And I think you indicated that you have not
 4   worked in a correctional facility?                          11:56:12
 5      A.   True.
 6      Q.   Okay.  And you are certainly not an expert
 7   in corrections, correct?
 8      A.   No.
 9      Q.   Okay.  It was a bad question.
10           And even in the scope of your practice,             11:56:25
11   other than I think you told us at one point in time
12   you were asked to review the health care at Washington
13   County, you yourself have never worked inside the
14   Washington County Jail?
15      A.   No.                                                 11:56:37
16      Q.   And so you would agree with me, would you
17   not, Doctor, that you are not qualified to express
18   opinions about correctional services; meaning the
19   services provided by deputies within the jail, how
20   they run their jail?                                        11:56:58
21      A.   Only to the extent they might affect the
22   health of the inmates, nothing more.
23      Q.   And you have never trained corrections
24   officers?
25      A.   No.                                                 11:57:14
```

Page 112

```
 1                    REPORTER'S CERTIFICATION
 2             I, Dina Ranger, Registered Professional
 3   Reporter and Notary Public for Oregon, do hereby
 4   certify that the deponent was by me first duly sworn
 5   and the testimony was reported by me and was
 6   thereafter transcribed with computer-aided
 7   transcription; that the foregoing is a full, complete,
 8   and true record of said proceedings.
 9             I further certify that I am not of counsel
10   or attorney for either or any of the parties in the
11   foregoing proceedings and caption named or in any way
12   interested in the outcome of the cause in said
13   caption.
14             The dismantling, unsealing, or unbinding of
15   the original transcript will render the reporter's
16   certificate null and void.
17             In witness whereof, I have hereunto set my
18   hand this 28th day of August, 2022.
19             [ ] Reading and signing was requested.
20             [ ] Reading and signing was waived.
21             [X] Reading and signing was not requested.
22
23
24                             _____
                               Dina Ranger, CSR-RPR
25                             RPR, WA-CSR NO. 2313
```

Page 145