# EXHIBIT 12

# Deposition Of:
## Vincent Reyes, MD

## Volume II

November 7, 2022

Tammy L. Thomsen
vs.
NaphCare, Inc.; et al.

Case No.: 3:19-CV-00969-AC



SYNERGY

LEGAL

LITIGATION SUPPORT SERVICES

EXHIBIT 12
Page 1 of 27

Vincent Reyes, MD
Volume II

```
 1              IN THE UNITED STATES DISTRICT COURT
 2           DISTRICT OF OREGON - PORTLAND DIVISION
 3
    TAMMY L. THOMSEN, Personal
 4  Representative of the Estate of
    DALE L. THOMSEN, Deceased,
 5            Plaintiff,
       v.                          No. 3:19-CV-00969-AC
 6  NAPHCARE, INC., an Alabama
    Corporation; WASHINGTON COUNTY,
 7  a government body in the State
    of Oregon; PAT GARRETT, in his
 8  capacity as Sheriff for
    Washington County; ROBERT DAVIS,
 9  an Individual; DON BOHN, an
    Individual; ERIN LARSEN, an
10  Individual; LISA WAGNER, an
    Individual; JULIE RADOSTITZ, MD,
11  an Individual; MELANIE MENEAR,
    an Individual; KATHY DEMENT, an
12  Individual; RACHEL ECLEVIA, an
    Individual; KATIE BLACK, an
13  Individual; ANDREA JILLETTE,
    also known as ANDREA GILLETTE,
14  an Individual; MORGAN HINTHORNE,
    an Individual; RACHEL STICKNEY,
15  an Individual; and JOHN/JANE
    DOES 1-10,
16            Defendants.

17       VIDEOTAPED DEPOSITION OF VINCENT REYES, MD
              Taken in behalf of the Defendants
18                      Volume II
               Monday, November 7, 2022
19
             BE IT REMEMBERED THAT, pursuant to the
20  Federal Rules of Civil Procedure, the videotaped
    deposition of VINCENT REYES, MD, was taken before
21  Kimberly M. Harrison, an Oregon Certified Shorthand
    Reporter, Washington Certified Court Reporter, and
22  Registered Professional Reporter, on Monday, the 7th of
23  November, 2022, at 10:05 a.m., in the law offices of
24  Paulson Coletti, 1022 NW Marshall Street, Suite 450,
25  Portland, Oregon.
```

Vincent Reyes, MD
Volume II

```
 1                        PROCEEDINGS
 2              THE VIDEOGRAPHER:  Here begins the video
 3   recorded deposition of Dr. Vincent Reyes in the matter
 4   of Thomsen versus NaphCare, et al.
 5              Will  counsel  please  state  your  appearances
 6   for the record.
 7              MR. COLETTI:  John Coletti for the
 8   plaintiff.
 9              MS. HOULIHAN:  Meg Houlihan for NaphCare
10   and the individual NaphCare defendants.
11              MS. MANDT:  Heidi Mandt for Washington
12   County.
13              THE VIDEOGRAPHER:  The stenographer will
14   now swear in the witness.
15
16   VINCENT REYES, MD,
17   called as a witness, having first been duly sworn,
18   testified under oath as follows:
19
20                        EXAMINATION
21   BY MS. HOULIHAN:
22        Q    Hi, Dr. Reyes.
23        A    Hello.
24        Q    My name is Meg Houlihan.  We met for the first
25   time briefly off the record just now.
```

EXHIBIT 12
Page 3 of 27

Vincent Reyes, MD
Volume II

1    of the questions that was asked of me last time was

2    that -- where in the record does Tammy Thomsen describe

3    any interaction with the jail system.  And I knew that

4    it had been done a few times, but I didn't know in the

5    records where it was.  So I looked in the exhibit, and I

6    found the details.

7        **Q    About how long did you spend preparing for**

8    **your deposition today?**

9        A    About 28 hours.

10       **Q    And that's just for your continued deposition?**

11       A    Yes.

12       **Q    And I don't want to know the substance of**

13   **these conversations, but did you speak at all with**

14   **Mr. Jones or Mr. Coletti in preparation for today?**

15       A    I did.

16       **Q    About how long were those conversations?**

17       A    Just an hour.  And that was last Tuesday.

18       **Q    Was that an hour of with each of the attorneys**

19   **together?**

20       A    No.  Just with Mr. Coletti.

21       **Q    You have some documents in front of you.**

22   **Could you tell me what you have there?**

23       A    You have -- you were given some of them.  I

24   think that pretty much is it, in different forms.

25                MS. HOULIHAN:  Okay.  Let's go ahead and

EXHIBIT 12
Page 4 of 27

Vincent Reyes, MD
Volume II

1    mark this as Exhibit 5.

2              (Exhibit No. 5 marked.)

3    BY MS. HOULIHAN: (continuing)

4        **Q    I'm marking, as Exhibit 5, the file that your**

5    **attorney prepared and handed me right before this**

6    **deposition.  I'll hand it to you.  And if you could just**

7    **confirm that it contains all the documents you have in**

8    **front of you.**

9        A    Yeah.

10       **Q    So you don't have anything else in front of**

11   **you that is not contained in Exhibit 5?**

12       A    There's a summary of the exhibits.  I made

13   a -- like, a spreadsheet of the exhibits.  That's all.

14       **Q    That's --**

15       A    But it's a spreadsheet of the exhibits.

16       **Q    When you say "exhibits," is that deposition**

17   **exhibits?**

18              MR. COLETTI:  I think he's referencing

19   Exhibit A, that we outline all of the documents that

20   were provided.

21              MS. HOULIHAN:  Okay.  Great.

22              THE WITNESS:  Yeah.  Noth -- nothing new.

23              MS. HOULIHAN:  Let's mark this as

24   Exhibit 6.

25              (Exhibit No. 6 marked.)

Vincent Reyes, MD
Volume II

```
 1        Q     How often do you treat patients going through
 2   alcohol withdrawal?
 3        A     So as the primary provider for them, never,
 4   recently.  However, as a consultant who goes -- who is
 5   asked to go in and evaluate patients who are going
 6   through withdrawal and evaluate their cardiac
 7   conditions, my guess would be five or ten a year.
 8        Q     When you --
 9        A     And I've been in practice for 37 years.
10        Q     So you think you see about five to ten people
11   going through withdrawal, and that's held true for 30
12   years?
13        A     Well, it was actually more when I was in
14   training.  And early on, when I was an assistant
15   professor at Wayne State University, and they had the
16   Detroit Receiving Hospital, which is an inner city -- an
17   inner city hospital, I think I saw more of it then.  But
18   since I've been here in Oregon, I see less of it.  So
19   probably -- maybe five or ten a year since I've been
20   here in Oregon, since 1990.  But prior to that, in my
21   training, I saw at least twice that.
22        Q     Let's focus on the time period that you've
23   been in Oregon, since 1990.  Have you ever diagnosed
24   someone with alcohol withdrawal since 1990?
25        A     As the primary provider, no.  Usually the
```

Vincent Reyes, MD
Volume II

```
 1   examined that person face-to-face?
 2        A    I can't answer it "yes" or "no."  I can answer
 3   it by saying, I do not make diagnoses on patients
 4   without seeing them.  Otherwise, it's a chart diagnosis
 5   that someone else has made.
 6        Q    Okay.  I'm not quite sure if I've gotten an
 7   answer to the question.
 8        A    So the question -- and to make a diagnosis,
 9   you have to go through some medical record history and
10   this thing called a physical exam.  So I don't make
11   diagnoses without doing a physical exam.  And that could
12   just be eyesight.  I don't need -- in the world of
13   COVID, sometimes you don't go and examine the patient,
14   but you -- you observe them, and you get the history
15   from a chart, and you see what they're doing.
16             And there are a number of other things that go
17   into diagnosing a person.  But I would not make that
18   diagnosis -- frankly, most diagnoses without examining
19   the patient, even if it's visual.
20        Q    Okay.  Thank you.
21             Have you ever conducted any research on the
22   effects of alcohol withdrawal on a person's heart?
23        A    No.
24        Q    Have you ever done research, in general, on
25   alcohol withdrawal?
```

Vincent Reyes, MD
Volume II

```
 1        A     No.
 2        Q     Is it fair --
 3        A     So can I ask a question?  Is -- does
 4   "research" mean do I look into the literature, or do I
 5   perform the research?
 6        Q     Perform the research.
 7        A     No.
 8        Q     Is it fair to say that alcohol withdrawal is
 9   not your area of expertise?
10        A     That's correct.
11        Q     You're not an addiction specialist?
12        A     No.
13        Q     I would like to take a look at your initial
14   expert report.  I believe you have that in front of you
15   in Exhibit 5.
16        A     I have this.  It's the same thing.  May --
17   May 16th?
18        Q     Yes.
19        A     Yes.
20        Q     And for the record, this was Exhibit 3 to your
21   original deposition.
22        A     Okay.
23        Q     You state in paragraph --
24             MR. COLETTI:  I'm sorry.  Was that the May
25   report or the March?
```

Vincent Reyes, MD
Volume II

```
 1        A    He was irritable.  He was irritable.

 2        Q    Let me finish my question.

 3        A    Okay.

 4        Q    What symptoms of alcohol withdrawal did

 5   Mr. Thomsen exhibit before 3:30 in the morning on

 6   June 28, 2017?

 7        A    Well, he was -- he was irritable, and he

 8   said -- I think he started to have some of these -- I

 9   think the initial discussion or mention of something in

10   his ear was the day before.

11        Q    Other than mentioning that he had tissue in

12   his ear the day before his death, did he exhibit any

13   other symptoms of alcohol withdrawal?

14        A    I -- I don't think it was real obvious.  The

15   obvious change was the morning of 6/28.  The other --

16   the other discussions or mentions are kind of subtle.

17   So, again, alcohol withdrawal can manifest itself in

18   many ways.  I'm not an expert.  I'm not going to claim

19   to be an expert.  But it wasn't as obvious as the change

20   in his clinical picture at 3:30 in the morning on 6/28.

21        Q    Okay.  I want to be clear.  When you say there

22   were more subtle symptoms, are you referring to anything

23   else other than Mr. Thomsen's report of tissue in his

24   ear?

25        A    He was very irritable.
```

Vincent Reyes, MD
Volume II

1    attributed to alcohol withdrawal?

2         A    Do I know that?

3         Q    Yes.

4         A    I do not know that.

5         Q    Is it possible that his seizures were caused

6    by something other than alcohol withdrawal?

7         A    Yes.

8         Q    You're not a neurologist, right?

9         A    No.

10        Q    You're not here to opine on the cause of

11   Mr. Thomsen's past seizures, right?

12        A    No.

13        Q    I'm looking back at your original report,

14   Exhibit 4.  You still have that in front of you?

15        A    I do.

16        Q    In paragraph 10, you say, "The stress of

17   alcohol withdrawal (the timing of withdrawal symptoms is

18   consistent with how long he had been off alcohol) did

19   create a significant (and documented) rise in blood

20   pressure and heart rate."

21             I want to focus in on what you have in

22   parentheses there, "The timing of withdrawal symptoms is

23   consistent with how long he had been off alcohol."  Do

24   you know when Mr. Thomsen had his last drink?

25        A    I do not.

Vincent Reyes, MD
Volume II

```
 1        Q    Mr. Thomsen was arrested on June 25, 2017,
 2    around 4:30 p.m.; is that right?
 3        A    Correct.
 4        Q    So at the very most -- sorry.  Let me start
 5    over.  So you would agree with me that Mr. Thomsen must
 6    have had his last drink sometime before 4:30 p.m. on
 7    June 25th, right?
 8        A    We can assume that.
 9        Q    You don't know whether that was an hour before
10    his arrest, right?
11        A    I do not know that.
12        Q    You don't know if it was 24 hours before his
13    arrest?
14        A    I do not know that for sure.  However, from
15    his family's account, he drank every day.  So it could
16    have been earlier in the day, during the day, up until
17    the time of his arrest.
18        Q    Do you know what time of day Mr. Thomsen
19    usually drank?
20        A    I do not.
21        Q    Is it possible that he typically drank in the
22    evenings?
23        A    It's possible.
24        Q    And if he drank in the evenings and arrest --
25    was arrested at 4:30 p.m., he might not have had a drink
```

Vincent Reyes, MD
Volume II

```
 1   on June 25th yet, right?
 2        A    It's possible.
 3        Q    So it's possible that he had not had a drink
 4   for at least 24 hours before his arrest, right?
 5        A    Correct.
 6        Q    So when you say in your report that, "The
 7   timing of withdrawal symptoms is consistent with how
 8   long he had been off alcohol," you don't actually know
 9   how long Mr. Thomsen had been off alcohol, right?
10        A    I did not ask him the question.  I went by the
11   history that his family gave, that if he drank every
12   day, it was at the very earliest the 24th, the very
13   latest on the 25th.  And --
14        Q    But back to my question.  You don't know
15   exactly how long he had been off alcohol, right?
16        A    Correct.
17        Q    Are you aware that Mr. Thomsen's arresting
18   officer checked "no" for whether Mr. Thomsen had
19   consumed alcohol in the last 24 to 48 hours?
20        A    He checked -- I think he denied everything.
21   What -- what they put on the form is, it was not a
22   positive, "Yes, he drank alcohol."  So it was a "no."
23        Q    I'm talking about the arresting officer.
24        A    Yeah.
25        Q    There was a question about whether Mr. Thomsen
```

Vincent Reyes, MD
Volume II

```
 1                 Go ahead.
 2                 THE WITNESS:  In general, yes.
 3    BY MS. HOULIHAN: (continuing)
 4         Q    Would you rely on this article for general
 5    information about alcohol withdrawal?
 6         A    Yes.
 7         Q    If you could look at page 3 of Exhibit 8,
 8    please, under the section "Delirium Tremens."
 9         A    Uh-huh.
10         Q    Do you see that?
11         A    Yes.
12         Q    This article states, "Virtually all patients
13    who develop delirium tremens experience some symptoms of
14    minor alcohol withdrawal prior to the onset of delirium
15    tremens."  Do you agree with that statement?
16         A    I do.  Again, I'm not an expert, but I would
17    agree with it.
18         Q    If you could look at page 11 of Exhibit 8,
19    please, under "Summary and Recommendations."  Do you see
20    that?
21         A    Uh-huh.
22         Q    It states, "Dangerous diagnoses can mimic or
23    coexist with alcohol withdrawal.  Alcohol withdrawal
24    remains a clinical diagnosis."  Do you agree with that
25    statement?
```

Vincent Reyes, MD
Volume II

1       Q    So that's a "yes" to my question?
2       A    In certain patient populations, that's
3  correct.
4       Q    Mr. Thomsen had 100 percent occlusion of his
5  left coronary artery, right?
6       A    Correct.
7       Q    He had 70 percent stenosis of his right
8  coronary artery, right?
9       A    Yes.
10       Q    This is a severe condition, right?
11       A    Yes.  But he seemed to -- he was asymptomatic
12  up until that day.
13       Q    So until June 28th, Mr. Thomsen had no
14  symptoms of his severe coronary artery disease, right?
15       A    No.
16       Q    Did he have symptoms?
17       A    Not -- not that I could see.
18       Q    His level of occlusion of his coronary
19  arteries could be fatal, right?
20       A    No.
21       Q    It cannot be fatal?
22       A    Well, if -- he existed with that combination
23  of coronary disease.  It's not -- not clear how long he
24  had that combination of coronary disease.  The LAD and
25  the circumflex, according to the coroner -- or the --

Vincent Reyes, MD
Volume II

1    yeah, the coroner were -- were chronic.  And he had a
2    70 percent proximal RCA stenosis.  We've seen this many,
3    many times.  I've seen it many, many times, where
4    patients can exist and do fine.
5         Q    Back to my question.
6         A    And it's not fatal on its own, as long as you
7    have collaterals.  And if the collaterals from the right
8    to the left are patent, patients do fine.  If, however,
9    the conditions change abruptly -- this is -- this is
10   where we see patients all the time with mild heart
11   attacks, and they have other contributing acute
12   conditions.  It could be stress.  It could be a big
13   workout.  It could be anemia.  It could be an infection.
14   It could be severe dehydration causing hypotension.  It
15   could be a pneumonia.
16              All of these things cause -- cause an acute
17   stress, and they compromise or change the supply-demand
18   ratio of oxygen going to the heart.  So something needs
19   to happen that's a significant change to cause a sudden
20   cardiac death in these patients.
21        Q    But with someone who has 100 percent
22   occlusion --
23        A    Uh-huh.
24        Q    -- of their left anterior artery --
25        A    Uh-huh.

Vincent Reyes, MD
Volume II

```
 1        A     Okay.

 2        Q     -- in your deposition.  I would like to turn

 3   your attention to the second page of Exhibit 11, and I'm

 4   looking at the paragraph that begins, "Mr. Thomsen's

 5   coronary disease was medically treatable."  Do you see

 6   that.

 7        A     I do.

 8        Q     Okay.  You state that, "Had the RCA abruptly

 9   and spontaneously closed, it is likely he would have had

10   a fatal arrhythmic event."  What does "RCA" mean here?

11        A     The right coronary artery.

12        Q     Are you saying that it's possible

13   Mr. Thomsen's right coronary artery could have abruptly

14   and spontaneously closed?

15        A     At any time?

16        Q     Well, what are you saying here in this

17   paragraph?

18        A     What I'm saying is that the rest of his heart,

19   including the areas that were provided -- previously

20   provided circulation, was being provided by the right

21   coronary artery.  Circulation was provided to his heart

22   via the right coronary artery.  And that was his only

23   source of myocardial profusion, because the other two

24   arteries were closed.  So if that artery closed, he

25   would have died -- probably had a sudden cardiac death,
```

Vincent Reyes, MD
Volume II

```
 1    if there was an acute thrombosis of that artery.
 2         Q    You state here also, "The postmortem did
 3    demonstrate a moderate to severe narrowing, but not
 4    occluded RCA stenosis, hence still providing collaterals
 5    to the remainder of the compromised heart."  Are you
 6    characterizing Mr. Thomsen's heart as compromised?
 7         A    At the time of this event, yes.
 8         Q    And "this event," you mean his death?
 9         A    At the time of his death, I believe his
10    circulation to his heart was -- there was a mismatch
11    between the demand and the supply.  The supply was
12    fixed.  The demand was substantial and different than
13    when he was at rest when he came into the facility.
14              So it doesn't mean that the -- the right
15    coronary artery had changed in character or there was a
16    thrombosis to the right coronary artery.  But the
17    ischemia was significant during this event.  Why?
18    Because the demand increased.
19         Q    Would you characterize anyone who has
20    100 percent occlusion of their left coronary artery as
21    having a compromised heart?
22         A    Not as long as there's not -- as long as there
23    are adequate collaterals from the other artery, which in
24    this case there were, it wasn't necessarily compromised.
25         Q    But 100 percent occlusion would still be a
```

EXHIBIT 12
Page 17 of 27

Vincent Reyes, MD
Volume II

```
 1   condition that could be concerning, right?
 2       A    I would -- if it was my heart, I would want it
 3   fixed.
 4       Q    So you say here -- I'm turning to the third
 5   page of your rebuttal report.  You say, "Severe
 6   multivessel coronary disease is treatable, and in
 7   Mr. Thomsen's case, coronary artery bypass is the
 8   standard of care."  Do you think Mr. Thomsen needed
 9   coronary artery bypass surgery?
10       A    I think he needed to have revascularization of
11   all three arteries of his heart -- the LAD, the
12   circumflex, and the RCA.  Bypass surgery, 15 years ago,
13   would have been the stand -- the standard of care in
14   him.  Nowadays, there are multivessel PCI stenting,
15   which has very similar outcomes as bypass surgery.
16            So this is a classic patient, who after a
17   diagnostic angiogram, which he would if -- you know, had
18   he presented at the hospital and been stabilized, a
19   diagnostic coronary angiogram would have been totally
20   indicated, low risk in his case.  And then he would have
21   gone to -- again, as someone who still practices
22   cardiology full-time, he would have been referred to a
23   surgical center -- OHSU, Legacy, St. V's.  And his case
24   would have been presented -- would have been presented
25   to a multidisciplinary committee of doctors, including
```

EXHIBIT 12
Page 18 of 27

Vincent Reyes, MD
Volume II

1   surgeons and interventional cardiologists.

2       Q    Doctor, I'm trying to understand the statement

3   in your report.  You say, "Coronary artery bypass is the

4   standard of care."  Are you saying that Mr. Thomsen

5   needed a coronary artery bypass?

6       A    I -- I think he -- that would have been his

7   best option.

8       Q    And that's because of the level of occlusion

9   of his coronary arteries, right?

10      A    Correct.  He had a left main equivalent, which

11  is the LAD and the circumflex, occluded.  So I think

12  that would have been the best option for him.

13      Q    Coronary artery bypass, that's a surgery,

14  right?

15      A    Yes.

16      Q    That's a serious surgery, right?

17      A    It's a heart surgery.

18      Q    You wouldn't recommend coronary artery bypass

19  surgery unless you thought someone really needed it,

20  right?

21      A    I think if -- if the decision is made to

22  proceed with the coronary artery bypass surgery, it's a

23  very deliberate decision based on a lot of different

24  factors.  So if they needed it, we'd recommend it.

25      Q    And someone would need that because they have

Vincent Reyes, MD
Volume II

 1   an otherwise life-threatening condition?

 2        A    I'm sorry.  Ask the question.

 3        Q    Would someone need coronary artery bypass

 4   surgery because they have an otherwise life-threatening

 5   condition?

 6        A    What do you mean "otherwise"?

 7        Q    That if they don't receive the bypass surgery,

 8   they have a condition that could be fatal?

 9        A    It's a serious condition.  I mean, he

10   obviously -- this fellow existed with this anatomy for

11   who knows how long, and he did fine.  However, with this

12   degree of stress -- for example, if someone is walking

13   around with this anatomy and they had any symptoms at

14   all and I say, "Well, let's do a treadmill on you," and

15   they got on the treadmill and they flunked it miserably

16   and we did an angiogram and found their anatomy, I would

17   say, "You need a bypass surgery or you could die," yes.

18        Q    And you're saying that about Mr. Thomsen,

19   right?  You're saying coronary artery bypass surgery was

20   the standard of care for him, right?

21        A    I think it is the best option for him.  Had

22   he -- he had come into the hospital, been stabilized,

23   had an angiogram, I think he would have -- that would

24   have been the best option for him.

25        Q    Can coronary artery bypass surgery itself be

EXHIBIT 12
Page 20 of 27

Vincent Reyes, MD
Volume II

```
 1        A    Which is May 16th.
 2        Q    -- eight pages.  Yes.
 3        A    Okay.
 4        Q    Turn to the page that starts with "STS Adult
 5   Cardiac Surgery Database."
 6        A    Oh, okay.  I see.  Oh, the short-term risk
 7   calculator?
 8        Q    The calculated risk scores.  Do you see that?
 9        A    Yeah.  It's at the bottom of the page.
10        Q    Are you looking at --
11        A    The risk calculator incorporates -- blah,
12   blah, blah.
13             THE COURT REPORTER:  Sorry.  Doctor, I
14   can't hear you.
15             THE WITNESS:  Oh, sorry.
16   BY MS. HOULIHAN: (continuing)
17        Q    Let me hold up the page that I'm looking at.
18   Are you looking at the one that says "Calculated Risk
19   Scores"?
20        A    Oh, here it is.  Got it.
21        Q    Do you see "Risk of Mortality" there?
22        A    I do.
23        Q    And it lists risk of mortality as
24   .834 percent?
25        A    Correct.
```

Vincent Reyes, MD
Volume II

```
 1        Q    Did you assume all of the lab values that
 2   allowed you to calculate that risk?
 3        A    I think I actually stated -- yeah, I did.  I
 4   assumed a couple of them.
 5        Q    Okay.
 6        A    Like, the renal function was something I
 7   assumed.  But then I went back and revised it.  And
 8   that's why I'm saying it went from 0.8 to 0.5.  Because
 9   his renal function was actually better than the renal
10   function that I assumed.
11        Q    Did you assume a platelet count?
12        A    Yeah.
13        Q    Did you assume the last creatinine level?
14        A    Creatinine, yeah.
15        Q    And I'm apologizing for my pronunciations
16   here.
17             Did you assume a hematocrit level?
18        A    Yes, I did.
19        Q    Okay.  You don't actually know what these
20   levels were, right?
21        A    No.  But when I did know them, I plugged them
22   into the revision.  And it went from the 0.8 to 0.5.
23        Q    Did you ever find out Mr. Thomsen's platelet
24   count?
25        A    I think it was in one of the labs.  I think it
```

EXHIBIT 12
Page 22 of 27

Vincent Reyes, MD
Volume II

1    was in -- I think it was in one of the labs.

2           Q     In his autopsy report?

3           A     No.  They don't do that.

4           Q     Okay.  What labs are you referring to?

5           A     The hospital labs.

6           Q     From the time of his death?

7           A     No.

8           Q     From when?

9           A     They don't -- I think it was OHSU.

10          Q     Was that in 2011?

11          A     Uh-huh.

12          Q     So six years before Mr. Thomsen's death?

13          A     Right.

14          Q     Okay.  And you're assuming that his lab levels

15   remained constant for six years?

16          A     There was no indication anywhere in any record

17   subsequent to that that there was any anemia,

18   thrombocytopenia, neutropenia, infection, or anything

19   that had changed.

20          Q     Back to my question.

21          A     No.

22          Q     You're assuming that they -- that those levels

23   remained constant for six years?

24          A     I -- I did.

25          Q     Okay.  You also list morbidity or mortality as

Vincent Reyes, MD
Volume II

1    report.

2         Q    You didn't --

3         A    But I don't -- I don't remember that,

4    honestly.

5         Q    You didn't see a history of marijuana use in

6    his medical records?

7         A    I don't remember that offhand.

8         Q    Is 100 percent occlusion of the left anterior

9    artery sometimes called "the widow-maker"?

10        A    It is.

11        Q    Is it the most common cause of acute death in

12   the United States?

13             MR. COLETTI:  Object to the form.

14             Go ahead and answer the question.

15             THE WITNESS:  Are you asking if coronary

16   artery disease or the LAD itself?

17   BY MS. HOULIHAN: (continuing)

18        Q    The LAD itself.

19        A    It used to be.

20        Q    When you say, "It used to be," what time frame

21   are you referring to?

22        A    Well, before -- before we started doing

23   complex interventions, like STEMIs, it used to be.

24        Q    So --

25        A    But now patients come in -- and I started the

Vincent Reyes, MD
Volume II

```
 1   STEMI program at Tuality, and I was very much involved
 2   in the STEMI program, in 1994, at St. V's.  But when we
 3   started doing STEMIs, which stands for ST-elevation
 4   myocardial infarction, we would treat the LAD stenosis.
 5   So since then and since the STEMI protocols have been
 6   activated and are so effective, that doesn't happen much
 7   anymore.  Why?  Because we treat them.
 8       Q    Do you know what the most common cause of
 9   acute death in the United States currently is?
10       A    Probably coronary disease.
11       Q    Not -- not necess --
12       A    It's the -- it's the cause of death in a lot
13   of countries.
14       Q    And that's not necessarily occlusion of the
15   LAD, but occlusion of the coronary arteries in general?
16       A    Yes.  And in this -- if I can qualify, that --
17   that has to do more with acute occlusions, acute
18   thrombotic occlusions.  That's not what Mr. Thomsen had.
19   He did not have an acute thrombotic occlusion of the
20   LAD.  He had an occlusion of the LAD and the circumflex,
21   which probably occurred over many years, and he didn't
22   notice it.  He didn't feel it.  He wasn't aware of it.
23   Because the right coronary artery is dominant, clearly
24   defined on the autopsy report, and it provided
25   circulation to the rest of the heart.
```

Vincent Reyes, MD
Volume II

```
 1        Q    But it was narrowing, his right coronary
 2    artery, right?
 3        A    It was.  Do I know if it was narrowing?  I
 4    know it was narrowed.
 5        Q    I would like to turn your attention to
 6    page 3 of Exhibit 11, your rebuttal report.  Again, this
 7    is the May 2022 report.
 8        A    Okay.
 9        Q    And I'm looking at the paragraph that begins,
10    "Severe multivessel coronary disease."
11        A    Yes.
12        Q    And I'm looking towards the bottom of the
13    paragraph, and you say, "The other obvious scenario is
14    he" -- Mr. Thomsen -- "might not have even survived to
15    get to the hospital."  Are you saying here that it's
16    possible that Mr. Thomsen would have died on his way to
17    the hospital on June 28, 2017?
18        A    It's possible.
19        Q    You can't rule it out?
20        A    No.
21        Q    Looking at page 2 of Exhibit 11, you state in
22    the paragraph that begins, "It has been well
23    demonstrated" -- do you see that paragraph?
24        A    Yes.
25        Q    In the middle of the paragraph you say, "Had
```

Vincent Reyes, MD
Volume II

```
 1                      CERTIFICATE
 2          I, Kimberly M. Harrison, an Oregon Certified
 3   Shorthand Reporter, a Washington Certified Court
 4   Reporter, and a Registered Professional Reporter, hereby
 5   certify that VINCENT REYES, MD, personally appeared
 6   before me at the time and place set forth in the caption
 7   hereof; that at said time and place, I reported in
 8   stenotype all testimony adduced and other oral
 9   proceedings had in the foregoing matter; that thereafter
10   my notes were reduced to typewriting under my direction;
11   and the foregoing transcript, pages 1 to 89, both
12   inclusive, constitutes a full, true, and correct record
13   of such testimony adduced and oral proceedings had and
14   of the whole thereof.
               Witness my hand and CSR seal at Portland,
15   Oregon, this 17th day of November, 2022.
16
17
18
19
20   _____
21               Kimberly M. Harrison
22               Oregon CSR No. 12-0423
23                  Expires 9/30/2023
24             Washington CCR No. 3287
25                  Expires 7/13/2023
```

