**Timothy J. Jones**, OSB No. 890654
TIM JONES PC
707 SW Washington St. Ste. 600
Portland, OR 97205
Phone: (503) 374-1414
tim@timjonespc.com

**John M. Coletti**, OSB No. 942740
PAULSON COLETTI TRIAL ATTORNEYS PC
1022 NW Marshall Street, Suite 450
Portland, OR 97209
Phone: (503) 226-6361
john@paulsoncoletti.com

[*Additional counsel listed on signature page*]

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON PORTLAND
DIVISION

| | |
|---|---|
| TAMMY L. THOMSEN, personal representative for the Estate of DALE L. THOMSEN, Deceased,<br><br>                              Plaintiff,<br><br>     v.<br><br>NAPHCARE, INC., an Alabama Corporation; WASHINGTON COUNTY, a government body in the State of Oregon; JULIE RADOSTITZ, MD, an Individual; MELANIE MENEAR, an Individual; KATHY DEMENT, an Individual; RACHEL ECLEVIA, an Individual; KATIE BLACK, an Individual; ANDREA JILLETTE, also known as ANDREA GILLETTE, an Individual; MORGAN HINTHORNE, an Individual; RACHEL STICKNEY, an Individual; and JOHN/JANE DOES 1-10.<br><br>                              Defendants. | Case No.: 3:19-cv-00969-AC<br><br><br><br>**PLAINTIFF'S COMBINED RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS TO EXCLUDE EXPERT REPORTS**<br><br><br>ORAL ARGUMENT REQUESTED |

# TABLE OF CONTENTS

INTRODUCTION AND BACKGROUND ................................................................. 1

    I.    Factual Background ................................................................. 2

    II.    The Parties' Claims and Defenses ......................................... 3

    III.    Parties' Expert Disclosures ................................................... 5

LEGAL STANDARD ............................................................................. 6

ARGUMENT ...................................................................................... 9

    I.    NaphCare improperly seeks to resolve disputes of material facts through its *Daubert* motions. .......................................... 9

    II.    Plaintiff's causation experts should not be excluded. ........... 12

        A.    Dr. Michael Freeman is qualified under Rule 702. ................... 13

        B.    Dr. Stuart Graham is qualified under Rule 702. ...................... 22

        C.    Dr. Vincent Reyes is qualified under Rule 702. ...................... 27

        D.    Dr. Michael Sucher is qualified under Rule 702. ..................... 32

        E.    Dr. Gregory Whitman is qualified under Rule 702. .................. 34

        F.    Bradford Hansen does not offer an opinion on the medical cause of Dale Thomsen's death. ....................................... 36

    III.    Plaintiff's experts are qualified to address the standard of care that applies to NaphCare. .......................................... 38

        A.    The standard of care that applies in the community also applies in the corrections setting. ................................... 39

        B.    Dr. Lori Roscoe is qualified under Rule 702. ......................... 42

        C.    Dr. Reed Paulson is qualified under Rule 702. ....................... 43

    IV.    Defendants' remaining arguments should be rejected. ......... 45

        A.    Plaintiff's experts do not offer inadmissible legal opinions or conclusions. ................................................... 45

        B.    Bradford Hansen may opine on the County's failure to learn from prior deaths in custody. ................................... 48

        C.    Dr. Roscoe's late supplemental disclosure was justified and harmless. ........................................................ 49

CONCLUSION ................................................................................. 52

# TABLE OF AUTHORITIES

## Cases

*Allard v. Baldwin*,
  779 F.3d 768 (8th Cir. 2015) .......................................................................... 40
*Allen v. Hinchman*,
  20 N.E.3d 863 (Ct. App. Ind. Nov. 10, 2014) ................................................ 41
*Allison v. McGhan Med. Grp.*,
  184 F.3d 1300 (11th Cir. 1999) ......................................................... 7, 27, 30
*Allstate Ins. v. Plambeck*,
  2012 WL 12885053 (N.D. Tex. June 26, 2012) ............................................. 22
*Anderson v. Columbia Cty.*,
  2014 WL 8103792 (S.D. Ga. Mar. 31, 2014) ................................................ 41
*Andrews v. Plains All Am. Pipeline, L.P.*,
  2019 WL 6647928 (C.D. Cal. Nov. 22, 2019) ............................................... 51
*Atencio v. Arpaio*,
  2015 WL 11117187 (D. Ariz. Jan. 15, 2015) ................................................ 38
*Ball v. Kootenai Cty.*,
  2016 WL 4974949 (D. Idaho Sept. 16, 2016) ............................................... 40
*Balla v. Idaho*,
  29 F.4th 1019 (9th Cir. 2022) ........................................................................ 40
*Berry v. Baca*,
  379 F.3d 764 (9th Cir. 2004) .......................................................................... 38
*Boykin v. W. Express, Inc.*,
  2015 WL 539423 (S.D.N.Y. Feb. 6, 2015) .................................................... 22
*Burke v. Cty. of Alameda*,
  586 F.3d 725 (9th Cir. 2009) ............................................................................ 5
*C&E Servs., Inc. v. Ashland, Inc.*,
  539 F. Supp. 2d 316 (D.D.C. 2008) ............................................................... 10
*Calva-Cerquira v. United States*,
  281 F. Supp. 2d 279 (D.D.C. 2003) ............................................................... 17
*City of Pomona v. SWM N. Am. Corp.*,
  750 F.3d 1036 (9th Cir. 2014) ....................................................................... 12
*Cloud v. Pfizer*,
  198 F. Supp. 2d 1118 (D. Ariz. 2001) ........................................................... 17
*Coppi v. City of Dana Point*,
  2014 WL 12589639 (C.D. Cal. Feb. 24, 2014) ............................................. 10
*Cotton v. City of Eureka*,
  2010 WL 5154945 (N.D. Cal. Dec. 14, 2010) ............................................... 45
*Cover v. Windsor Surry Co.*,
  2017 WL 9837932 (N.D. Cal. July 24, 2017) ............................................... 34
*Daubert v. Merrell Dow Pharms., Inc.*,
  43 F.3d 1311 (9th Cir. 1995) .......................................................... 6, 8, 12, 17
*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) ................................ passim
*Davenport v. Menard, Inc.*,
  2016 WL 1298636 (D. Wyo. Feb. 9, 2016) ................................................... 21

*Davis v. Mason Cty.*,
   927 F.2d 1473 (9th Cir. 1991) ............................................................ 46, 47, 48
*Dean v. McDonald*,
   2014 WL 585404 (E.D. Cal. Feb. 14, 2014) .................................................. 22
*Doe v. Cutter Biological, Inc.*,
   971 F.2d 375 (9th Cir. 1992) ...................................................................... 31
*Dold v. Snohomish Cty.*,
   2023 WL 123335 (W.D. Wash. Jan. 5, 2023) ................................................ 48
*E. Allen Reeves, Inc. v. Michael Graves & Assocs., Inc.*,
   2015 WL 105825 (D.N.J. Jan. 7, 2015) ........................................................ 18
*Eaves v. United States*,
   2009 WL 3754176 (W.D. Ky. Nov. 5, 2009) .................................................. 18
*Edmo v. Corizon, Inc.*,
   935 F.3d 757 (9th Cir. 2019) ...................................................................... 40
*Farley v. State Farm Mut. Auto Ins. Co.*,
   2019 WL 7987440 (M.D. Fla. Nov. 12, 2019) ................................................ 20
*Fernandez v. Cornelios Trucking Refridgerados SA de CV*,
   2022 WL 2236288 (S.D. Tex. June 22, 2022) ................................................ 20
*Fleck v. Douglass Roofing Co.*,
   2014 WL 11498472 (D. Wyo. Oct. 8, 2014) .................................................. 21
*Fricano v. Lane Cty.*,
   2018 WL 2770643 (D. Or. June 18, 2018) ...................................................... 5
*Frye v. United States*,
   293 F. 1013 (D.C. Cir. 1923) ...................................................................... 21
*GemCap Lending, LLC v. Quarles & Brady, LLP*,
   269 F. Supp. 3d 1007 (C.D. Cal. 2017) ........................................................ 47
*GLF Constr. Corp. v. FEDCON Joint Venture*,
   2019 WL 7423552 (M.D. Fla. Oct. 15, 2019) .................................................. 9
*Gov't of Virgin Islands v. Sampson*,
   94 F. Supp. 2d 639 (D.V.I. 2000) ................................................................ 24
*Grove City Veterinary Serv., LLC v. Charter Practices, Int'l, LLC*,
   2016 WL 1573830 (D. Or. Apr. 19, 2016) .................................................... 50
*Hall v. Baxter Healthcare Corp.*,
   947 F. Supp. 1387 (D. Or. 1996) .............................................................. 6, 7
*Hangarter v. Provident Life & Accident Ins. Co.*,
   373 F.3d 998 (9th Cir. 2004) ...................................................................... 45
*Haro v. Torres*,
   2010 WL 11618180 (Fla Cir. Ct. Sept. 27, 2010) .......................................... 21
*Heard v. Loughney*,
   2017 WL 3328185 (D.N.M. July 11, 2017) .................................................... 21
*Heck v. City of Lake Havasu*,
   2006 WL 2460917 (D. Ariz. Aug. 24, 2006) .................................................. 22
*Henderson v. Ghosh*,
   755 F.3d 559 (7th Cir. 2014) (per curiam) .................................................... 40
*Hill v. Reederei F. Laeisz G.M.B.H., Rostock*,
   435 F.3d 404 (3d Cir. 2006) ...................................................................... 52

*Holbrook v. Lykes Bros., S.S. Co.*,
   80 F.3d 777 (3d Cir. 1996)................................................................................. 31

*Hunt v. Dental Dep't*,
   865 F.2d 198 (9th Cir. 1989)...................................................................... 19, 40

*In re Breast Implant Litig.*,
   11 F. Supp. 2d 1217 (D. Colo. 1998) ................................................................ 19

*In re Juul Labs., Inc. Mktg., Sales Practices & Prods. Liab. Litig.*,
   2022 WL 1814440 (N.D. Cal. June 2, 2022) .................................................... 19

*In re Phenylpropanolamine (PPA) Prod. Liab. Litig.*,
   289 F. Supp. 2d 1230 (W.D. Wash. 2003) .................................................... 8, 20

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales
   Practices, & Prods. Liab. Litig.*, 978 F. Supp. 2d 1053 (C.D. Cal. 2013) ............... 18

*In re Viagra Prods. Liab. Litig.*,
   572 F. Supp. 2d 1071 (D. Minn. 2008) .............................................................. 20

*In re Wright Med. Tech., Inc., Conserve Hip Implant Prods. Liab. Litig.*,
   127 F. Supp. 3d 1306 (N.D. Ga. 2015) .............................................................. 17

*In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*,
   858 F.3d 787 (3d Cir. 2017) .............................................................................. 19

*ity of Oklahoma v. Tuttle*,
   471 U.S. 808, 105 S. Ct. 2427, 85 L. Ed. 2d 791 (1985) .................................. 38

*Jackson v. Parker Hannifin Corp.*, -- F. Supp. 3d --,
   2022 WL 17585278 (S.D. Miss. Dec. 12, 2022)................................................... 9

*Jarrow Formulas, Inc. v. Now Health Grp., Inc.*,
   2012 WL 3186576 (C.D. Cal. Aug. 2, 2012) ...................................................... 51

*Jimenez v. United States*,
   2014 WL 3907773 (W.D. Tex. July 25, 2014) ................................................... 22

*Keener v. United States*,
   181 F.R.D. 639 (D. Mont. 1998).......................................................................... 51

*Kennedy v. Collagen Corp.*,
   161 F.3d 1226 (9th Cir. 1998)............................................................................... 8

*Kumho Tire Co., Ltd. v. Carmichael*,
   526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999) ................................... 7

*Lamer Corp., Inc. v. State Auto. Mut. Ins. Co.*,
   2015 WL 11622488 (W.D. Tex. Dec. 22, 2015).......................................... 1, 10

*Legier and Matterne v. Great Plains Software, Inc.*,
   No. Civ. A. 03-0278, 2005 WL 2037346 (E.D. La. Aug 3, 2005)......................... 26

*Lo v. United States*,
   2022 WL 1014902 (W.D. Wash. Apr. 5, 2022) .................................................. 10

*Luke v. Family Care & Urgent Med. Clinics*,
   323 F. App'x 496 (9th Cir. 2009) ....................................................................... 51

*M.H. v. Cty. of Alameda*,
   2015 WL 54400 (N.D. Cal. Jan. 2, 2015) .......................................................... 46

*McClellan v. I-Flow Corp.*,
   710 F. Supp. 2d 1092 (D. Or. 2010).................................................................. 19

*McCullock v. H.B Fuller Co.*,
   61 F.3d 1038 (2d Cir. 1995)............................................................................... 31

*McDowell v. Brown*,
   392 F.3d 1283 (11th Cir. 2004)......................................................................... 40

*McKendall v. Crown Control Corp.*,
   122 F.3d 803 (9th Cir. 1997)............................................................................. 6

*Moore v. BASF Corp.*,
   2012 WL 6002831 (E.D. La. Nov. 30, 2012)................................................... 26

*Morales v. Anastassiou*,
   2022 WL 17324923 (C.D. Cal. Nov. 29, 2022) ............................................... 40

*Mukhtar v. Cal. State Univ., Hayward*,
   299 F.3d 1053 (9th Cir. 2002)........................................................................... 45

*Pages-Ramirez v. Ramirez-Gonzalez*,
   605 F.3d 109 (1st Cir. 2010) ............................................................................ 31

*Paris v. Conmed Healthcare Mgmt., Inc.*,
   2017 WL 7310079 (D. Or. Nov. 28, 2017) ....................................................... 4

*Patient A v. Vt. Agency of Human Servs.*,
   2015 WL 6449301 (D. Vt. Oct. 23, 2015) ....................................................... 41

*Pope v. McComas*,
   2011 WL 1584200 (W.D. Wash. Apr. 26, 2011) ............................................ 40

*Precision Seed Cleaners v. Country Mut. Ins. Co.*,
   2013 WL 943571 (D. Or. Mar. 11, 2013) ........................................................ 17

*Primiano v. Cook*,
   598 F.3d 558 (9th Cir. 2010)............................................................................. 8

*Raymo v. Sec'y of Health & Human Servs.*,
   2014 WL 1092274 (Fed. Cl. Feb. 24, 2014) ................................................... 26

*Richman v. Sheahan*,
   415 F. Supp. 2d 929 (N.D. Ill. 2006) .............................................................. 47

*Rock v. Arkansas*,
   483 U.S. 44, 107 S. Ct. 2704 97 L. Ed. 2d 37 (1987) ...................................... 8

*Rollins v. Calderon*,
   2019 WL 4544459 (S.D. Tex. May 13, 2019) ................................................. 22

*Salgado v. Gen. Motors Corp.*,
   150 F.3d 735 (7th Cir. 1998).............................................................................. 50

*Schroeder v. Cty. of San Bernardino*,
   2019 WL 3037923 (C.D. Cal. May 7, 2019) ............................................. 25, 31

*Sheffield v. McClean*,
   2013 WL 1088847 (Utah Dist. Ct. Mar. 8, 2013) ........................................... 21

*Shimabukoru v. Ibarra*,
   2012 WL 5207470 (Cal. Ct. App. Oct. 23, 2012), *as modified* (Nov. 13, 2012)...................... 21

*Shipp v. Murphy*,
   9 F.4th 694 (8th Cir. 2021)................................................................................ 43

*Shire Viropharma Inc. v. CSL Behring LLC*,
   2021 WL 1227097 (D. Del. Mar. 31, 2021)..................................................... 10

*Snyder v. Bank of America, N.A.*,
   2020 WL 6462400 (N.D. Cal. Nov. 3, 2020).................................................... 26

*Spiral Direct, Inc., v. Basic Sports Apparel, Inc.*,
   2017 WL 11457208 (M.D. Fla. Apr. 13, 2017) ............................................... 26

*Taylor v. Royal Caribbean Cruises, Ltd.*,
   2019 WL 8362117 (S.D. Fla. Oct. 24, 2019) ......................................................... 22
*Tillman v. C.R. Bard, Inc.*,
   96 F. Supp. 3d 1307 (M.D. Fla. 2015) ................................................................... 21
*Trees v. Ordonez*,
   354 Or. 197, 311 P.3d 858, 855 (2013) .................................................................. 41
*United States v. 14.38 Acres of Land, More or Less Situated in Leflore Cty., Miss.*,
   80 F.3d 1074 (5th Cir. 1996) ............................................................................ 7, 10
*United States v. McCaleb*,
   552 F.3d 1053 (9th Cir. 2009) ................................................................................. 7
*United States v. Onuoha*,
   820 F.3d 1049 (9th Cir. 2016) ............................................................................... 39
*United States v. Sandoval-Mendoza*,
   473 F.3d 645 (9th Cir. 2006) .............................................................................. 8, 12
*Villanueva Carreon v. Gonzales Gamez*,
   2021 WL 3604843 (S.D. Tex. Mar. 24, 2021) ...................................................... 22
*Wanke Cascade Dist. Ltd. v. Forbo Flooring, Inc.*,
   2017 WL 1837862 (D. Or. May 4, 2017) .............................................................. 51
*Watkins v. Telsmith, Inc.*,
   121 F.3d 984 (5th Cir. 1997) ................................................................................... 7
*Wereb v. Maui Cty.*,
   2011 WL 13279150 (D. Haw. Dec. 2, 2011) ........................................................ 34
*White v. Ford Motor Co.*,
   312 F.3d 998 (9th Cir. 2002) ................................................................................... 6
*White v. Kent Med. Ctr., Inc.*,
   61 Wash. App. 163, 810 P.2d 1 (1991) ................................................................. 40
*Yarbrough v. Hunt S. Grp., LLC*,
   2019 WL 4392519 (S.D. Miss. Sept. 12, 2019) ................................................... 19
*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*,
   259 F.3d 1101 (9th Cir. 2001) ............................................................................... 50

## Other Authorities

Christine M. Albert et al., *Triggering of Sudden Death from Cardiac Causes
by Vigorous Exertion*, 343 New England J. Med. 19 (2000) ................................ 16
David E. Bernstein, *The Admissibility of Scientific Evidence After Daubert
v. Merrell Dow Pharmaceuticals, Inc.*, 15 Cardozo L. Rev. 2139 (1994) ............ 19
Elsevier, *Forensic Epidemiology: Principles and Practice* (1st ed. 2016) ................ 13
Hall & Silbergeld, *Reappraising Epidemiology: A Response to Mr. Dore*,
7 Harv. Envt'l L. Rev. 441 (1983) ......................................................................... 14
Obrien et al., S*ociety of Thoracic Surgeons 2018 Adult Cardiac Surgery
Risk Models Part 2—Statistical Methods and Results*,
   Report of the STS Quality Measurement Task Force (2018) ............................... 30
Rebecca Woolington, *Dying Alone: A jail inmate's health spiraled for 7 days
and no one stopped it*, The Oregonian (Apr. 10, 2016, 11:00 AM) ...................... 48
*Reference Guide on Epidemiology*, in Federal Judicial Center,
*Reference Manual on Scientific Evidence* (3d ed. 2011) ................................. 14, 15

Robert S. Hoffman & Gerald L. Weinhouse, *Management of Moderate & Severe Alcohol Withdrawal Syndrome*, UpToDate, Post TW (Ed.), UpToDate, Waltham, MA (2017) ........... 25

Society of Thoracic Surgeons, STS Short-Term Risk Calculator 2018, https://www.sts.org/resources/risk-calculator ............................................................... 28

Society of Thoracic Surgeons, STS Short-Term Risk Calculator, *What You Need to Know*, https://www.sts.org/sites/default/files/STS-2018-Risk-Model-Calculator.pdf ......................... 29

**Rules**

Fed. R. Civ. P. 26(a)(2) ........................................................................................... 49

Fed. R. Civ. P. 37(c)(1) ........................................................................................... 49

Fed. R. Evid. 601 .................................................................................................... 40

Fed. R. Evid. 702 ............................................................................................ passim

Fed. R. Evid. 702, adv. comm. notes (2000) ........................................................ 7, 8

**Treatises**

*Weinstein's Federal Evidence*, § 703 (2017) ............................................................. 18

Plaintiff respectfully offers the following in response to NaphCare's Motion to Exclude Plaintiff's Experts, ECF 232, and Washington County's Joinder and Motion to Exclude Testimony of Plaintiff's Expert Witnesses, ECF 237. Plaintiff's response is supported by the memorandum set forth below and the Declaration of Nadia Dahab ("Dahab Decl."), filed concurrently herewith.

## INTRODUCTION AND BACKGROUND

Plaintiff's claims in this case arise out of the tragic death of Dale Thomsen, who at the time of his death was detained at the Washington County Jail. Complaint ("Compl.") ¶ 1. At that time, NaphCare had contracted with Washington County to provide medical services to jail inmates, including to pretrial detainees. *Id.* ¶¶ 4, 9–16.

Because they are relevant to Defendants' motions, Plaintiff provides a brief summary of her allegations regarding the events that occurred while Dale was detained, and which ultimately led to his sudden cardiac death. Defendants, of course, dispute those allegations. Plaintiff also describes in some detail the nature of her claims against Defendants, and certain defenses that have been raised in response. Plaintiff notes, however, that the issues Defendants present in their motions are evidentiary only; they have not yet filed motions for summary judgment against Plaintiff's claims. To the extent that the pending motions present factual disputes relating to Plaintiff's allegations or the claims she asserts, this Court is not yet in a position to resolve those disputes. *See Lamer Corp., Inc. v. State Auto. Mut. Ins. Co.*, 2015 WL 11622488, at *5 (W.D. Tex. Dec. 22, 2015) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) (*Daubert I*)) (factual disputes are more appropriate resolved "by the trier of fact through cross-examination rather than through exclusion through a *Daubert* motion.).

I.      **Factual Background**

Plaintiff's claims in this case arise out of the tragic death of Dale Thomsen, who at the time of his death was detained at the Washington County Jail.  Compl. ¶ 1.  Between June 25 and June 28, 2017, over the three days that Dale was detained, he was denied access to life-saving medical care.  *Id.* ¶¶ 21–28.  At that time, NaphCare had contracted with Washington County to provide medical services to jail inmates, including to pretrial detainees.  *Id.* ¶¶ 4, 9–16.

Dale was admitted to the Washington County Jail on June 25, 2017.  At the time that he was admitted, he was examined by NaphCare Nurse Kathy Dement, who took his vital signs and noted that he appeared "alert and very talkative," "friendly," and "oriented to time and place and what was going on."  Dahab Decl. ¶ 2, Ex. 1.

After his intake was completed, one of the County's jail deputies, Deputy Adams, took a call at the booking station from Tammy Thomsen, Dale's wife.  Dahab Decl. ¶ 3, Ex. 2 (Adams Depo. at 35:3–13).  Ms. Thomsen informed Deputy Adams that Dale "was going to have withdrawals from alcohol" and that Dale had also "suffered a brain injury."  Adams Depo. at 35:9–13.  Deputy Adams did not pass this information along to medical staff.  Instead, he spoke directly with Dale, who denied that he would experience withdrawals.  Adams Depo. at 38:3–39:7; *id.* at 41:12–17.

The next day, June 26, 2017, Ms. Thomsen appeared in person at the jail and signed a sworn affidavit attesting to her husband's brain damage, history of seizures, and risk of alcohol withdrawal.  Dahab Decl. ¶ 4, Ex. 3.  Again, her affidavit was not provided to medical staff.  Meanwhile, on the same day, Dale made a request for medical attention to address "tissue in [his] ear."  Dahab Decl. ¶ 5, Ex. 4.  Medical staff attempted once to see him, but he was unavailable.  They did not make any further attempts.  *Id.*

Over the course of the next two days, Dale medically decompensated, and by the early morning hours of June 28, 2017, jail staff observed him in a hyperverbal, agitated, anxious, and confused state. Deputy Smith contacted medical about Dale's behavior and altered mental status, noting that Dale was calling him "Jim" and saying things like "tell Debbie I'm going to be late." Dahab Decl. ¶ 5, Ex. 4. That afternoon, Dale was evaluated by NaphCare nurse Katie Black, who took a second set of vital signs. The vital signs were not normal, and Nurse Black observed that Dale was "anxious" and "hyperverbal," later comparing his behavior to someone experiencing dementia or Alzheimer's. Dahab Decl. ¶ 5, Ex. 4. Notwithstanding his abnormal vital signs and altered mental state, no immediate treatment was recommended.

Over the next several hours, Dale's physical behavior became so out of control that he was transported to a holding cell. No further medical examination was conducted by any NaphCare staff at that time. *See* Dahab Decl. ¶ 5, Ex. 4. Once in the holding cell, Dale yelled and banged and kicked the holding cell doors for several hours. Dahab Decl. ¶ 6, Ex. 5. Still, no further medical examination was conducted by any NaphCare staff. *See* Dahab Decl. ¶ 5, Ex. 4. Dale banged and kicked the door until he suffered a cardiac arrest and died. He was found unresponsive in his cell on January 28, 2017, around 12:30 p.m. Dahab Decl. ¶ 6, Ex. 5.

## II.    The Parties' Claims and Defenses

Plaintiff's claims in this case arise under both federal and state law. In her first claim for relief, brought pursuant to 42 U.S.C. § 1983, Plaintiff alleges that certain individual NaphCare and Washington County Defendants were deliberately indifferent to Dale's serious medical needs in several respects, including by failing to call for emergency assistance before or at the time of Dale's death; failing to provide prompt and appropriate medical treatment during the time that Dale was detained at the jail; failing to follow the County's and NaphCare's detoxification program monitoring requirements and other policies and procedures relating to

PAGE 3 – PLAINTIFF'S COMBINED RESPONSE IN OPPOSITION TO DEFENDANTS'
MOTIONS TO EXCLUDE EXPERT REPORTS

alcohol withdrawal; ignoring Dale's obvious symptoms of a serious medical need; and failing to follow nationally recognized jail standards, including staffing standards, for providing minimally adequate medical care in a correctional setting. *See generally* Compl. ¶¶ 31–36.

In her second claim for relief, Plaintiff alleges *Monell* claims against NaphCare and Washington County on the ground that several policies, customs, and practices in place at the Washington County Jail gave rise to the constitutional violation that Dale suffered. Those policies, customs, and practices include, among others, failing to follow, and failing to train employees and corrections officers to follow, standard practices and monitoring guidelines relating to alcohol withdrawal; denying detainees at the jail access to appropriate and necessary medical care; and failing to meet widely accepted community standards of care for medical services. *See generally* Compl. ¶¶ 37–44.

In her third claim for relief, Plaintiff alleges related § 1983 supervisory liability claims against NaphCare, the County, and several of the individual NaphCare Defendants. *See generally* Compl. ¶¶ 45–50. Finally, Plaintiff's fourth and fifth claims for relief allege state-law wrongful death claims grounded on theories of negligence and gross negligence against the NaphCare Defendants and the County. Plaintiff's state-law claims are based on the same conduct as that forming the basis of Plaintiff's constitutional claims.[1] *See generally* Compl. ¶¶ 51–58. In her prayer for relief, Plaintiff requests compensatory, pecuniary, and punitive damages. Compl. at 26–27.

Defendants, for their part, assert several defenses to Plaintiff's claims. They assert that none of the individual Defendants, including NaphCare's nurses, was negligent or deliberately indifferent to Dale's serious medical needs. They assert that none of the customs, policies, or

---

[1]     *See also Paris v. Conmed Healthcare Mgmt., Inc.*, 2017 WL 7310079, at *15 (D. Or. Nov. 28, 2017) (liability under § 1983 gives rise to liability in negligence).

practices created by NaphCare or Washington County (or both) was deliberately indifferent to, or the moving force behind, Dale's death.[2]  They assert that Dale died not of alcohol withdrawal, but of a heart attack; that he did not suffer delirium tremens; and that the seizures he suffered were not related to alcohol.  And, they assert that transfer to the emergency room would not have made a difference, because Dale would have died in any event.

## III.    Parties' Expert Disclosures

Plaintiff has retained several experts in highly relevant specialty fields of expertise to support her claims.  In April 2021, Plaintiff timely produced reports of 16 expert witnesses, including experts relating to jail/correctional operations and safety; correctional management of medical staff; jail and medical staff training regarding health needs of detainees; nursing staff training, standards of care, competence, and supervision; jail-setting medical director training and supervision; emergency treatment; addiction medicine and the effects of delirium tremens; and forensic pathology.  Dahab Decl. ¶ 7.  Plaintiff later informed Defendants that only 11 of the experts they had initially disclosed would be testifying at trial.  Dahab Decl. ¶ 8.

The NaphCare Defendants initially produced reports of 4 expert witnesses relating to neurology, cardiology, emergency medicine, and correctional medicine.  Dahab Decl. ¶ 9.  The NaphCare Defendants did not initially disclose any experts relating to nursing standards of care or training,[3] and, remarkably, never disclosed any experts relating to alcohol withdrawal,

---

[2]     To prevail on a *Monell* claim, a plaintiff must show "that (1) she was deprived of a constitutional right, (2) the entity had a policy or custom evincing its deliberate indifference to the prisoner's constitutional right, and (3) the policy or custom was the moving force behind the constitutional violation."  *Fricano v. Lane Cty.*, 2018 WL 2770643, at *9 (D. Or. June 18, 2018) (citing *Burke v. Cty. of Alameda*, 586 F.3d 725, 734 (9th Cir. 2009)).

[3]     As Plaintiff explains in her Motion to Strike Defendants' Rebuttal Expert Reports, ECF 199, NaphCare produced untimely reports from experts seeking to address the issues of nursing standard of care and the amount of pecuniary damages to which Plaintiff is entitled.  This Court has not yet ruled on that motion.

addiction medicine, forensic pathology, or cause of death.  Dahab Decl. ¶ 9.  The County

produced a report from one expert witness in corrections management.  Dahab Decl. ¶ 10.  The

County has not disclosed any medical experts in this case.  Dahab Decl. ¶ 10.

## LEGAL STANDARD

Federal Rule of Evidence (Rule) 702 governs the admissibility of expert opinions and

testimony.  When either party attempts to offer expert testimony through an expert witness, the

district court "must determine whether the expert witness is qualified and has specialized

knowledge that will assist a trier of fact to understand the evidence or to determine a fact in

issue."  *McKendall v. Crown Control Corp.*, 122 F.3d 803, 805 (9th Cir. 1997) (citing Fed. R.

Evid. 702; *Daubert I*, 509 U.S. at 591), *overruled on other grounds by White v. Ford Motor Co.*,

312 F.3d 998, 1007 (9th Cir. 2002).

Rule 702 provides,

A witness who is qualified as an expert by knowledge, skill, experience, training,
or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help
the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of
the case.

Fed. R. Evid. 702.  In *Daubert I*, the Supreme Court charged district courts with acting as

"gatekeepers" to ensure that scientific testimony and evidence admitted under Rule 702 is both

relevant and reliable.  *Hall v. Baxter Healthcare Corp.*, 947 F. Supp. 1387, 1396 (D. Or. 1996).

The task before this Court, then, is two-pronged.  First, the Court must ensure that the

proposed expert opinion reflects " 'scientific knowledge,; " constitutes " 'good science,' " and

was " 'derived by the scientific method.' "  *Id.* (quoting *Daubert v. Merrell Dow Pharms., Inc.*,

43 F.3d 1311, 1316 (9th Cir. 1995) ("*Daubert II*").  "The requirement that an expert's testimony

pertain to 'scientific knowledge' 'establishes a standard of evidentiary reliability,' *i.e.*, trustworthiness." *Id.* (quoting *Daubert I*, 509 U.S. at 590 & n.9). Second, the Court must ensure that the opinion is "relevant to the task at hand" in that it "logically advances a material aspect of the proposing party's case." *Daubert II*, 43 F.3d at 1315 (quoting *Daubert I*, 509 U.S. at 597). This Court has broad discretion in making those determinations. *United States v. McCaleb*, 552 F.3d 1053, 1060 (9th Cir. 2009). The proponent of the expert testimony bears the burden of establishing its admissibility. *Hall*, 947 F. Supp. at 1395.

Notably, the test of reliability is a flexible one. *Daubert I*, 509 U.S. at 594 ("The inquiry envisioned by Rule 702 is, we emphasize, a flexible one."). As the Supreme Court has explained, the *Daubert* factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of [the expert's] testimony." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 138, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999); *see also Watkins v. Telsmith, Inc.*, 121 F.3d 984, 990–91 (5th Cir. 1997) ("Not every guidepost outlined in *Daubert* will necessarily apply to expert testimony[.]"); *McCaleb*, 552 F.3d at 1060 (same). A district court thus has wide latitude in deciding how to determine reliability, just as it has considerable discretion with respect to the ultimate reliability determination. *Kumho Tire Co.*, 526 U.S. at 152.

The Supreme Court in *Daubert* also made clear, however, that a district court's gatekeeper role "is not intended to supplant the adversary system or the role of the jury." *Allison v. McGhan Med. Grp.*, 184 F.3d 1300, 1311 (11th Cir. 1999); *see also* Fed. R. Evid. 702, adv. comm. notes (2000) (" '[T]he trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system.' " (quoting *United States v. 14.38 Acres of Land, More or Less Situated in Leflore Cty., Miss.*, 80 F.3d 1074, 1078 (5th Cir. 1996)). Thus, under *Daubert*, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the

burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert I*, 509 U.S. at 596 (citing *Rock v. Arkansas*, 483 U.S. 44, 61, 107 S. Ct. 2704 97 L. Ed. 2d 37 (1987)); *see also In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994) ("The grounds for the expert's opinion merely have to be good, they do not have to be perfect."). Under Rule 702, then, "the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702, adv. comm. notes (2000).

For that reason, the Court's inquiry at this stage focuses on the principles and methodology underlying expert opinion testimony; it does not focus on the conclusion the expert generates. *Daubert I*, 509 U.S. at 595. Stated another way, it is neither party's burden to show that any expert's opinion is correct or incorrect; instead, the question is whether the expert's opinion is scientifically reliable. *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) ("'[T]he test under *Daubert* is not the correctness of the expert's conclusions but the soundness of [the expert's] methodology.'" (quoting *Daubert II,* 43 F.3d 1311, 1318 (9th Cir. 1995) (alteration in original)). Thus, a difference in opinion with or between experts is not a basis for exclusion. *In re Phenylpropanolamine (PPA) Prod. Liab. Litig.*, 289 F. Supp. 2d 1230, 1249 (W.D. Wash. 2003) (" 'Judges in jury trials should not exclude expert testimony simply because they disagree with the conclusions of the expert.' " (quoting *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1230–31 (9th Cir. 1998))).

Finally, specifically with respect to medical expert testimony, the Ninth Circuit has held that " '[a] trial court should admit medical expert testimony if physicians would accept it as useful and reliable,' but it need not be conclusive because 'medical knowledge is often uncertain.' " *Primiano*, 598 F.3d at 565 (quoting *United States v. Sandoval-Mendoza*, 473 F.3d 645, 655 (9th Cir. 2006). " 'The human body is complex, etiology is often uncertain, and ethical concerns often prevent double-blind studies calculated to establish statistical proof.' " *Id.* at

656–66 (quoting *Sandoval-Mendoza*, 473 F.3d at 655).  Thus, so long as the foundation is

sufficient, a litigant " 'is entitled to have the jury decide upon [the experts'] credibility, rather

than the judge.' "  *Id.* (quoting *Sandoval-Mendoza*, 473 F.3d at 656).

     With those legal standards in mind, Plaintiff respectfully offers the following response to

Defendants' *Daubert* motions.[4]

## ARGUMENT

**I.**    **NaphCare improperly seeks to resolve disputes of material facts through its *Daubert* motions.**

     NaphCare spends the first nine pages of its argument addressing material disputes of fact

that exist in this case, inviting the Court to resolve those disputes in the context of its *Daubert*

motions.  But the law is clear that "[a] *Daubert* motion is not the proper means by which to

resolve the parties' dispute about material facts."  *GLF Constr. Corp. v. FEDCON Joint Venture*,

2019 WL 7423552, at *4 (M.D. Fla. Oct. 15, 2019).  As the Supreme Court itself explained in

*Daubert I*, the "conventional devices" of summary judgment (Rule 56), or judgment as a matter

of law (Rule 50(a)) are the "appropriate safeguards where the basis of scientific testimony meets

the standards of Rule 702" but the parties dispute the material facts underlying their claims or

defenses.  *Daubert*, 509 U.S. at 596; *see also Jackson v. Parker Hannifin Corp.*, -- F. Supp. 3d --,

2022 WL 17585278, at *7 (S.D. Miss. Dec. 12, 2022) ("[I]n determining the admissibility of

expert testimony, the district court should approach its task 'with proper deference to the jury's

role as the arbiter of disputes between conflicting opinions.  As a general rule, questions relating

to the bases and sources of an expert's opinion affect the weight to be assigned that opinion

---

[4]    Plaintiff attributes the arguments set forth in the Daubert motion filed by Defendants NaphCare, Inc.; Julie Radostitz, MD; Melanie Menear; Kathy Dement; Katie Black; Andrea Gillette; Morgan Hinthorne; and Rachel Stickney ("the NaphCare Defendants") to "NaphCare." Plaintiff notes, however, that Defendant Washington County, through its motion, has joined all of NaphCare's arguments.  County Motion at 2.

rather than its admissibility and should be left for the jury's consideration.' " (quoting *14.38 Acres of Land*, 80 F.3d at 1078) (alteration in original)); *Shire Viropharma Inc. v. CSL Behring LLC*, 2021 WL 1227097, at *28 (D. Del. Mar. 31, 2021) (arguments that turn on the resolution of factual disputes are "not the proper subject of a *Daubert* motion"); *Lamer Corp.*, 2015 WL 11622488, at *5 ("Factual disputes are more appropriately resolved by the trier of fact through cross-examination rather than exclusion under a *Daubert* motion."  (citing *Daubert*, 509 U.S. at 596)); *cf. Lo v. United States*, 2022 WL 1014902, at *2 (W.D. Wash. Apr. 5, 2022) ("A motion *in limine* should not be used to resolve factual disputes, weigh evidence, or as a substitute for a motion for summary judgment."); *Coppi v. City of Dana Point*, 2014 WL 12589639, at *3 (C.D. Cal. Feb. 24, 2014) (citing *C&E Servs., Inc. v. Ashland, Inc.*, 539 F. Supp. 2d 316, 323 (D.D.C. 2008)) (same).  The Court should decline NaphCare's improper invitation to resolve disputes of fact at this juncture.

In all events, NaphCare's arguments on this score lack support in the factual record and thus are not persuasive.  Its assertion that "none of [Plaintiff's] experts have sufficient facts and data to conclude that Thomsen died of alcohol withdrawal or that he would have survived if he had been taken to the hospital earlier" is also simply incorrect.

First, it is not correct to say that no expert can opine "on the timeline for Thomsen's supposed alcohol withdrawal."  Motion at 32.  Dale Thomsen consumed alcohol every day. Dahab Decl. ¶ 12 (Thomsen Depo.) at 11:6–11; 22:24–23:3; 204:12–15 (testifying that Dale drank every day); 127:14–24 (referring to medical histories confirming that Dale drank every day).  So, although the precise time of Dale's last drink cannot be determined from the record,

every expert in this case can reasonably and reliably assume that Dale had at least one drink (and likely more)[5] the day before he was arrested and taken to the Washington County Jail.

Second, it is also incorrect to state that Dale Thomsen's "documented symptoms did not match the typical presentation of alcohol withdrawal."  Motion at 34.  Again, this is a factual dispute that is not appropriately resolved at this stage.  But is also inconsistent with the record; NaphCare staff documented that Dale was anxious and confused.  Dahab Decl. ¶¶ 5, 6.[6]  Jail deputies documented that he was disoriented and hallucinating, Dahab Decl. ¶ 6, and Plaintiff's experts opine that the statements Dale made to the jail deputies also demonstrate that he may have been experiencing audio and visual disturbances, Decl. ¶ 12, Ex. 7 (Bains Depo.) at 94:25–97:10.  What is perhaps most clear is the significant altered mental status that Dale experienced over the course of the 48 hours after he was booked in the Washington County Jail.  These are all symptoms of Dale's acute alcohol withdrawal, and later delirium tremens, that ultimately led to his sudden cardiac death.  Bains Depo. at 65:9–13.[7]

And third, NaphCare's assertion that Dale was not "diagnosed" with withdrawal seizures or delirium tremens before 2017 is not particularly relevant.  Whether or not Dale had previously been diagnosed with withdrawal-related seizures does not change what he experienced at the

---

[5]     Tammy Thomsen testified that Dale drank four to six 16-ounce beers every day. Thomsen Depo. at 22:22–23:3.

[6]     When they provided medical care to him.  It's difficult to prove documented symptoms of alcohol withdrawal when the claims arise out of Naphcare's wholesale failure to provide (and therefore document) the treatment that Dale's condition needed.

[7]     NaphCare's repeated references to Dale's diagnosis with coronary artery disease (*i.e.*, the "widow maker") are misleading.  NaphCare Motion at 1, 9, 10, 36.  Dale Thomsen's autopsy report does not list his cause of death as a "heart attack."  *But see* Motion at 9 (implying the opposite).  And although it does identify his cause of death as coronary artery disease, all of the parties' experts make clear that this was a chronic condition that existed over a period of years. Dahab Decl. ¶ 13 (Korngold Rep. at 2); Dahab Decl. ¶ 14 (Reyes Depo.) at 55:13–56:20.  It is "not fatal on its own"; generally, even in a person with coronary artery disease, an acute change in condition (*e.g.*, the prolonged physical exertion that Dale experienced at the Washington County Jail) is what precipitates a cardiac arrest.  Reyes Depo. at 55:13–56:20.

Washington County Jail during his incarceration in June 2017.  And Plaintiff's experts certainly

do not "falsely assert" that Dale had a history of withdrawal seizures and delirium tremens; they

offer their expert opinion based on their qualifications, expertise, experience, and extensive

review of Dale Thomsen's records.  That NaphCare disagrees with their opinions is not a basis

on which to exclude them.  *See City of Pomona v. SWM N. Am. Corp.*, 750 F.3d 1036, 1049 (9th

Cir. 2014) ("A factual dispute is best settled by a battle of the experts before the fact finder, not

by judicial fiat.  Where two credible experts disagree, it is the job of the fact finder, not the trial

court, to determine which source is more credible and reliable." (citing *Sandoval–Mendoza*, 472

F.3d at 654)).

## II.      Plaintiff's causation experts should not be excluded.

Defendants begin by seeking to exclude wholesale all of Plaintiff's experts to the extent

that they offer opinions on Dale Thomsen's cause of death.  In Defendants' view, those

experts—who collectively offer 150 years of experience in the fields of epidemiology, anatomic

and clinical pathology, cardiology, neurology, and addiction medicine—are not qualified to

conclude that Dale suffered a sudden cardiac death while he was in their custody and care.  To

bolster their arguments, they launch unnecessarily inflammatory attacks against each and every

one of those experts, contending that they are either unqualified or unreliable (or both) because

of, among other things, the communities they serve, the way they cite their sources, and the

buildings in which they work.

Plaintiff urges the Court to reject Defendants' arguments and instead apply the legal

standard that Rule 702 requires.  Under Rule 702, this Court is charged with assessing whether

Plaintiff's experts are qualified to opine on the issues this case presents; that is whether the

opinions they offer are (1) reliable, and (2) relevant to the task at hand.  *Daubert II*, 43 F.3d at

1315.  A careful review of the record, applying that *legal* standard, reveals that none of

Plaintiff's experts should be excluded for their opinions on Dale Thomsen's cause of death.

### A.    Dr. Michael Freeman is qualified under Rule 702.

Dr. Michael Freeman is an epidemiologist.  He holds several academic degrees, including

a Doctor of Medicine from Umeå University of Sweden, a Ph. D. in public health and

epidemiology from Oregon State University, a Master of Public Health (MPH) in epidemiology

and biostatistics, also from Oregon State University, and a Master of Forensic Medical Studies

(MScFMS) from the Academy of Forensic Medical Studies in the United Kingdom.  He has

completed a two-year post-doctoral fellowship in forensic pathology at Umeå University, and he

is a fellow of the Pathology Section of the American Academy of Forensic Sciences (AAFS) and

the American College of Epidemiology (ACE).  He has also published, among other things,

approximately 220 scientific, peer-reviewed papers, abstracts, book chapters, and books,

including the recent text for Elsevier, *Forensic Epidemiology: Principles and Practice* (1st ed.

2016).  Several of those papers address triggers for cardiopulmonary arrest.  Dahab Decl. ¶ 15

(Freeman Depo.) at 27:13–22 (describing "[a]t least as half a dozen" peer-reviewed publications

involving the triggers of cardiopulmonary arrest).

In this case, Dr. Freeman offers an expert opinion addressing the cause of Dale

Thomsen's death, specifically as it relates to Dale Thomsen's increased risk of sudden cardiac

death associated with physical exertion.  Freeman Rep. at 1.[8]  In preparing his report, Dr.

Freeman reviewed, among other things, Dale Thomsen's autopsy report, his medical records, and

other historical records relating to the circumstances of Dale Thomsen's incarceration in the

Washington County Jail.  *See* Freeman Rep. at 5–6 (listing material reviewed).  He concludes,

---

[8]      Dr. Freeman's expert report is attached as Exhibit 18 to the Declaration of Megan K.
Houlihan ("Houlihan Declaration"), ECF 233.

based on a review of those materials and "a literature review and research regarding

epidemiologic evidence regarding risk factors for sudden cardiac death in men like Mr.

Thomsen," that Dale Thomsen died of a cardiopulmonary arrest leading to his sudden cardiac

death.  Freeman Rep. at 1, 7.  Based on that, he opines that Dale Thomsen "was at approximately

17 times greater risk of [sudden cardiac death] because of the combination of the emotional and

physiological effects of his alcohol withdrawal symptoms, combined with the physical exertion

he engaged in during the hours prior to his death."  Freeman Rep. at 9.

"Epidemiology is the field of public health and medicine that studies the incidence,

distribution, and etiology of disease in human populations." *Reference Guide on Epidemiology*,

in Federal Judicial Center, *Reference Manual on Scientific Evidence*, 551 (3d ed. 2011)

("*Reference Guide*").  It "focuses on the question of general causation (*i.e.*, is the agent capable

of causing disease) rather than that of specific causation (*i.e.*, did it cause disease in a particular

individual)." *Id.* at 552.  Stated another way, epidemiology focuses on associations; "assessing

whether an association is causal requires an understanding of the strengths and weaknesses of the

study's design and implementation, as well as a judgment about how the study findings fit with

other scientific knowledge." *Id.* at 552–53;[9] *see also* Hall & Silbergeld, *Reappraising*

*Epidemiology: A Response to Mr. Dore*, 7 Harv. Envt'l L. Rev. 441, 443 (1983) ("An

epidemiological study reveals the correlation between some factor and a significant excess in the

---

[9]     NaphCare complains that Dr. Freeman "is not a medical doctor and has no expertise in alcohol withdrawal.  He has never published any articles on alcohol withdrawal or delirium tremens.  He has never observed anyone going through alcohol withdrawal in a clinical setting or assessed someone using a CIWA scale."  Motion at 40.  That is true—so far as it goes—but it is irrelevant.  Dr. Freeman does not here, and has not elsewhere, held himself out as a medical doctor, a clinician, or an expert in alcohol withdrawal or delirium tremens.  That is the not the purpose for which his expert opinion has been offered in this case.

number of deaths or injury above that which would otherwise have occurred—that is, above normal background levels.").[10]

This is what Dr. Freeman's opinion seeks to do. As he explains in his report, Dr. Freeman's opinion and conclusion is that Dale Thomsen "was at approximately 17 times greater risk of [sudden cardiac death] because of the combination of the emotional and physiologic effects of his alcohol withdrawal symptoms, combined with the physical exertion he engaged in during the hours prior to his death." Freeman Rep. at 9. This is a conclusion of general, not specific, causation.

Dr. Freeman goes on to state that Dale Thomsen's "[r]elative risk of 16.9 indicates that 15.9 out of 16.9 (94%) of the explanations for [his sudden cardiac death] was his pre-mortem exertions, and ignoring the additive effects of his abnormal vital signs and emotional upset." Freeman Rep. at 9 n.a. In other words, he concludes that "there is a >94% probability that [Dale Thomsen] would not have died at the same time." *Id.* Again, this is a conclusion of general, not specific, causation.

---

[10]    The *Reference Guide* goes on to explain,

> Epidemiology is concerned with the incidence of disease in populations, and epidemiologic studies do not address the question of the cause of an individual's disease. This question, often referred to as specific causation, is beyond the domain of the science of epidemiology. Epidemiology has its limits at the point where an inference is made that the relationship between an agent and a disease is causal (general causation) and where the magnitude of excess risk attributable to the agent has been determined; that is, epidemiologists investigate whether an agent can cause a disease, not whether an agent did cause a specific plaintiff's disease.

> Nevertheless, . . . . numerous cases have confronted the legal question of what is acceptable proof of specific causation and the role that epidemiologic evidence plays in answering that question.

*Reference Guide* at 608–09.

To support his conclusions, Dr. Freeman notes, consistent with established methodology, the competing explanations for Dale Thomsen's sudden cardiac death by reference to the incidence of sudden cardiac death "in the general population like Mr. Thomsen." Freeman Rep. at 9. This can reasonably be stated by considering the "annual incidence of [sudden cardiac death] in men aged 55-64 years old."[11] Although NaphCare seeks to undermine Dr. Freeman's use of this general population study by highlighting the "different risk factors for sudden cardiac death" that the men in the study may have had, Motion at 42, that is not relevant—as Dr. Freeman explains, regardless of risk factors, the study is not a "risk factor study," but a "trigger study" used to assess the triggering of sudden cardiac death in a comparable group. *See* Christine M. Albert et al., *Triggering of Sudden Death from Cardiac Causes by Vigorous Exertion*, 343 New England J. Med. 19 (2000). Dr. Freeman used the study to formulate an opinion about Dale Thomsen's increased risk of suffering a sudden cardiac death in light of the triggers he experienced immediately before the event. Freeman Depo. at 37:9–15:38:10–18; 57:11–16; *see also* Freeman Rep. at 7 ("The purpose of [Dr. Freeman's] analysis is to provide an estimate of Mr. Thomsen's risk of SCD given the vigorous physical exertion and emotional stress that preceded it, versus the SCD risk, at the same point in time, but in the absence of such stress and exertion."). As he explained in his deposition, this was methodologically sound, and well within the limits of epidemiology.

This Court's caselaw allows Plaintiff to offer Dr. Freeman's epidemiologic opinion for the purposes of establishing the likely cause of Dale Thomsen's death. In the Ninth Circuit, "[f]or an epidemiological study to show causation under a preponderance standard, the relative risk of [the harm caused] arising from the epidemiological data . . . will, at a minimum, have to

---

[11]    Dale Thomsen was 58 years old when he died at the Washington County Jail.

exceed 2." *Daubert II*, 43 F.3d at 1321.  Again, Dr. Freeman's analysis shows that the relative

risk that Dale Thomsen suffered a sudden cardiac death as a result of the triggering events he

experienced at the Washington County Jail was 17 times greater than it would have been at the

same time, and in the absence of those events.  This is sufficient epidemiologic evidence of

causation.  *See Cloud v. Pfizer*, 198 F. Supp. 2d 1118, 1134 (D. Ariz. 2001) (citing *Daubert II*,

43 F.3d at 1321).

To be clear, Dr. Freeman does not seek to diagnose Dale with alcohol withdrawal; that is

beyond the scope of Dr. Freeman's expertise.  Freeman Depo. at 33:1–6; 33:14–20: 38:19–39:1;

*see also supra* n. 4.  Nonetheless, NaphCare complains that Dr. Freeman's expert opinion must

be excluded entirely because, in NaphCare's view, Dr. Freeman "depends entirely on other

experts to diagnose Thomsen with alcohol withdrawal."  Motion at 40.  But that is not a basis on

which to exclude an expert, particularly one who is not offered for the purposes of making an

alcohol withdrawal diagnosis.

Under Rule 703, an expert may rely on the opinions or conclusions of other experts if the

expert, in his or her respective field, would reasonably rely on other experts' opinions.  *Precision

Seed Cleaners v. Country Mut. Ins. Co.*, 2013 WL 943571, at *6 (D. Or. Mar. 11, 2013)

("Experts are permitted to rely on hearsay, including the opinions of other experts, if proper

foundation is laid that others in the field would likewise rely on them." (internal quotation marks

omitted)); *see also Calva-Cerquira v. United States*, 281 F. Supp. 2d 279, 300 (D.D.C. 2003)

(holding that experts may rely on the opinions of other experts); *In re Wright Med. Tech., Inc.,

Conserve Hip Implant Prods. Liab. Litig.*, 127 F. Supp. 3d 1306, 1320 (N.D. Ga. 2015) (same).

District courts in the Ninth Circuit have further explained that

> expert opinions may find a basis in part on what a different expert believes on the
> basis of expert knowledge not possessed by the first expert.  Indeed, this is
> common in technical fields.  For example, a physician may rely for a diagnosis on

an x-ray taken by a radiologist, even though the physician is not an expert in
radiology.

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.*,
978 F. Supp. 2d 1053, 1066 (C.D. Cal. 2013) (quotation marks, citation, and brackets omitted).[12]
Of course, "[w]here the soundness of the underlying expert judgment is in issue, the testifying
expert cannot merely act as a conduit for the underlying expert's opinion. *Id.* (internal quotation
marks omitted).

Through his expert report, Dr. Freeman does not seek to diagnose Dale Thomsen with
alcohol withdrawal; he seeks instead to opine about Dale Thomsen's relative risk of suffering
cardiopulmonary arrest leading to sudden cardiac death. Thus, contrary to NaphCare's
suggestion, Dr. Freeman is not "simply . . . bas[ing] his opinion on the opinions of others."
Motion at 40.[13] Quite the opposite—he has formulated an independent opinion, based on
reliable methodology and relevant medical and historical records, about Dale Thomsen's
increased risk of suffering a sudden cardiac death in the circumstances in which he was placed in
the Washington County Jail.

NaphCare also argues that Dr. Freeman's opinion must be excluded as unreliable because
he "dispens[ed] with the Hill criteria and evaluat[ed] Thomsen's cause of death based on gut
instinct." Motion at 43. This, again, is untrue. As Dr. Freeman explained in his deposition,

---

[12]    *See also E. Allen Reeves, Inc. v. Michael Graves & Assocs., Inc.*, 2015 WL 105825, at *5
(D.N.J. Jan. 7, 2015) ("An expert . . . may rely on the opinion of another expert in formulating
his or her opinion."); *Eaves v. United States*, 2009 WL 3754176, at *9 (W.D. Ky. Nov. 5, 2009)
(denying motion to preclude expert testimony because experts may rely upon the opinions of
other experts); *Weinstein's Federal Evidence*, § 703.04[3] (2017) (Rule 703 permits experts to
rely on "[o]pinions of other experts") (citing cases).
[13]    In this respect, NaphCare's motion is confusing and somewhat misleading. Dr. Freeman
does not "offer an opinion that alcohol withdrawal caused Thomsen's death." Motion at 41.
NaphCare's argument to the contrary turns Dr. Freeman's report into something that it's not, and
seeks to exclude the report on a ground that, frankly, does not make sense.

application of the so-called "Bradford Hill criteria"[14] generally is unnecessary where the causal

relationship between the triggering event and the injury are well established.  Freeman Depo. at

53:1–15.

That is consistent with the purpose the Hill criteria are intended to serve.  "The Bradford

Hill criteria are metrics that epidemiologists use to distinguish a causal connection from a mere

association."  *In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*, 858 F.3d 787, 795 (3d

Cir. 2017); *McClellan v. I-Flow Corp.*, 710 F. Supp. 2d 1092, 1133 n.29 (D. Or. 2010) (Bradford

Hill criteria are "nine factors . . . generally employed by researchers when determining whether

an association reflects a true cause-effect relationship").  In applying the criteria, an

epidemiologist begins with an epidemiological association and then applies nine metrics to

determine whether the association is causal.  *In re Breast Implant Litig.*, 11 F. Supp. 2d 1217,

1234 (D. Colo. 1998).[15]

But courts have also held that reliance and application on the Bradford Hill criteria is

unnecessary where the connection between the triggering event and the harm is clear.  *See, e.g.*,

*Yarbrough v. Hunt S. Grp., LLC*, 2019 WL 4392519, at *4 (S.D. Miss. Sept. 12, 2019)

(application of the Hill criteria unnecessary "insofar as general causation is concerned" where

causal connection is established through other sources); *see also In re Juul Labs., Inc. Mktg.,*

*Sales Practices & Prods. Liab. Litig.*, 2022 WL 1814440, at *33 (N.D. Cal. June 2, 2022)

(application of Hill criteria "does not appear necessary" where causal connection otherwise

---

[14]     The Bradford Hill criteria derive from a 1965 lecture by British epidemiologist and
statistician, Sir Austin Bradford Hill.  *See* David E. Bernstein, *The Admissibility of Scientific*
*Evidence After Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 15 Cardozo L. Rev. 2139, 2167
(1994) ("In a celebrated lecture in 1965, Sir Austin Bradford Hill proposed nine criteria to aid
scientists in deciding whether a reported association in an epidemiological study is causal.").
[15]     The metrics include strength of the association, consistency, specificity, temporality,
coherence, biological gradient, plausibility, experimental evidence, and analogy.  *In re Zoloft*
*(Sertraline Hydrochloride) Prods. Liab. Litig.*, 858 F.3d at 795.

established); *cf. In re Viagra Prods. Liab. Litig.*, 572 F. Supp. 2d. 1071, 1081 (D. Minn. 2008)

(finding Hill criteria helpful but rejecting the suggestion that "failure to satisfy those criteria

provides independent grounds for granting [a] *Daubert* motion"); *In re PPA Prods. Liab. Litig.*,

289 F. Supp. 2d at 1243 n.13 (finding the Hill criteria neither "necessary [n]or helpful" in

considering reliability under *Daubert*).

Dr. Freeman explained in his deposition that applying the Hill criteria is unnecessary to

determine whether a trigger like the one Dale Thomsen experienced caused his sudden cardiac

death, because the causal connection is already well established.  Freeman Depo. at 53:3–11

(Hill criteria unnecessary where causal relationship is not "new or novel" and instead is "well-

established").  This, again, makes sense in light of the purposes the Hill criteria are intended to

serve, is methodologically sound, and is not a ground on which to exclude Dr. Freeman's

testimony.  At best, it is a basis for cross-examination at trial.  *See Daubert I*, 509 U.S. at 596.

Finally, NaphCare suggests that Dr. Freeman's opinion in this case *must* be unreliable

because other courts have excluded him from "offer[ing] a medical opinion" in other cases.

Motion at 45–46.  NaphCare's argument here suffers several flaws.

First, Dr. Freeman does not offer a medical cause-of-death opinion in this case.  Court

orders concluding that he is not qualified to do so are therefore irrelevant.

Second, NaphCare's list of cases requires additional context, as many of the cases do not

stand for the proposition that NaphCare attributes to them.  Additional context is provided below.

| Case | Holding |
|---|---|
| *Fernandez v. Cornelios Trucking Refridgerados SA de CV*, 2022 WL 2236288 (S.D. Tex. June 22, 2022) | Excluding Dr. Freeman's opinion on relevance grounds.  The court did not conclude that Dr. Freeman was not qualified to offer an opinion on general or specific causation. |
| *Farley v. State Farm Mut. Auto Ins. Co.*, 2019 WL 7987440 (M.D. Fla. Nov. 12, 2019) | Excluding, without explanation, Dr. Freeman's assessment of the plaintiff's medical condition and application of the |

| | plaintiff's condition to epidemiological causation theories.  The court did not state that Dr. Freeman was not qualified to offer an opinion. |
|---|---|
| *Heard v. Loughney*, 2017 WL 3328185 (D.N.M. July 11, 2017) | Excluding Dr. Freeman's testimony on the ground that it was untimely and not qualified as a biomedical engineer.  The court did not conclude that Dr. Freeman was not qualified to offer an opinion on general or specific causation. |
| *Davenport v. Menard, Inc.*, 2016 WL 1298636 (D. Wyo. Feb. 9, 2016) | *Allowing* Dr. Freeman to testify on general causation, but not specific causation, and finding him qualified and reliable. |
| *Tillman v. C.R. Bard, Inc.*, 96 F. Supp. 3d 1307 (M.D. Fla. 2015) | *Allowing* Dr. Freeman to testify on the comparative failure rate of the defendant's medical device, but not on the appropriate corporate response to medical device failure. |
| *Fleck v. Douglass Roofing Co.*, 2014 WL 11498472 (D. Wyo. Oct. 8, 2014) | *Allowing* Dr. Freeman to testify on general causation, but not specific causation, and finding him qualified and reliable. |
| *Shimabukoru v. Ibarra*, 2012 WL 5207470 (Cal. Ct. App. Oct. 23, 2012), *as modified* (Nov. 13, 2012) | On appeal, holding that the trial court did not abuse its discretion in excluding Dr. Freeman's testimony because he did not explain how the accident caused the plaintiff's injuries. |
| *Haro v. Torres*, 2010 WL 11618180 (Fla Cir. Ct. Sept. 27, 2010) | Applying the narrower *Frye* test,[16] which the U.S. Supreme Court overruled in *Daubert I*, to exclude Dr. Freeman's testimony. |
| *Sheffield v. McClean*, 2013 WL 1088847 (Utah Dist. Ct. Mar. 8, 2013) | Excluding without any explanation. |

As shown above, the federal courts in *Davenport*, *Tillman*, and *Fleck* all found Dr. Freeman

qualified and reliable and allowed him to testify on matters of general causation.

Third, NaphCare suggests that this court "may be in the minority" if it admits Dr.

Freeman's opinions in this case.  This statement lacks factual support.  Just as in *Davenport*,

*Tillman*, and *Fleck*, many other courts have concluded that Dr. Freeman is qualified and reliable

and should be allowed to offer an expert opinion.  *See, e.g.*, *Villanueva Carreon v. Gonzales*

---

[16]     *See generally Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923).

*Gamez*, 2021 WL 3604843, at *3 (S.D. Tex. Mar. 24, 2021); *Taylor v. Royal Caribbean Cruises, Ltd.*, 2019 WL 8362117 (S.D. Fla. Oct. 24, 2019); *Rollins v. Calderon*, 2019 WL 4544459, at *5 (S.D. Tex. May 13, 2019); *Boykin v. W. Express, Inc.*, 2015 WL 539423 (S.D.N.Y. Feb. 6, 2015); *Jimenez v. United States*, 2014 WL 3907773, at *1 (W.D. Tex. July 25, 2014); *Allstate Ins. v. Plambeck*, 2012 WL 12885053, at *3 (N.D. Tex. June 26, 2012).

\* \* \* \* \*

For the foregoing reasons, Dr. Freeman is qualified to offer an opinion in this case about Dale Thomsen's cause of death. And his opinions are also "relevant to the task at hand," in that they "logically advanc[e] a material aspect" of Plaintiff's case—they identify the event that more likely than not triggered Dale Thomsen's sudden cardiac death. *See Daubert II*, 43 F.3d at 1315 (quoting *Daubert I*, 509 U.S. at 597). Because Dr. Freeman offers relevant opinions about Dale's cause of death that would be a helpful to the jury in this case, his opinions should not be excluded.

### B.    Dr. Stuart Graham is qualified under Rule 702.

Dr. Stuart Graham is board certified in anatomic and clinical pathology with subspeciality certifications in forensic pathology and cytopathology. Dahab Decl. ¶ 16 (Graham Curriculum Vitae) at 2. He has maintained a forensic pathology practice since 1981, and in 2001 worked in the New York City Office of Chief Medical Examiner, where he worked as medical examiner during the 9/11 World Trade Center disaster. *Id.* at 3.[17] Throughout his career, Dr. Graham has performed approximately 2500 forensic autopsies, Dahab Decl. ¶ 17 (Graham Depo.) at 11:22–23, and in hundreds of those has diagnosed chronic ethanol abuse, or

---

[17]    "Forensic pathologists look at deaths that are of interest in the legal system." *Dean v. McDonald*, 2014 WL 585404, at *42 (E.D. Cal. Feb. 14, 2014); *see also Heck v. City of Lake Havasu*, 2006 WL 2460917, at *8 n.3 (D. Ariz. Aug. 24, 2006) (Forensic pathology is "the branch of medicine used for legal purposes and concerned with determining cause of death." (internal quotation marks omitted)).

alcoholism, as the cause of death. Graham Depo. at 11:24–12:1. With that experience, Dr.

Graham is very familiar with the physical signs that commonly are associated with chronic

alcohol abuse. *See* Graham Depo. at 12:2–14:20.[18]

Dr. Graham concluded, based on his extensive review of Dale Thomsen's medical

records and the circumstances giving rise to this death, that "the cause of Dale Thomsen's death

was his undiagnosed and untreated alcohol withdrawal while at the Washington County Jail."

Graham Rep. at 25. In reaching that conclusion, Graham undertook the following analysis:

- He reviewed Dale's medical records, noting his chronic seizure disorder and his prior diagnosis with chronic alcoholism. Graham Rep. at 3.[19] He also reviewed the records relating to Dale's booking into the Washington County Jail on June 25, 2017, including the reports that Tammy Thomsen made to the Jail relating to his alcoholism and Dale's behavior over the course of the next 48 or more hours. Graham Rep at 3, 5–10.

- He reviewed the autopsy report, noting the information that it did and did not include, and the toxicology analysis performed by the Oregon Department of State Police Forensic Laboratory. Graham Rep. at 10–11.

- He reviewed and explained alcohol withdrawal syndrome, including its rate of occurrence, pathophysiology, and complications that occur during withdrawal. He noted, importantly, that cessation of alcohol results in unregulated excitation and facilitates withdrawal syndrome, and that withdrawal-associated seizures generally occur within 12 to 48 hours after the person's last alcoholic drink. He then reviewed the rate of occurrence, risk factors, and symptoms of delirium tremens, which is experienced by approximately 5 percent of patients who undergo withdrawal from alcohol. Graham Rep. at 12–15, 16–17.

- He applied the Prediction of Alcohol Withdrawal Severity Scale (PAWSS), which is "the best predictor for clinically significant alcohol withdrawal." "A PAWSS score greater than or equal to four suggests a high risk for moderate to severe alcohol withdrawal syndrome and necessitates consideration of prophylaxis and treatment." Graham Rep. at 16. He observed that Dale Thomsen had at least five of the seven risk factors for delirium tremens and a PAWSS score of "at least four." Graham Rep. at 18–19.

---

[18]     Dr. Graham explained that those physical signs include enlargement of the liver, fibrosis, fatty deposits in the liver, enlargement of the heart, focal scarring in the heart, cerebral atrophy, and other neuropathologic conditions. Graham Depo. at 12:16–23; 14:8–11.

[19]     Dr. Graham's initial and rebuttal reports are attached as Exhibits 19 and 20 to the Houlihan Declaration.

- Based on his review of records in this case, he observed that "[a]pproximately 59 hours following his arrest, Dale exhibit[ed] unequivocal symptoms and signs of [delirium tremens]." Graham Rep. at 19. "Despite having certain [delirium tremens] (and contrary to basic treatment guidelines), Dale was not transferred to a nearby medical facility so that he could receive IV hydration and sedation with benzodiazepines, and frequent medical assessment with recording his vital signs." Graham Rep. at 20.

- Also based on his review, he observed that "[t]he severity of coronary atherosclerotic disease at autopsy with 70% stenosis of the right coronary artery and occlusion of the left anterior descending and obtuse marginal coronary arteries places Dale at a heightened risk for cardiac dysrhythmia when subjected to unrelating physiologic stress associated with his [delirium tremens] following his arrest and deprivation of medical therapy." Graham Rep. at 21.

Based on those observations, among many others, Dr. Graham concluded that,

> Based upon the autopsy report and all available medical records, Dale suffered no disease or injuries to the brain, heart, liver or kidneys which would have shortened his life other than his atherosclerotic coronary artery disease, a disease which is routinely treated successfully in a 58 year old without comorbid conditions.

> Based on upon a reasonable medical probability, the cause of Dale Thomsen's death was his undiagnosed and untreated alcohol withdrawal while at the Washington County Jail.

Graham Rep. at 24–25.

NaphCare makes a handful of unpersuasive arguments to support its motion to exclude Dr. Graham's report. First, it contends that Dr. Graham is unqualified because he "has not treated any live patients for more than 20 years, and has never diagnosed a live patient with alcohol withdrawal." But that is irrelevant; in this case, Dr. Graham's testimony relates to the cause of death based on analysis of the records of a patient who had already died. Dr. Graham's experience supports precisely the scope of the opinion he offers in this case.[20]

---

[20]    To be sure, as a forensic pathologist with decades of experience in this area, Dr. Graham would be qualified in all events. *See Gov't of Virgin Islands v. Sampson*, 94 F. Supp. 2d 639, 649 (D.V.I. 2000) ("[I]f the liberal standard of Rule 702 allows an engineer who teaches auto

Second, NaphCare contends that Dr. Graham is unqualified because he "lack[s] expertise in alcohol withdrawal." Motion at 47. That statement, however, squarely contradicts the record. Dr. Graham testified that, of the approximately 2500 autopsies that he has performed in his career, he has diagnosed chronic ethanol abuse, or alcoholism, as the cause of death in hundreds of them. Graham Depo. at 11:22–12:1. Of course, even if NaphCare's assertions were true, that would be a topic for cross-examination, not grounds for exclusion wholesale. *See Schroeder v. Cty. of San Bernardino*, 2019 WL 3037923, at *3 (C.D. Cal. May 7, 2019) (so stating with respect to otherwise qualified expert who did not focus on a particular condition).

NaphCare's third argument is particularly off the mark. There, it contends that Dr. Graham's opinion should be excluded because, in its view, Dr. Graham "is a plagiarist [who has] perjured himself." Motion at 46. More specifically, NaphCare contends that Dr. Graham heavily relied in his report on an article entitled *Management of Moderate & Severe Alcohol Withdrawal Syndromes* without proper attribution.[21] NaphCare goes on to accuse Dr. Graham of perjuring himself when he testified that the opinions he reached in his report are entirely his own. Motion at 49 ("Here's the kicker: when given the chance to confess to copying the Hoffman Article, Dr. Graham repeatedly lied under oath.").

NaphCare's arguments on this score are unsupported by the record, unnecessarily inflammatory, and insufficient to support exclusion of Dr. Graham's expert opinions. First of all, the article at issue, on which Dr. Graham reasonably relied, is included on Dr. Graham's list of

---

mechanics to testify in a products liability action about tractors, *see Hammond* [*v. Int'l Harvester Co.*], 691 F.2d 646 [(3d Cir. 1982)], and an individual who only has on the job training in placing disabled persons to testify as an expert in vocational rehabilitate, *see Waldorf* [*v. Shuta*], 142 F.3d 601 [(3d Cir. 1998)], it surely allows a medical doctor trained in forensic pathology to give his opinion on whether the actions of a surgeon were so grossly negligent that caused the death of the victim.").

[21]    Robert S. Hoffman & Gerald L. Weinhouse, *Management of Moderate & Severe Alcohol Withdrawal Syndrome*, UpToDate, Post TW (Ed.), UpToDate, Waltham, MA (2017).

references accompanying his initial report.[22]  *See* Graham Rep. at Ex. B.  And Dr. Graham did

not, in *any* respect, lie under oath; the fact that Dr. Graham relied on the article to support the

aspects of his analysis relating to moderate and several alcohol withdrawal syndrome does not

mean that his analysis and conclusions as a forensic pathologist are not entirely his own.  In fact,

they are.  Graham Depo. at 26:14–27:21.

The cases that NaphCare cites are not to the contrary.  *See* Motion at 49–50.  In *Snyder v.*

*Bank of America, N.A.*, 2020 WL 6462400, at *4 (N.D. Cal. Nov. 3, 2020), the district court

granted the defendants *unopposed* motion to exclude an expert on the ground that the expert was

neither qualified nor reliable.  There, the expert testified that she had plagiarized portions of her

report by, among other things, copying and pasting opinions from the report of another expert in

that case and using those opinions as her own.  *Id.*  That has not, in any respect, happened here.

Nor are NaphCare's out-of-context citations to *Spiral Direct, Inc., v. Basic Sports*

*Apparel, Inc.*, 2017 WL 11457208 (M.D. Fla. Apr. 13, 2017); *Raymo v. Sec'y of Health &*

*Human Servs.*, 2014 WL 1092274 (Fed. Cl. Feb. 24, 2014); or *Moore v. BASF Corp.*, 2012 WL

6002831 (E.D. La. Nov. 30, 2012), helpful to its cause.  In *Spiral Direct*, the expert had lifted

large portions of another expert's report and used it as her own, and then failed to list the other

expert's report among the sources on which she relied.  2017 WL 11457208, at *2.[23]  In *Raymo*,

---

[22]     NaphCare implies that Dr. Graham never cited to the article at all.  *See* Motion at 17
("Dr. Graham never cites the Hoffman Article in his initial report.").  This is not correct.
[23]     As the district court explained in *Spiral*,

> Plagiarism in an expert report does not automatically render the expert's
> testimony inadmissible.  *See e.g.*, *Legier and Matterne v. Great Plains Software,*
> *Inc.*, No. Civ. A. 03-0278, 2005 WL 2037346, at *4 (E.D. La. Aug 3, 2005)
> (denying a motion to exclude an expert witness where the expert plagiarized
> portions of the report).  However, Kasper's situation is unique.  At the beginning
> of her deposition, Kasper testified under oath that all of the documents she relied
> upon in this case were attached as exhibits to her report.  And although Kasper

the expert deliberately attempted to mislead the parties and the Court, testifying that he had not consulted with the expert whose work he had plagiarized.  2014 WL 1092274, at *13.  The same was true in *Moore*.  2012 WL 6002831, at *7.

To be clear, Plaintiff disagrees completely with NaphCare's suggestion that Dr. Graham is a "plagiarist" who "perjured himself."  Dr. Graham is a respected and experienced forensic pathologist who relied on, and cited, the work of others relating to symptoms and management of alcohol withdrawal syndrome in his expert report.  His conclusions and opinions about Dale Thomsen's cause of death are nonetheless entirely his own.  NaphCare's suggestion to the contrary should be rejected, and Dr. Graham's credibility as an expert should be left to the jury to assess.  *See Allison*, 184 F.3d at 1311 (A district court's gatekeeper role "is not intended to supplant the adversary system or the role of the jury.").

**C.    Dr. Vincent Reyes is qualified under Rule 702.**

Dr. Vincent Reyes is a licensed and board-certified cardiologist who has practiced interventional cardiology for thirty years in Oregon.  He received his M.D. from the University of Southern California School of Medicine in 1985 and worked as a cardiologist and/or medical director at several hospitals in Oregon between 1990 and now.  Dahab Decl. ¶ 18 (Reyes Curriculum Vitae at 1–2, 6).  In his cardiology practice, he works with approximately 5 to 10 patients each year who are experiencing alcohol withdrawal symptoms for the purpose of "evaluat[ing] their cardiac conditions."  Dahab Decl. ¶ 14 (Reyes Depo.) at 9:1–7.

Consistently with other experts who have reviewed Dale Thomsen's records and circumstances, Dr. Reyes' report concludes that the cause of Dale Thomsen's death was "a

---

attached nearly two hundred pages of documents to her report, Nelson's report was not among them.

2017 WL 11457208, at *2 (second internal citation omitted).

cardiac arrythmia (i.e., primary ventricular fibrillation without evidence of an acute infarct or heart failure), due to undiagnosed and untreated delirium tremens, combined with chronic, severe, and diffuse atherosclerotic coronary disease." Reyes Rep. at 2.[24] He notes that "[t]he stress of the alcohol withdrawal [created] a rise in [blood pressure] and heart rate, essentially creating a maximum stress situation." Reyes Rep. at 2. Dr. Reyes goes on to conclude that had Dale Thomsen "been evaluated by EMS and/or monitored in an ED setting, the resting EKG would have been markedly abnormal, and telemetry would have detected the fatal arrythmia." Reyes Rep. at 2. "This would have been treated appropriately, and would have been life saving." Reyes Rep. at 2.

Dr. Reyes' opinions are the result of reliable methodology. In his report, he opines that the best medical care for Dale Thomsen would have included IV heparin, beta blockers and possible amiodarone, CEWA protocol, urgent referral to a cath lab, transfer for urgent coronary stenting of the right coronary artery with circulatory assist, followed by coronary artery bypass surgery later or, if necessary, urgently. Reyes Reb. Rep. at 3. He then calculated Dale Thomsen's risk of morbidity and mortality during surgery using what is known as STS Short-Term Risk Calculator ("Calculator").[25] The STS Short-Term Risk Calculator is used to calculate a patient's risk of mortality and morbidities for commonly performed cardiac surgeries.[26] To do so, the Calculator uses patient demographic and clinical variables, including age, gender, platelet

---

[24]    Dr. Reyes' expert initial and rebuttal reports are attached as Exhibit 26 and 42, respectively, to the Houlihan Declaration.

[25]    Society of Thoracic Surgeons, STS Short-Term Risk Calculator 2018, https://www.sts.org/resources/risk-calculator (last visited Feb. 2, 2023).

[26]    *See id.*

count, last creatine level, hematocrit, and others.  *See* Reyes Reb. Rep. at 6–8 (listing variables and showing STS Short-Risk Calculator score).[27]

NaphCare complains that Dr. Reyes' calculation of Dale Thomsen's risk of morbidity and mortality should be excluded because of the assumptions that Dr. Reyes made relating to Dale Thomsen's lab values.  As he explained in his deposition, Dr. Reyes ran the STS Short-Term Risk Calculator twice.  Reyes Depo. at 67:18–25; 70:6–10.  The first time, he had no lab values for Dale Thomsen and thus made reasonable assumptions, based on his expertise, about what those values might be.  Reyes Depo. at 70:1–22.  The second time, the lab values available to Dr. Reyes were from Mr. Thomsen's 2011 visit to OHSU.  Reyes Depo. at 71:4–13.  Because "[t]here was no indication anywhere in any record subsequent to [the visit of] anything that had changed," Dr. Reyes used those known lab values to determine Dale Thomsen's risk.  As Dr. Reyes states in his report, this was a reasonable approach to take in his analysis.

NaphCare argues otherwise, suggesting that there is no authority, anywhere, for Dr. Reyes' decisions to assume Dale's lab values or to use known lab values from a visit that occurred six years before Dale died.  In NaphCare's view, Dr. Reyes should have left the lab values blank in the STS Short-Term Risk Calculator.  Motion at 52 (citing Society of Thoracic Surgeons, STS Short-Term Risk Calculator, *What You Need to Know* at 11 (2018)).[28]  Because he did not, NaphCare argues, Dr. Reyes' analysis "does not follow established methods for calculating risk and is not reliable."  Motion at 52.

NaphCare's arguments are confusing in at least two respects, and should be rejected.  First, in circumstances where lab values are unknown, the STS Short-Term Risk Calculator is

---

[27]     *See also* Society of Thoracic Surgeons, STS Short-Term Risk Calculator, *What You Need to Know*, https://www.sts.org/sites/default/files/STS-2018-Risk-Model-Calculator.pdf (last visited Feb. 2, 2023),

[28]     *See id.*

designed to make assumptions about those values.  *See* Obrien et al., S*ociety of Thoracic Surgeons 2018 Adult Cardiac Surgery Risk Models Part 2—Statistical Methods and Results*, Report of the STS Quality Measurement Task Force (2018) (explaining that, where data is missing, values are imputed to "the most common category of binary or categorical variables and to the median or subgroup-specific median of continuous variables").[29]  Dr. Reyes—a cardiologist of thirty years who continues to practice with OHSU—was entitled to make his own reasonable initial assumptions rather than rely on the assumptions the Calculator would inevitably make for him.  Dr. Reyes' approach was consistent with the very methodology he used to determine Dale Thomsen's mortality risk.

Second, when Dr. Reyes performed his second risk calculation, Dale's lab values were *not* unknown.  At that time, Dr. Reyes was aware of Dale Thomsen's lab values from his 2011 visit to OHSU.  And in his deposition, Dr. Reyes offered a reasonable and credible explanation for why his use of those lab values, although outdated, was reasonable—that "[t]here was no indication anywhere in any record subsequent to [the visit of] anything that had changed."[30]  Dr. Reyes' decision to use Dale's earlier *known* lab values was consistent with established methodology.  His analysis and calculation should not be excluded.

NaphCare's last argument should also be rejected.  It notes that alcohol withdrawal is not Dr. Reyes' area of expertise, Reyes Depo. 14:8–10, and therefore seeks to exclude his opinion entirely, arguing that at Dr. Reyes "should not be allowed to offer an opinion that Thomsen went

---

[29]     Available at https://www.sts.org/sites/default/files/documents/Shahian-%202018%20Risk%20Model-Part%202%20of%202.pdf (last visited Feb. 2, 2023).

[30]     To the extent that NaphCare disagrees with that explanation, that is not a ground to exclude Dr. Reyes altogether, but is instead a basis for cross-examination.  *See Allison*, 184 F.3d at 1311 (A district court's gatekeeper role "is not intended to supplant the adversary system or the role of the jury.").

through alcohol withdrawal or that alcohol withdrawal caused Thomsen's sudden cardiac death." Motion at 51.

This is improper. Dr. Reyes is a cardiologist with decades of experience in interventional cardiology. He has served as the medical director at several hospitals in Oregon. He treats several patients a year who are experiencing alcohol withdrawal, and he has diagnosed patients with both alcohol withdrawal and delirium tremens. Reyes Depo. at 9:22–10:11. He is qualified to testify that Dale Thomsen experienced alcohol withdrawal, which led to his sudden cardiac death.

This is also consistent with caselaw in the Ninth Circuit. Indeed, "it is well-settled that medical experts need not have a subspecialty in the particular field about which they testify." *Schroeder*, 2019 WL 3037923, at *3 (citing *Doe v. Cutter Biological, Inc.*, 971 F.2d 375, 385 (9th Cir. 1992) ("[C]ourts impose no requirement that an expert be a specialist in a given field, although there may be a requirement that he or she be of a certain profession, such as a doctor.")). It is also "a generally accepted principle that courts should not exclude expert testimony simply because 'the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate.'" *Id.* (quoting *Holbrook v. Lykes Bros., S.S. Co.*, 80 F.3d 777, 782 (3d Cir. 1996)) (citing *McCullock v. H.B Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995); *Pages-Ramirez v. Ramirez-Gonzalez*, 605 F.3d 109, 114 (1st Cir. 2010)). Thus, to the extent that Dr. Reyes is not a primary care provider for patients experiencing alcohol withdrawal, that is a topic for cross-examination, not grounds for exclusion wholesale. *See id.* (so holding with respect to otherwise qualified ophthalmologist who did not focus professionally on ocular injuries).

For the foregoing reasons, and because Dr. Reyes offers relevant opinions about Dale's cause of death that would be a helpful to the jury in this case, Dr. Reyes' opinions should not be excluded.

**D.    Dr. Michael Sucher is qualified under Rule 702.**

Dr. Michael Sucher is board certified in addiction medicine and has been practicing addiction medicine for three decades.  Sucher Rep. at 1.[31]  His practice includes addiction medicine from all aspects, including clinical, education, and administrative.  Sucher Rep. at 1. He practices in crisis addiction medicine, medical detoxification, and residential treatment. Sucher Rep. at 1.  In addition to personally caring for thousands of patients suffering from alcohol use disorder and withdrawal, Dr. Sucher educates and trains addiction medicine fellows, psychiatry residents, internal medicine residents, family medicine residents, and medical students on alcohol use disorder and withdrawal management.  Sucher Rep. at 1.  This includes severe alcohol withdrawal and delirium tremens.  Sucher Rep. at 1.

NaphCare does not argue that Dr. Sucher is not qualified to testify that Dale Thomsen suffered from alcohol withdrawal; indeed, it agrees that he is.  Motion at 52 ("Dr. Sucher has expertise on the manifestations of alcohol withdrawal . . . .").  Instead, it makes irrelevant and inflammatory statements about the building in which Dr. Sucher works and the patients he currently serves and argues that "Dr. Sucher is utterly unqualified and unreliable," Motion at 53, in concluding that Dale Thomsen's "pre-existing cardiac condition in the face of Delirium Tremens likely caused a fatal dysrhythmia which was the direct cause of his death," Sucher Rep. at 6.[32]  In NaphCare's view, "Dr. Sucher does not have ***any*** expertise to testify on cause of death."  Motion at 52 (emphasis in original).

---

[31]    Dr. Sucher's expert report is attached as Exhibit 27 to the Houlihan Declaration.
[32]    Dr. Sucher's opinion, in part, is as follows:

NaphCare is incorrect. Dr. Sucher is qualified to opine on Dale Thomsen's likely cause of death as it relates to his severe alcohol use disorder, withdrawal symptoms, and delirium tremens. In addition to his work in addiction medicine, Dr. Sucher has twenty years of experience practicing as a full-time emergency physician. Dahab Decl. ¶ 19 (Sucher Depo.) at 10:10–16. In that context, and in his current practice, Dr. Sucher has made diagnoses of patients that were also the cause of their death. Sucher Depo. at 10:10–12 ("As an emergency physician, I would make a diagnosis which often was the cause of death."); *id.* at 11:4–6 ("I have certainly seen people who died under my care or at the time I was caring for them. My diagnosis would often talk about their cause of death."); *id.* at 13:1–4 ("In rehabilitation facilities, I sometimes see suicide or drug overdoses, so I am familiar with the cause of death in those cases.").[33]

-------------------

> [Defendants] failed to recognize the signs and symptoms of Dale's alcohol withdrawal and its progression to delirium tremens manifested by confusion, hallucinations, altered mental status and abnormal vital signs. During the morning hours of June 28, 2017 while in the throes of acute and progressing delirium tremens and prior to the cardiac arrest Dale was experiencing pain and suffering which ended at the time of his death. This opinion is true to a reasonable degree of medical probability.
>
> . . . .
>
> I disagree with the conclusions of the Medical Examiner regarding Cause of Death and Manner of Death. Alcohol withdrawal and delirium tremens do not exhibit physical findings that would be noted in an autopsy. The Medical Examiner did not obtain or take into account the history of alcohol dependence, traumatic brain injury or Mr. Thomsen's seizure history. Mr. Thomsen's pre-existing cardiac condition in the face of Delirium Tremens likely caused a fatal dysrhythmia that was the direct cause of his death. Another shortcoming of the autopsy report was non examination of the tongue which could have demonstrated injury from a grand mal seizure.

Sucher Rep. at 6.

[33] Dr. Sucher is not a coroner, however. Sucher Depo. at 9:3–22. To the extent that NaphCare argues that a doctor with decades of experience in emergency and addiction medicine is not qualified to opine on cause of death because he is not a coroner, or somehow is not

His opinions are also reliable.  On this, NaphCare appears to make two points.  First, it implies that Dr. Sucher's opinion is somehow unreliable because it was prepared for purposes of litigation.  *See* Motion at 53.  But all expert reports are prepared for litigation, and that does not make them unreliable.  *See Cover v. Windsor Surry Co.*, 2017 WL 9837932, at *20 (N.D. Cal. July 24, 2017) ("An opinion that relies on established and accepted scientific methods is not made unreliable simply because it was prepared for the purposes of litigation—all expert reports are prepared for litigation.").  Second, NaphCare contends that the opinion is unreliable because Dr. Sucher does not consider in his analysis Dale Thomsen's own statements about his history of alcohol use.  Motion at 53.  But as Dr. Sucher explained in his deposition, Dale's statements (*i.e.*, that he had not consumed alcohol in the 48 hours before being booked in the Jail) were not accurate and relevant only with respect to his "complete denial about his alcoholism."  Sucher Depo. at 129: 5–16; 130:18–131:7 ("[I]t's only relevant in that it's an indication of his level of denial.").  Dr. Sucher's decision not to consider them in determining Dale's cause of death was reasonable and consistent with his expertise.  His opinions should not be excluded.

### E.    Dr. Gregory Whitman is qualified under Rule 702.

Dr. Gregory Whitman is a board-certified neurologist.  Whitman Rep. at 1.[34]  He has an M.D. from the University of Connecticut and completed a two-year post-doctoral fellowship in neurology and otoneurology at UCLA.[35]  Whitman Rep. at 2.  He has served as full-time faculty at UCLA, UC-Irvine, and Harvard Medical School.  Whitman Rep. at 2.  In the years leading up

---

allowed to disagree with the coroner, those arguments should also be rejected.  *See, e.g.*, *Wereb v. Maui Cty.*, 2011 WL 13279150, at *1–2 (D. Haw. Dec. 2, 2011) (fact that an expert is not a coroner or medical examiner does not render expert otherwise unqualified to testify on alcohol withdrawal-related death).

[34]    Dr. Whitman's expert report is attached as Exhibit 30 to the Houlihan Declaration.
[35]    Otoneurology is a subspeciality of neurology that focuses on vestibular and balance disorders, including the interactions between disorders of the inner ear and disorders of the nervous system.  Whitman Rep. at 2.

to this case, Dr. Whitman's neurology practice focused on imbalances, vertigo, dizziness, and

cognitive impairment.  Dahab Decl. ¶ 20 (Whitman Depo.) at 22:8–10.  He has extensive

experience treating patients with alcohol withdrawal, Whitman Depo. at 22:11–16, which is

within the scope of knowledge of neurology, Whitman Depo. at 21:4–9.

Dr. Whitman's expert report notes, among other things, Mr. Thomsen's altered mental

state during the period of his incarceration:

> Mr. Thomsen was observed on 6/28/17 to have a terminal syndrome that did not
> include a complaint of "chest pain," as would be expected in a patient who is
> experience [a myocardial infarction].  Instead, Mr. Thomsen's syndrome
> consisted of a period of hours during which Mr. Thomsen had an altered mental
> status, was in a hyperkinetic, agitated confusional state (neurologists call this type
> of state a "delirium"), and at the end of which, he was found unresponsive and
> could not be resuscitated resulting in death.  This type of delirium occurs in
> patients who are experiencing alcohol withdrawal in which case one often uses
> the term delirium tremens.  Additional classic features of delirium tremens
> manifested by Mr. Thomsen on 6/28/17 were seizures (as opined by defense
> expert Dr. Elliott) and cardiac arrhythmia (as is well documented in the records).

Whitman Rep. at 29.  He then opines that Dale Thomsen's

> alcohol withdrawal and [his] predisposition to secondary generalization of
> seizures, together represent a deadly combination. . . . [T]he acute confusion
> manifested on the morning of June 28, 2017 warranted further medical evaluation
> that the jail and jail staff failed to provide.  In my opinion, the right thing to do
> medically would have been to emergently transport Mr. Thomsen to the hospital,
> as soon as he was observed to manifest a new and unexplained acute agitated
> confusional state; this is true both because of his presentation itself and also Mr.
> Thomsen's high risk history.  Any reasonable health care provider would know or
> should know that a brain damaged patient with a history of alcohol withdrawal
> and epilepsy who acutely develops an unexplained agitated confusional state
> needs urgent medical attention.

Whitman Rep. at 30.  Based on that analysis, and because Dale Thomsen's autopsy report also

contained information suggestive of "larger alcohol withdrawal syndrome," Whitman Rep. at 31,

Dr. Whitman concludes that "[u]nder any reasonable medical assumptions or scenario, it is

medically probable that if [Dale Thomsen] had been brought to an acute care hospital at the time

when he was observed to have developed an unexplained agitated delirium in the early morning of 6/28/17, then Mr. Thomsen would have survived," Whitman Rep. at 32.

Notwithstanding Dr. Whitman's experience and extensive analysis of the records in this case, NaphCare makes a cursory (yet again, also overstated) argument that Dr. Whitman "is not remotely qualified to tell a jury about what killed Thomsen." Motion at 54. It offers virtually no meaningful support for that argument, noting instead that Dr. Whitman "has never published any articles on alcohol withdrawal," "has never performed an autopsy," and "treats patients for earaches." Its arguments are not only inconsistent with Dr. Whitman's testimony, *see* Whitman Depo. at 22:8–10; 25:1–3: 31:25–32:4; 33:6–23, but also insufficient to exclude Dr. Whitman as a qualified expert in this case.

### F.    Bradford Hansen does not offer an opinion on the medical cause of Dale Thomsen's death.

The last in a string of motions to exclude all of Plaintiff's causation experts, NaphCare argues that Bradford Hansen's opinion should be excluded because he "has no medical training to opine on causation." Motion at 54. NaphCare apparently seeks to strike one sentence from Mr. Hansen's report, highlighted below.

> This vital training to pass along medical and mental health information to medical by the deputies was a complete failure on the part of Naphcare which has a duty to train and [the Washington County Jail] which has a duty to oversee the contract. *It is very probable that with the proper training and understanding by all staff Dale would be alive today.*

Hansen Rep. at 12 (emphasis added).[36]

Bradford Hansen has more than 42 years of experience in all aspects of corrections, including in assisting state correctional agencies and county jails in developing emergency preparedness training and security improvements. Hansen Rep. at 2. He is a retired prison

---

[36]    Mr. Hansen's expert report is attached as Exhibit 39 to the Houlihan Declaration.

warden whose responsibilities as a warden included "ensur[ing] that [prison] medical and mental health programs performed their duties as they should." Hansen Rep. at 2.

In his report, Mr. Hansen explains the "well-established methodology" for assessing policies, procedures, and practices "within prisons, jails, and detention centers across the United States." Hansen Rep. at 3.

> The first step is to determine applicable duties, reviewing relevant law and regulations, department policies and procedures, professional standards, and widely accepted correctional standards and practices. The second step is to determine whether the various duties identified have been complied with by review of documents and other information available and facts from other sources. An additional step in the analysis is to examine the existing policies, procedures, and practices to determine whether they contribute to any deficiencies and by comparing them to legal and regulatory requirements and comparable policies and practices in other correctional agencies.

Hansen Rep. at 3–4. The above-described methodology, Mr. Hansen explains, is the methodology used to audit correctional institutions for accreditation by the American Correctional Association (ACA) and National Commissioner on Correctional Health Care (NCCHC). Hansen Rep. at 4. Applying that methodology to the record in a particular case allows the auditor to "determine whether it was reasonably predictable that the harm that occurred to the Plaintiff would occur if the identified duties of the Defendants were not fulfilled." Hansen Rep. at 4. Here, that would allow Mr. Hansen to conclude "whether Dale Thomsen's death was a direct result of the breach of those duties by the Defendants." Hansen Rep. at 4.

Mr. Hansen then applies that well-established methodology to the record in this case. He reaches several conclusions, including that the Washington County Jail and NaphCare failed to provide policy and training for jail deputies who receive medical information from family and friends. Hansen Rep. at 7–12. He further concludes that, because the jail deputies were untrained, they failed to pass crucial medical information relating to Dale Thomsen to medical

staff.  Hansen Rep. at 13.  This resulted in jail deputies using their own (again, untrained)

observations to determine whether Dale was in danger, and they incorrectly concluded that he

was not.  Hansen Rep. at 13.  Both jail deputies and NaphCare staff failed to recognize Dale's

altered mental state, and therefore delayed and interfered with his ability to seek immediate and

necessary medical care.  Hansen Rep. at 15–19.  Based on that analysis, Mr. Hansen opines, as

he is qualified to do, that had NaphCare and Washington County provided training to their

employees and deputies, those employees and deputies would have provided Dale with the

medical care necessary to save his life.  Hansen Rep. at 15–19.[37]

Mr. Hansen's opinions in this respect are admissible in this case.  To establish liability

for Plaintiff's *Monell* claim, she must prove that Defendants' policies or practices were the

"moving force" behind the constitutional injury that Dale Thomsen suffered.  *Berry v. Baca*, 379

F.3d 764, 767 (9th Cir. 2004).  To do so, courts generally have allowed causation testimony from

nonmedical corrections experts for the purpose of establishing a causal connection between the

policies at issue and the constitutional harm.  *See, e.g.*, *Atencio v. Arpaio*, 2015 WL 11117187, at

*14 (D. Ariz. Jan. 15, 2015) (citing *City of Oklahoma v. Tuttle*, 471 U.S. 808, 823–24, 105 S. Ct.

2427, 85 L. Ed. 2d 791 (1985)).  His opinions should not be excluded.

## III.  Plaintiff's experts are qualified to address the standard of care that applies to NaphCare.

Next, NaphCare seeks to exclude the opinions of Drs. Bains, Freedman, and Sucher on

the ground that they do not practice medicine in the corrections setting.  NaphCare Motion at 55–

57.  The County, for its part, seeks further to exclude the opinions of Dr. Reyes on the same

ground.  County Motion at 5–7.  These arguments are premised on Defendants' suggestion that

---

[37]     To be clear, Mr. Hansen does not claim to be a medical expert, and therefore does not
opine on the specific cause of Dale's death.  That is not within the area of his expertise.

PAGE 38 – PLAINTIFF'S COMBINED RESPONSE IN OPPOSITION TO DEFENDANTS'
MOTIONS TO EXCLUDE EXPERT REPORTS

the standard of care that applies in jails and prisons is somehow different than the standard that applies in the community.  This not only is incorrect, but also would create the perverse incentive for jails, prisons, and detention facilities to provide substandard medical care to individuals in custody.  The Court should reject it.

NaphCare and the County also argue that Drs. Roscoe and (with respect to the County only) Paulson also do not have the expertise necessary to opinion on corrections administration. But both experts have decades of experience in corrections healthcare and administration, and neither offers an opinion outside the scope of their expertise.  They should not be excluded.

A.    **The standard of care that applies in the community also applies in the corrections setting.**

Defendants seek to exclude otherwise reliable medical expert opinions from Drs. Bains, Freedman, Sucher, Reyes, Paulson, and Roscoe on the ground that, because they are practice in the community, and not in the corrections setting, they "do not have the requisite training, knowledge or experience on which to rely for proffering an opinion as to the 'standard of care' applicable to a correctional facility."  County Motion at 5; *see also* NaphCare Motion at 55 (arguing that Drs. Bains, Feedman, and Sucher lack "expertise on healthcare policies, procedures, or training in a jail setting").  Defendants essentially seek to create separate and distinct standards of medical care between the corrections and community settings.  They offer no support for this distinction.  Plaintiff respectfully urges the Court to reject it.

The Ninth Circuit has held that standards of medical care in the community are no different than those in the corrections setting.  *United States v. Onuoha*, 820 F.3d 1049, 1059 (9th Cir. 2016) ("[B]est medical interests are best medical interests, whether that individual is in custody or in the community."); *see also id.* (in assessing whether a person in custody received "medically appropriate" care, "courts must consider the long-term medical interests of the individual rather than the short-term institutional interests of the justice system").  Thus, in

PAGE 39 – PLAINTIFF'S COMBINED RESPONSE IN OPPOSITION TO DEFENDANTS'
MOTIONS TO EXCLUDE EXPERT REPORTS

determining whether a particular course of treatment was medically acceptable, courts must consider not only " 'the record [and] the judgments of prison medical officials,' " but also " 'the views of prudent professionals in the field.' "  *Morales v. Anastassiou*, 2022 WL 17324923, at *8 (C.D. Cal. Nov. 29, 2022) (quoting *Edmo v. Corizon, Inc.*, 935 F.3d 757, 786 (9th Cir. 2019), *cert. denied sub nom. Idaho Dep't of Corr. v. Edmo*, 141 S. Ct. 610, 208 L. Ed. 2d 197 (2020)); *see also Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989) (Judges and juries "need not defer to the judgment of prison doctors or administrators.").  "Accepted standards of care and practice within the medical community are highly relevant in determining what care is medically acceptable and unacceptable."  *Edmo*, 935 F.3d and 786 (citing *Allard v. Baldwin*, 779 F.3d 768, 772 (8th Cir. 2015); *Henderson v. Ghosh*, 755 F.3d 559, 566 (7th Cir. 2014) (per curiam)); *see also Balla v. Idaho*, 29 F.4th 1019, 1025 (9th Cir. 2022) ("The community standard of care outside the prison context is highly relevant . . . .").

For that reason, district courts generally do not exclude opinions or testimony from an otherwise qualified expert simply because the expert has not practiced in a correctional setting. *See, e.g.*, *Ball v. Kootenai Cty.*, 2016 WL 4974949, at *6 (D. Idaho Sept. 16, 2016) (finding no legitimate reason to "exclud[e] an otherwise qualified expert from testifying on the basis . . . that the physician had not practiced medicine in a correctional setting"); *Pope v. McComas*, 2011 WL 1584200, at *5 (W.D. Wash. Apr. 26, 2011) ("So long as a physician with a medical degree has sufficient expertise to demonstrate familiarity with the procedure or medical problem at issue, '[o]rdinarily [they] will be considered qualified to express an opinion on any sort of medical question, including questions in areas in which the physician is not a specialist.'" (quoting *White v. Kent Med. Ctr., Inc.*, 61 Wash. App. 163, 173, 810 P.2d 1 (1991))).  And the same is true for courts in other jurisdictions.  *See, e.g.*, *McDowell v. Brown*, 392 F.3d 1283, 1296 (11th Cir. 2004) ("The standard of care applicable to nurses is universal, and does not diminish when the

setting is a jail rather than a hospital.") (applying Georgia law); *Patient A v. Vt. Agency of Human Servs.*, 2015 WL 6449301, at *5 (D. Vt. Oct. 23, 2015) ("As a general observation, the mere fact of incarceration does not justify the delivery of health care lower in quality than an inmate would receive outside of prison.") (applying Vermont law); *Anderson v. Columbia Cty.*, 2014 WL 8103792, at *10 (S.D. Ga. Mar. 31, 2014) (holding that although "the correctional setting imposes certain challenges and *administrative* procedures not faced in other settings," "correctional medicine" is not "a *medical* specialty thereby requiring the exclusion of" otherwise qualified expert); *Allen v. Hinchman*, 20 N.E.3d 863, 870–72 (Ct. App. Ind. Nov. 10, 2014) (concluding that "the standard of care for doctors practicing in prisons is the same as the standard of care for physicians practicing outside of prison" and noting that to conclude otherwise would "empower prison physicians to determine for themselves what standard of care should apply based on each individual case, a practice we cannot endorse").[38]

The relevant question, then, is not whether Plaintiff's experts have practiced in the corrections setting, but whether they are qualified to testify to the medical care that Dale received based on their "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. They plainly are, and Defendants do not argue otherwise. The opinions of Drs. Bains, Freedman, Sucher, and Reyes should not be excluded on this ground.[39]

---

[38]   Under the Federal Rules of Evidence, state witness competency rules apply to claims and defenses for which state law supplies the rule of decision. Fed. R. Evid. 601. Although state law does not determine "deliberate indifference" in § 1983 claims, it does determine the standard of care in the medical profession. Under Oregon law, there is no difference in the standard of care between the community and corrections settings. The Oregon Supreme Court has held that the standard of care in the medical context is established by experts who have "the necessary knowledge to support his or her testimony, rather than whether the expert has a particular degree or specialty." *Trees v. Ordonez*, 354 Or. 197, 208, 311 P.3d 858, 855 (2013).

[39]   For the same reasons, they should not be excluded under Rule 403, as the County suggests. The opinions would neither confuse nor mislead the jury, but would instead provide helpful guidance on the medical standard of care that applies at the Washington County Jail.

PAGE 41 – PLAINTIFF'S COMBINED RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS TO EXCLUDE EXPERT REPORTS

**B.    Dr. Lori Roscoe is qualified under Rule 702.**

Dr. Lori Roscoe is an Advanced Practice Registered Nurse certified as an Adult Nurse Practitioner.  She has a Master of Nursing, a Doctor of Nursing Practice, and a Doctor of Health Care Administration.  Roscoe Rep. at 1; Roscoe Curriculum Vitae at 1.[40]  She also has particular expertise in the corrections setting: she began working in the corrections healthcare setting almost 30 years ago, and is certified through the NCCHC as a Correctional Health Professional and a Correctional Health Professional-Registered Nurse.  Roscoe Rep. at 1.  She has worked in various correctional healthcare roles, including as a correctional facility Health Services Administrator, a Regional Administrator, an Association Program Director, an Executive Director of Clinical Services, a nurse practitioner, and a clinical registered nurse.  Roscoe Rep. at 1.  She has also worked with and for private contractors, and in her administrative roles was responsible for policy and procedure development, staff supervision, staff education, Continuous Quality Improvement (CQI) programs, and fiscal management.  Roscoe Rep. at 1–2.

NaphCare moves to exclude portions of Dr. Roscoe's expert report, arguing that "Dr. Roscoe is unqualified to give opinions on standards of care for medical doctors."  Motion at 57 (seeking to exclude portions of Dr. Roscoe's report "critiz[ing] Dr. Radostitz . . . for failing to provide proper oversight of the Jail's correctional healthcare program").  NaphCare contends, specifically, that Dr. Roscoe is "not qualified to opine on the standards of care relevant to how a physician performs her duties."  Motion at 57.

But that is not the sort of testimony that Dr. Roscoe offers, and so there is nothing for this Court to exclude.  Dr. Roscoe opines, based on her experience and expertise not as a doctor, but in correctional healthcare *administration*, that the facts that the Washington County Jail's

---

[40]    Dr. Roscoe's expert report and curriculum vitae are attached as Exhibits 38 and 36, respectively, to the Houlihan Declaration.

Medical Director did not supervise the medical care provided at the jail, did not directly monitor

the care provided, and did not know the training topics for any healthcare staff demonstrated

inadequacies in the Washington County Jail's policies and practices relating to the oversight and

provision of an adequate correctional healthcare program.  Roscoe Rep. at 11.  Later in her

report, she refers again to those failures in correctional healthcare oversight and concludes that

they were contrary to standards and accepted practices for healthcare administration.  Roscoe

Rep. at 12–13.  She offers her opinions and findings "to a reasonable degree of nursing and

*administrative* certainty."[41]  Roscoe Rep. at 13.  She does not opine in any respect about a

physician's standard of care.  Cf. Motion at 57.  Her opinions should not be excluded.

### C.    Dr. Reed Paulson is qualified under Rule 702.

Dr. Reed Paulson has an extensive career in emergency medicine and family medicine,

including in the corrections setting.  Dr. Paulson has a Doctor of Medicine from Creighton

University and a Master of Public Health from the University of California–Berkeley.  Paulson

Curriculum Vitae at 3.  Between 2009 and the present, Dr. Paulson has served as a Correctional

Physician Specialist and Chief Medical Officer at the Oregon State Penitentiary.  Dahab Decl.

¶ 21 (Paulson Curriculum Vitae) at 7.  He also served a corrections medicine appointment at the

Hopi Nation Jail in Lebanon, Oregon.  Paulson Rep. at 1.[42]

---

[41]    The case that NaphCare cites, *Shipp v. Murphy*, 9 F.4th 694 (8th Cir. 2021), is in accord.
There, the district court had allowed the portions of Dr. Roscoe's report that opined on nursing
and administrative standards and practices.  *Id.* at 701.  The only portion stricken was a statement
relating directly to the physician's failure to document facts relating to the physician's
interaction with the patient.  *Id.*  The Eight Circuit, over a dissent, held only that the district court
properly had stricken that particular opinion as outside the scope of Dr. Roscoe's expertise.  *Id.*;
*see also id.* at 706 (Kelly, J., concurring in part) (explaining that Dr. Roscoe's "competence
sufficiently matches the subject matter of her testimony").  Notably, though, *Shipp* also states
expressly that the case does not "set a bright line rule that a nurse practitioner may never offer an
opinion on a physician's conduct if the same standard of care applies to both" and does not "say
that a nurse may not recount first-hand observations of medical treatment."  *Id.* at 701 n.3 (citing
cases).

[42]    Dr. Paulson's expert report is attached as Exhibit 34 to the Houlihan Declaration.

Only the County seeks to exclude the opinions of Dr. Paulson, and for reasons that are not particularly clear.  The County acknowledges that Dr. Paulson has "corrections experience in the context of a medical provider," but asserts that he lacks experience in the "training of correctional officers, the standards that apply to them, or the operational aspects of a correctional facility."  County Motion at 6.

But as Dr. Paulson explained, medical providers in the corrections setting provide training to corrections officers and deputies on medical issues.  That is because officers and deputies are the "first responders," and on medical issues, jail medical providers and correctional deputies "have constant interaction."  Dahab Decl. ¶ 22 (Paulson Depo.) at 170:5–8.  So, to the extent that officers and deputies are responding to medical emergencies—like the one that Dale Thomsen experienced at the Washington County Jail—Dr. Paulson is qualified to opine on the standards that apply to them, the training they received (including "first aid and first responder and intoxication and withdrawal training"), and operational aspects of the jail relating to "the extent of th[e] interaction" between correctional and medical staff.  Paulson Depo. at 170:5–8; 170:12–19.

And those are precisely the issues on which Dr. Paulson offers his expert opinion.  In his report, Dr. Paulson opines that the failure by corrections staff to communicate critical medical information to medical staff "represents a serious breach of custodial management and oversight of this vital chain of communication."  Paulson Rep. at 2.  He further opines that the Washington County deputies should be able to, but cannot, recognize the signs and symptoms of alcohol withdrawal syndromes, including delirium tremens.  Paulson Rep. at 3.  And he opines that jail deputies should not stand idly by knowing that the jail's medical providers are not taking steps to respond to an inmate experiencing a serious medical need.  Paulson Rep. at 3, 4, 5.  These are all topics on which Dr. Paulson is more qualified to opine.  His opinions should not be excluded.

IV.    **Defendants' remaining arguments should be rejected.**

Defendants make a handful of remaining arguments that the Court should also reject. First, they seek to exclude Plaintiff's expert opinions to the extent that those opinions constitute inadmissible legal opinions or conclusions. Second, the County (but not NaphCare) seeks to exclude the portions of Bradford Hansen's opinion addressing a prior in-custody death at the Washington County Jail. Third, they seek to exclude wholesale Dr. Roscoe's supplemental disclosure. That supplemental disclosure offers no new opinions and was served one day after the close of expert discovery. For the reasons that follow, Plaintiff respectfully urges the Court to reject each of these arguments.

A.    **Plaintiff's experts do not offer inadmissible legal opinions or conclusions.**

NaphCare seeks to exclude portions of four of Plaintiff's expert reports on the ground that, in NaphCare's view, those experts offer legal opinions, including opinions about "whether NaphCare's conduct was constitutional, negligent, reckless, or deliberately indifferent," and whether NaphCare "violated its contract with Washington County."

It is "'well-established . . . that expert testimony concerning an ultimate issue is not per se improper.'" *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004) (quoting *Mukhtar v. Cal. State Univ., Hayward*, 299 F.3d 1053, 1066 n.10 (9th Cir. 2002), *overruled on other grounds by Unites States v. Bacon*, 979 F.3d 766 (9th Cir. 2020) (en banc)) (omission in original); *see also* Fed. R. Evid. 704(a) (Expert opinion that is otherwise admissible is "not objectionable just because it embraces an ultimate issue" to be decided by the trier of fact.). Thus, an expert can testify about an issue that is ancillary to the ultimate issue in the case, including whether certain conduct deviated from established laws, policies, or other guidance, *see Cotton v. City of Eureka*, 2010 WL 5154945, at *18–19 (N.D. Cal. Dec. 14, 2010), without usurping the court's role in instructing the jury on the applicable law, and without treading on a

juror's role as the ultimate finder of fact, *see id.* (rejecting argument that expert testimony relating to compliance with industry standards and policies constituted improper legal conclusions or failed to aid the jury in considering the facts presented).

NaphCare appears to contend that the Court should exclude portions of four of Plaintiff's expert reports on the ground those reports (1) opine on whether NaphCare's conduct was "constitutional, negligent, reckless, or deliberately indifferent" and (2) opine on whether NaphCare violated its contract with Washington County.[43]  Motion at 58.  For the reasons set forth below, Plaintiff disagrees on both scores.

With respect to NaphCare's first argument, in the corrections healthcare context, federal courts have held that "while an expert cannot testify as to 'deliberate indifference' or 'objective reasonableness' using those specific terms, . . . they may opine as to the appropriate standards of healthcare in a correctional facility, or generally accepted law enforcement standards, custom, or practice."  *M.H. v. Cty. of Alameda*, 2015 WL 54400, at *2 (N.D. Cal. Jan. 2, 2015) (citing *Davis v. Mason Cty.*, 927 F.2d 1473, 1484–85 (9th Cir. 1991)).  Experts can offer, for instance, testimony "as to appropriate standards of care—which go to the ultimate issues of 'deliberate indifference' and what conduct is 'objectively reasonable'—so long as they do not use those 'judicially defined' and 'legally specialized' terms."  *Id.*

That authority makes clear that the portions of Dr. Freedman's and Dr. Paulson's reports of which NaphCare complains constitute permissible expert opinions that should not be excluded.  Dr. Freedman's report offers opinions relating to Defendants' "breaches of the standard of care as it relates to treating patients in Mr. Thomsen's condition," and its "complete

---

[43]    NaphCare does not state explicitly which portions of Dr. Freedman's report it seeks to exclude, leaving Plaintiff to make her best guess to fully respond to NaphCare's motion.  Its motion refers simply to Dr. Freedman's report at pages 3–4 and 8–11.

lack of concern and reckless disregard for Mr. Thomsen's health, well-being and safety in the face of what should have been a well-known obvious high risk."[44]  Freedman Rep. at 3.  Dr. Paulson, for his part, states that "[t]here was clearly a failure in [training] and an atmosphere of monstrous negligence and indifference pervading the Washington County Jail."  Paulson Rep. at 5.  Neither offers testimony on the ultimate question of whether Defendants—including their policies, practices, or the conduct of any of their employees—were deliberately indifferent, objectively unreasonable, negligent, or grossly negligent.  *Cf. Davis*, 927 F.2d at 1485 (allowing expert testimony that officer "was reckless in his failure to adequately train his deputies, and that there was a causal link between his recklessness and plaintiffs' injuries"); *GemCap Lending, LLC v. Quarles & Brady, LLP*, 269 F. Supp. 3d 1007, 1029 (C.D. Cal. 2017) (allowing expert testimony addressing whether the defendants breached a duty owed to the plaintiff or met the applicable standard of care); *Richman v. Sheahan*, 415 F. Supp. 2d 929, 945 (N.D. Ill. 2006) ("There is no doubt that under Rules 702 and 704 an expert may testify about applicable professional standards and the defendants' performance in light of those standards.").

So, too, with respect to the portions of the expert reports that address NaphCare's noncompliance with the terms of its contract with Washington County.  *See* Freedman Rep. at 9 (stating that Defendants "ignore[ed] the contractual obligation to meet [NCCHC] Standards" by failing to provide healthcare-related training Washington County deputies); Roscoe Rep. at 13 (stating that "if training was not provided to the deputies as required, then this failure violated the contract between Washington County and NaphCare, and was contrary to standards and accepted practices for administrators to follow"); Hansen Rep. at 1 (¶ 8), 19–23 (§ E), 26

---

[44]    Dr. Freedman's report explains in detail how and in what circumstances Defendants breached their standards of care to provide healthcare to inmates in the corrections setting, Freedman Rep. at 3–8, the particular conduct demonstrating indifference to patient safety and well-being, *id.* at 8–12, and the nature of the risk they faced in their failures to do so, *id.* at

(opining that Dale Thomsen's death could have been avoided had Defendants taken certain

actions, including "complied with the contract as written").  Again, none of these statements

involve terms "that have a 'specialized meaning in law' or otherwise 'attempt to instruct the jury

on the law.'"  *Dold v. Snohomish Cty.*, 2023 WL 123335, at *1 (W.D. Wash. Jan. 5, 2023)

(quoting *Diaz*, 876 F.3d at 1198–99).  The experts simply offer statements comparing

NaphCare's conduct to the terms of that agreement.  *See Davis*, 927 F.2d at 1485 ("Fed. R. Evid.

702 permits expert testimony comparing the conduct of parties to the industry standard.").  That

testimony is helpful to the jury in determining the ultimate issues in this case—that is, whether

Defendants were negligent, grossly negligent, or deliberately indifferent to the rights of Dale

Thomsen.  The opinions should not be excluded.

### B.    Bradford Hansen may opine on the County's failure to learn from prior deaths in custody.

The County urges the Court to exclude from Mr. Hansen's report his opinion relating to

the death of Madaline Pitkin.[45]  Notably, in doing so, the County does not challenge Mr.

Hansen's qualifications to render that opinion, nor does it challenge the relevance of prior in-

custody deaths to the claims that Plaintiff asserts here.  County Motion at 12.

The County instead makes the cursory argument that "[t]here is no commonality between

the circumstances surrounding Ms. Pitkin['s] death and that of Mr. Thomsen sufficient to allow

Mr. Hansen to broadcast his unfounded and unsupported opinions to the jury."  County Motion

at 12.  It does not explain what it means by "commonality," nor does it explain why the specific

circumstances of Madaline Pitkin's death are not relevant to this case.  *See* County Motion at 12.

---

[45]    *See* Rebecca Woolington, *Dying Alone: A jail inmate's health spiraled for 7 days and no one stopped it*, The Oregonian (Apr. 10, 2016, 11:00 AM), https://www.oregonlive.com/ washingtoncounty/2016/04/dying_alone_a_jail_inmates_hea.html (last visited Feb. 6, 2023).

As Plaintiff explains above, Mr. Hansen is an expert in corrections who is qualified to opine on all aspects of corrections, including the failures in training, emergency preparedness, emergency response, critical incident response and review, and security. In his report, he explains and applies well-established methodology for assessing policies, procedures, and training programs in prisons, jails, and detention centers across the United States. He is qualified to assess and opine on Washington County's continued failures in training and oversight, including those that resulted in prior in-custody deaths.[46]

And his testimony on this point is relevant as well. As Mr. Hansen explains, Washington County was on notice of certain failures in its training and oversight of jail staff in 2014, when Madaline Pitkin died as a result of those failures. *See* Hansen Rep. at 25 ("The County and WCJ were on notice from the Madeline Pitkin case and from the County auditor's reports that healthcare at WCJ was substandard, and that the failure to provide adequate healthcare threatened inmate health."). The fact that those failures continue, and the fact that the County has not fully implemented a quality assurance program designed to respond to those failures, is relevant to the County's deliberate indifference to the constitutional rights and medical needs of those in its custody.[47]  Mr. Hansen's opinion should not be excluded.

### C.    Dr. Roscoe's late supplemental disclosure was justified and harmless.

Finally, NaphCare moves under Rule 37(c)(1) to exclude Dr. Roscoe's supplemental expert report, which was produced one day after the close of expert discovery and addressed

---

[46]    In that respect, Mr. Hansen is also qualified to identify "the similarities in the failures in both Mad[a]line Pitkin's death and Dale Thomsen's death." Hansen Rep. at 24. "Like Dale Thomsen's death, Mad[a]line Pitkin's death was due to the failure of medical staff not responding to repeated requests for help . . . ." *Id.*

[47]    *See* Hansen Rep. at 23–24 ("[I]t is important to review the fact that there were similarities in the failures in both Madeline Pitkin's death and Dales Thomsen's death.").

topics within the scope of her original report.  Plaintiff respectfully urges the Court to deny that motion.

Under Rule 26(a)(2), parties intending to call expert witnesses at trial must disclose the identities of such experts, the reports concerning their opinions, the basis for those opinions, and the experts' qualifications and backgrounds.  Fed. R. Civ. P. 26(a)(2)(A)–(C).  The disclosures must be made "at the times and in the sequence that the court orders."  Fed. R. Civ. P. 26(a)(2)(D).

"Rule 37(c)(1) gives teeth to these requirements by forbidding the use at trial of any information required to be disclosed by Rule 26(a) that is not properly disclosed."  *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001).[48]  The sanction imposed under Rule 37 is "automatic and mandatory unless the sanctioned party can show that its violation . . . was either justified or harmless."  *Grove City Veterinary Serv., LLC v. Charter Practices, Int'l, LLC*, 2016 WL 1573830, at *16 (D. Or. Apr. 19, 2016) (quoting *Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 742 (7th Cir. 1998).

Dr. Roscoe's supplemental report seeks to confirm that, even after reviewing additional materials relating to NaphCare training, her opinions relating to the inadequacies of NaphCare's training remained unchanged.  Dahab Decl. ¶ 23 (Roscoe Supp. Rep.) at 1 ("As a result, my opinions in this matter have not changed regarding the custom, policy, and practice of providing

---

[48]     Rule 37(c)(1) provides, in relevant part,

>     If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.

Fed. R. Civ. P. 37(c)(1).

a training program for both correctional staff and healthcare staff that was ineffective.").[49] She notes simply that the additional material she reviewed "included no evidence that competency was measured." Roscoe Supp. Rep. at 1.

Supplemental expert reports are permissible when the expert seeks to " 'correc[t] inaccuracies, or fil[l] the interstices of an incomplete report based on information that was not available at the time of the initial disclosure.' " *Luke v. Family Care & Urgent Med. Clinics*, 323 F. App'x 496, 500 (9th Cir. 2009) (quoting *Keener v. United States*, 181 F.R.D. 639, 640 (D. Mont. 1998)). By contrast, "[a] supplemental report that seeks to 'strengthen or deepen' opinions expressed in the original expert report is improper under Rule 26(e) and subject to exclusion." *Andrews v. Plains All Am. Pipeline, L.P.*, 2019 WL 6647928, at *4 (C.D. Cal. Nov. 22, 2019) (quoting *Jarrow Formulas, Inc. v. Now Health Grp., Inc.*, 2012 WL 3186576, at *15 (C.D. Cal. Aug. 2, 2012)) (second internal quotation mark omitted).

In Plaintiff's view, Dr. Roscoe's supplemental report does not seek to "deepen" her prior analysis and does not provide new analysis to "strengthen" her prior opinions. Her supplemental report—which is a single page and was produced one day after the close of expert discovery in this case—merely confirms that her prior opinions remain unchanged. And because training was within the scope of Dr. Roscoe's initial report, and thus well within the scope of any testimony she may offer at trial, the supplemental report is both justified and harmless. *See Wanke Cascade Dist. Ltd. v. Forbo Flooring, Inc.*, 2017 WL 1837862, at *4 (D. Or. May 4, 2017) (" '[T]he permissible scope of expert testimony is quite broad, and District Courts are vested

---

[49]    During Dr. Roscoe's deposition, counsel for NaphCare asked Dr. Roscoe whether she had reviewed several NaphCare training materials that Dr. Roscoe had not had the opportunity to review.

with broad discretion in making admissibility determinations.' " (quoting *Hill v. Reederei F.*

*Laeisz G.M.B.H., Rostock*, 435 F.3d 404, 422–23 (3d Cir. 2006)).

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully urges the Court to deny Defendants'

*Daubert* motions.

DATED this 6th day of February, 2023.

/s/ Nadia H. Dahab
**Nadia Dahab**, OSB No. 125630
SUGERMAN DAHAB
707 SW Washington Street Ste. 600
Portland, OR 97205
Phone: (503) 228-6474
nadia@sugermandahab.com

**Timothy J. Jones**, OSB No. 890654
TIM JONES PC
707 SW Washington St. Ste. 600
Portland, OR 97205
Phone: (503) 374-1414
tim@timjonespc.com

**John M. Coletti**, OSB No. 942740
PAULSON COLETTI TRIAL ATTORNEYS PC
1022 NW Marshall Street, Suite 450
Portland, OR 97209
Phone: (503) 226-6361
Fax: (503) 226-6276
john@paulsoncoletti.com

**Dain Paulson**, OSB No. 973653
570 NE Tomahawk Drive
Portland, OR 972217
Phone: (503) 593-9562
dain.paulson@gmail.com