UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

TAMMY L. THOMSEN, *personal*                              Case No. 3:19-cv-00969-AR
*representative of the Estate of* DALE L.
THOMSEN, *deceased*,                                      **OPINION AND ORDER**

                Plaintiff,

     v.

NAPHCARE, INC., *an Alabama
corporation*; WASHINGTON COUNTY, *a
government body in the State of Oregon*;
PAT GARRETT, *in his capacity as Sheriff
for Washington County*; ROBERT DAVIS,
*an individual*; DON BOHN, *an individual*;
JULIE RADOSTITZ, MD, *an individual*;
MELANIE MENEAR, *an individual*;
KATHY DEMENT, *an individual*; RACHEL
ECLEVIA, *an individual*; KATIE BLACK,
*an individual*; ANDREA JILLETE, *also
known as* ANDREA GILLETTE, *an
individual*; MORGAN HINTHORNE, *an
individual*; RACHEL STICKNEY, *an
individual*; and JOHN/JANE DOES 1-10,

                Defendants.

---

**ARMISTEAD, Magistrate Judge**

     Dale Thomsen (Thomsen) died while in the custody of Washington County Jail. During

his detention, NaphCare, Inc., provided the jail's medical care. Thomsen's widow, plaintiff

Tammy Thomsen, brings this action against Washington County, NaphCare, and NaphCare

Page 1 – OPINION AND ORDER

employees for failure to provide Thomsen adequate medical care while he was in custody from June 25, 2017, until his death three days later. She alleges that Thomsen was an alcoholic, that he died from untreated alcohol withdrawal, and that had defendants given him the appropriate medical care, he would not have died. Plaintiff brings claims under Oregon law and 42 U.S.C. § 1983, alleging that defendants were negligent, grossly negligent, and deliberately indifferent to Thomsen's medical needs. (First Am. Compl. ¶¶ 27-53.)

In their motion to exclude plaintiffs' expert opinions under Federal Rule of Evidence 702, defendants see this as a case where Thomsen died of a heart attack and challenge the admissibility of plaintiff's experts' opinions that say otherwise. Specifically, NaphCare,[1] joined by Washington County, moves under Rule 702 to exclude the expert opinions of plaintiff's proffered experts Michael Freeman, Stuart Graham, Vincent Reyes, Michel Sucher, Samuel Freedman, Gregory Whitman, Amarprit Bains, Reed Paulson, Lori Roscoe, and Bradford Hansen. Naphcare asserts that plaintiff's experts (1) base their opinions on insufficient facts and data; (2) use unreliable methodologies; (3) are unqualified; and (4) make impermissible legal conclusions. (NaphCare Mot. to Exclude, ECF No. 232.)

Washington County, joined by NaphCare, further moves to exclude the expert testimony of Bains, Freedman, Sucher, Reyes, Paulson, and Roscoe, arguing that those experts (1) are unqualified to offer opinions related to Washington County; (2) base their opinions related to the County on incomplete information; and (3) make impermissible legal conclusions. Washington

---

[1]     The court refers only to NaphCare when describing motions and arguments made by NaphCare and its employee-codefendants Julie Radostitz, Melanie Menear, Kathy Dement, Katie Black, Andrea Gillette, Morgan Hinthorne, and Rachel Stickney.

County also moves for exclusion of plaintiff's expert reports under Federal Rule of Evidence 403. (Wash. Cnty. Mot. to Exclude at 5-13, ECF No. 237.)

Plaintiff responds that defendants read too much into Rule 702's requirements. In her view, the experts are qualified, reach their opinions using sound science and relevant expert knowledge, and base their opinions on sufficient information in the record. She disagrees that the alleged shortcomings in her experts' qualifications, methodologies, or factual assumptions justify exclusion of their opinions, arguing that such shortcomings instead go to the weight of the experts' testimony. (Pl.'s Resp., ECF No. 246.) For the reasons explained below, defendants' Motions to Exclude are granted in part and denied in part.[2]

## LEGAL STANDARD

Rule 702 governs the admissibility of expert testimony. The Rule provides that expert opinion evidence is admissible if (1) the witness is sufficiently qualified as an expert by knowledge, skill, experience, training, or education; (2) the expert's specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (3) the testimony is based on sufficient facts or data; (4) the testimony is the product of reliable principles and methods; and (5) the expert has reliably applied those principles and methods to the facts of the case. FED. R. EVID. 702; *Siring v. Or. State Bd. of Higher Educ.*, 927 F. Supp. 2d 1069, 1072 (D. Or. 2013).

---

[2]    Although the parties have not consented to magistrate judge jurisdiction under 28 U.S.C. § 636(c)(1), the court issues this opinion and order on defendants' nondispositive motions to exclude plaintiff's expert witnesses for the limited purpose of addressing the parties' anticipated motions for summary judgment.

The proponent of expert testimony has the burden of showing, by a preponderance of the evidence, that the proposed testimony is admissible under Rule 702. *See Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007). In evaluating proffered expert testimony, the trial court is "a gatekeeper, not a fact finder." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010). The inquiry into the admissibility of an expert opinion is a "flexible one," where "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Id.* at 564.

## DISCUSSION

**A.    *Sufficiency of Facts and Data***

Rule 702(b) requires that an expert opinion be "based on sufficient facts and data." As the advisory committee note to the Rule explains:

> Subpart [b] of Rule 702 calls for a quantitative rather than qualitative analysis. The amendment requires that expert testimony be based on sufficient underlying "facts or data." The term "data" is intended to encompass the reliable opinions of other experts. The language "facts or data" is broad enough to allow an expert to rely on hypothetical facts that are supported by the evidence.
>
> When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis in the amendment on "sufficient facts or data" is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.

FED. R. EVID. 702 Advisory Committee Notes (2000 Amendment) (citations omitted).

"Rule 702's 'sufficient facts or data' element requires foundation, not corroboration."

*Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1026 (9th Cir. 2022). It is not the court's role "to determine whether an expert's hypothesis is correct, or to evaluate whether it is corroborated by

other evidence on the record." *Id.* (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 594-95 (1993)). Instead, "the question is whether the expert considered enough information to make the proffered opinion reliable." *Jerid Enterprises, LLC v. Lloyd's London*, Case No. 3:10-CV-435 JD, 2012 WL 6115673, at *4 (N.D. Ind. Dec. 10, 2012) (citing CHARLES ALAN WRIGHT & VICTOR JAMES GOLD, FED. PRAC. & PROC. § 6266, at 41 (Supp. 2004)). "Rule 702 does not license a court to engage in freeform factfinding, to select between competing versions of the evidence, or to determine the veracity of the expert's conclusions at the admissibility stage." *Elosu*, 26 F.4th at 1027 (citation and quotation marks omitted).

Expert testimony should be excluded, however, when a court "conclude[s] that there is simply too great an analytical gap between the data and the opinion proffered." *Elosu*, 26 F.4th at 1026 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). Courts properly exclude expert opinions that are "based on assumptions which are speculative and are not supported by the record." *Morrison v. Quest Diagnostics Inc.*, Case No. 2:14-cv-01207-RFB-PAL, 2016 WL 3457725 (D. Nev. June 23, 2016); *see also McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000) ("An expert's opinion, where based on assumed facts, must find some support for those assumptions in the record.").

In this case, many of plaintiff's experts opining that Thomsen died from untreated alcohol withdrawal rely on Thomsen having had his last drink within a specific time period before entering the jail, that Thomsen was going through alcohol withdrawal while at the jail, and that Thomsen had a history of alcohol withdrawal seizures. NaphCare argues that plaintiff's experts' assumptions are speculative because (1) no one knows exactly when Thomsen had his last drink; (2) his documented symptoms do not match the typical presentation of alcohol withdrawal;

(3) Thomsen was never diagnosed with withdrawal seizures or delirium tremens before his

death; and (4) there is no physical evidence that Thomsen experienced alcohol withdrawal while

in custody. (*Id.* at 42-47.) Plaintiff responds that NaphCare improperly asks the court to resolve

issues of fact and that her experts' opinions are sufficiently supported by the record. (Pl.'s Resp.

at 17-20.)

### 1.    Thomsen's last drink

NaphCare asserts that "[n]o one knows when Thomsen had his last drink." (NaphCare

Mot. at 42.) Without that information, NaphCare argues, no expert can "opine on the timeline for

Thomsen's supposed alcohol withdrawal." (*Id.*) Thomsen's widow testified at her deposition

that, before he was arrested, her husband drank four to six 16-ounce beers each day. (Thomsen

Dep., 22:22-23:3, ECF No. 247-6.) She also called the jail while Thomsen was in custody,

warning that her husband would go through alcohol withdrawal. (Adams Dep., 35:3-13, ECF No.

247-2.) Thomsen's medical record further documents that he was an alcoholic. (*See* Thomsen's

Tuality Health Care Record, ECF No. 233-14.) Based on the information in the record, plaintiff's

experts can reasonably assume that Thomsen had four to six drinks the day before he was

arrested and could permissibly base their expert opinions on that hypothetical fact. Additionally,

although Thomsen, when he entered the jail's custody, denied having drunk alcohol in the

previous day or two, an alcoholic's denial of drinking is not enough to establish that the experts'

assumptions about when he last had alcohol are speculative.

### 2.    Thomsen's symptoms

The symptoms of alcohol withdrawal include audio, visual, or tactile disturbances, and

NaphCare argues that plaintiff's experts have insufficient data to conclude that Thomsen

experienced those symptoms. According to Naphcare, it is "unclear" that Thomsen "calling

Deputy Jeff Smith by the name 'Jim' and referring to 'Debbie' represented any [such]

disturbances." (NaphCare Mot. at 45.) But an expert may properly "rely on hypothetical facts

that are supported by the evidence." FED. R. EVID. 702 Advisory Committee Notes (2000

Amendment). Thomsen's nonsensical statements, combined with Deputy Smith's report that

Thomsen was experiencing "hallucinations" (NaphCare Medical Records at 48, ECF No. 233-5),

provide sufficient support for plaintiff's experts to conclude that Thomsen was suffering from

audio, visual, or tactile disturbances while in custody. That NaphCare interprets the facts

differently is not grounds for exclusion.

　　　　NaphCare further argues that plaintiff's experts lack sufficient facts to conclude that

Thomsen experienced alcohol withdrawal, because "Thomsen's documented symptoms did not

match the typical presentation of alcohol withdrawal." (NaphCare Mot. at 44.) NaphCare points

out that there are many common symptoms of alcohol withdrawal—such as nausea, vomiting,

sweating, tremors, and headaches—that are not documented in Thomsen's medical records from

his incarceration. But as NaphCare acknowledges, Thomsen did have some symptoms of alcohol

withdrawal. (*Id.* at 45 (noting that Thomsen experienced confusion and agitation).) Further,

Thomsen experienced tachycardia and hypertension, both symptoms of delirium tremens.

(NaphCare Medical Records at 6.) Plaintiff's experts therefore had sufficient facts from which to

conclude that Thomsen suffered from alcohol withdrawal. Rule 702 does not permit the court to

choose between competing interpretations of the evidence. *See Elosu,* 26 F.4th at 1027.

　　　　NaphCare relies on *Goomar v. Centennial Life Ins. Co.*, 855 F. Supp. 319 (S.D. Cal.

1994), to argue that "[r]etrospective expert testimony regarding the existence or onset of a

medical condition is inadmissible speculation." (NaphCare Mot at 46 (quoting *Goomar*, 855 F. Supp. at 326)).) In *Goomar*, however, medical experts opined that a patient had been suffering from a mental illness in 1980, based on medical records beginning nine years later. 855 F. Supp. at 326. The court excluded the expert opinions because there was no medical evidence that the patient had suffered from the illness during the relevant period. *Id.* (citing *Benchmaster, Inc. v. Kawaelde*, 107 F.R.D. 752, 753 (E.D. Mich. 1985) (denying motion to compel plaintiff to submit to a mental examination because the results of that examination would be unhelpful in determining whether plaintiff suffered from mental illness 10 years earlier)). Plaintiff's experts here, in contrast, base their opinions on medical records from before and during Thomsen's jail custody. Those records provide sufficient facts and data to enable plaintiff's experts to reliably opine on Thomsen's medical condition in the days leading up to his death.

### 3.    Thomsen's previous diagnoses

NaphCare argues that there are insufficient facts to support Graham's conclusion that Thomsen had a "known history" of delirium tremens. (Graham Report at 22, ECF No. 233-19.) The court agrees. As Graham acknowledged in his deposition, Thomsen's medical record makes no mention of delirium tremens. (Graham Dep. at 82:15-22, ECF No. 233-13.) Because there is "too great an analytical gap between the data and the opinion proffered," Graham's conclusion that Thomsen had a known history of delirium tremens must be excluded. *Elosu*, 26 F.4th at 1027.

NaphCare also contends that there are insufficient facts to support Sucher's statement that Thomsen's seizures were "primarily attributed to alcohol withdrawal." (Sucher Report at 4, ECF No. 233-27.) It is true that Thomsen's medical record reveals no definitive identification of the

cause of his seizures. Even so, there is support in the record for the conclusion that Thomsen's doctors had attributed his seizures to alcohol withdrawal. (*See, e.g.*, Thomsen's Tuality Health Care Record at 17 (describing Thomsen as "56 y/o male with history of alcohol abuse and withdrawal seizures"); *id.* at 23 (same); *id.* at 14 (noting that "the only obvious potential cause of [Thomsen's seizures] is ethanol withdrawal," but concluding "I think it is more likely he has a primary seizure disorder"); *id.* at 18 ("Seizures – while they may be [alcohol] withdrawal – he denies stopping drinking.").) Sucher acknowledged in his deposition that the medical records included contradictory opinions about the likely cause of Thomsen's seizures, but that a review of all the records led him to believe that Thomsen's seizures were primarily attributed to alcohol withdrawal. (Sucher Dep. at 24:24-26:24, ECF No. 233-6.) "Rule 702's 'sufficient facts or data' element requires foundation, not corroboration." *Elosu*, 26 F.4th at 1026. Because Thomsen's medical records provide sufficient foundation for Sucher's conclusion that Thomsen's seizures were primarily attributed to alcohol withdrawal, the court will not exclude that opinion.

### 4.    Evidence of Thomsen's alcohol withdrawal

NaphCare argues that there is insufficient data for any expert to conclude that Thomsen suffered from alcohol withdrawal prior to his death. NaphCare points the court to Graham's deposition testimony that, after death, there are no physical signs that a person went through alcohol withdrawal or delirium tremens. (NaphCare Mot. at 48 (citing Graham Dep. at 14:21-15:16).) In contrast, NaphCare asserts, "there is objective physical evidence that Thomsen had coronary artery disease." (*Id.*) It argues that the lack of physical evidence precludes plaintiff's experts from opining that Thomsen suffered from alcohol withdrawal or that alcohol withdrawal caused his death. (*Id.* at 47-49.) NaphCare appears to ask the court to conclude that (1) plaintiff's

experts did not accord proper weight to the physical evidence, and (2) their conclusions are incorrect. Those arguments are for trial; they are not proper grounds for exclusion of expert testimony on a *Daubert* motion. *IceMOS Tech. Corp. v. Omron Corp.*, Case No. CV-17-02575-PHX-JAT, 2019 WL 4750129, at \*9 (D. Ariz. Sept. 30, 2019).

**B.    *Reliability***

      To be admissible, expert testimony must be "the product of reliable principles and methods," and "the expert [must have] reliably applied the principles and methods to the facts of the case." FED. R. EVID. 702(c)-(d). "The test of reliability is flexible." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014). Courts have identified four factors that may be considered in evaluating the reliability of scientific opinions: "(1) whether the theory can be and has been tested, (2) whether the theory has been peer reviewed and published, (3) what the theory's known or potential error rate is, and (4) whether the theory enjoys general acceptance in the applicable scientific community." *Murray v. S. Route Mar. SA*, 870 F.3d 915, 922 (9th Cir. 2017) (citing *Daubert*, 509 U.S. at 593-94). Those factors, however, are "meant to be helpful, not definitive, and the trial court has discretion to decide how to test an expert's reliability as well as whether the testimony is reliable," based on the circumstances of each case. *Primiano*, 598 F.3d at 564. For nonscientific opinions, the *Daubert* factors do not apply, and "reliability depends heavily on the knowledge and experience of the expert rather than the methodology or theory behind it." *United States v. Hankey*, 203 F.3d 1160, 1169 (9th Cir. 2000).

      **1.    Michael Freeman**

      Freeman, an epidemiologist, wrote a scientific report that assesses the most likely cause of Thomsen's death. His report concludes:

> [I]t is my opinion that Mr. Thomsen was at approximately 17 times
> greater risk of [sudden cardiac death] because of the combination
> of the emotional and physiologic effects of his alcohol withdrawal
> symptoms, combined with the physical exertion he engaged in
> during the hours prior to his death.

(Freeman Report at 2, ECF No. 233-18.) NaphCare argues that Freeman's expert report must be

excluded because it is not the product of reliable principles and methods. (NaphCare Mot. at 51-

54.)

"[T]he party presenting [a scientific] expert must show that the expert's findings are

based on sound science." *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1316 (9th Cir.

1995) (*Daubert II*). Plaintiff argues, and Freeman asserts in his report, that Freeman's methods

are consistent with the Reference Guide on Epidemiology. (Pl.'s Resp. at 22-24; Freeman Report

at 3.) Freeman applies the results of a study of male physicians to Thomsen, stating that those

results are "generally applicable" to Thomsen. (Freeman Report at 8.) In doing so, Freeman does

not consider Thomsen's individual risk factors, despite the Reference Guide's admonition that

consideration of individual risk factors is required "[b]efore any causal relative risk from an

epidemiologic study can be used to estimate the probability that the agent in question caused an

individual plaintiff's disease." MICHAEL D. GREEN, D. MICHAL FREEDMAN, and LEON GORDIS,

*Reference Guide on Epidemiology*, in Federal Judicial Center, REFERENCE MANUAL ON

SCIENTIFIC EVIDENCE, 615 (3d ed. 2011) (*Reference Guide*). Consideration of those factors is

necessary because "the results of [a] study will not provide an accurate basis of the probability of

causation for [an] individual" where the individual's risk factors differ from the study

participants' risk factors. *Id.* at 614.

The Reference Guide also explains that, when attempting to identify the cause of an

individual's disease, "an expert first determines other known causes of the disease in question and then attempts to ascertain whether those competing causes can be 'ruled out' as a cause of [the individual's] disease." *Id.* at 617, 617 n.211; *see also Henricksen v. ConocoPhillips Co.*, 605 F. Supp. 2d 1142, 1162 (E.D. Wash. 2009) ("[T]o result in an admissible conclusion, Gardner's analysis should reliably rule out reasonable alternative causes of the alleged harm . . ."). Freeman asserts that he can rule out alternative causes of Thomsen's sudden cardiac death simply by examining the annual incidence of sudden cardiac death in men aged 55-64 years. (Freeman Dep. at 46:18-47:21, ECF. No. 233-17.) He makes no attempt to either identify or rule out specific alternative causes for Thomsen's death. (*See* Freeman Report at 9-10.) That methodology is inconsistent with the Reference Guide. *Reference Guide* at 617 (explaining, for example, that "an expert attempting to determine whether an individual's emphysema was caused by occupational chemical exposure would inquire whether the individual was a smoker").

Freeman further asserts in his report that his methods are consistent with those described in a book he co-authored. (Freeman Report at 3.) Plaintiff makes no argument that Freeman's book provides evidence that the methods he employs in his report are "practiced by (at least) a recognized minority of scientists in [the] field." *Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 606 (9th Cir. 2002). Nor does she provide the court with sufficient information to make that determination. Plaintiff has not met her burden of showing that Freeman's methods are "based on sound science." *Daubert II*, 43 F.3d at 1316. The court therefore excludes his opinion.[3]

\ \ \ \ \

\ \ \ \ \

---

[3]     Because the court excludes Freeman's opinion on the basis that it is unreliable, the court does not address NaphCare's other arguments for excluding his opinion.

2.    **Stuart Graham**

NaphCare contends that Graham is unreliable because he is a "plagiarist" who "perjured himself." (NaphCare Mot. at 56.) NaphCare's argument is based on 13 excerpts from Graham's report that use similar or identical phrasing to sections of an article by R.S. Hoffman and G.L. Weinhouse (Hoffman Article). (*See* Plagiarism Chart, ECF No. 233-21.) NaphCare asserts that Graham plagiarized the Hoffman Article by "cop[ying] *wholesale*" sections of the Hoffman Article and that he "repeatedly lied under oath" about whether his report reflected his own work. (NaphCare Mot. at 57, 59.)

"Plagiarism in an expert report does not automatically render the expert's testimony inadmissible." *Spiral Direct, Inc. v. Basic Sports Apparel, Inc.*, Case No. 6:15-cv-641-Orl-28TBS, 2017 WL 11457208, at *2 (M.D. Fla. Apr. 13, 2017). In some cases, however, plagiarism may demonstrate the proffered expert's lack of expertise. In *Snyder v. Bank of Am., N.A.*, Case No. 15-cv-04228-KAW, 2020 WL 6462400 (N.D. Cal. Nov. 3, 2020), for example, the court observed that the proffered expert (who was also the plaintiff) had "almost entirely copied and pasted from [another expert's] report, with changes from third-person to first-person." 2020 WL 6462400, at *4. Importantly, the plaintiff-expert in *Snyder* copied her case-specific analysis from another expert's report in the same case. *See* Expert Witness Report of Pamela Snyder, *Snyder*, 2020 WL 6462400; Report or Affidavit of Thomas A. Tarter, *Snyder*, 2020 WL 6462400. Another court that excluded expert testimony on the basis of plagiarism similarly noted that the proffered expert report copied case-specific conclusions that the expert claimed as his own. *Moore v. BASF Corp.*, Case No. 11-1001, 2012 WL 6002831, at *7 (E.D.

La. Nov. 30, 2012), *aff'd sub nom. Moore v. Int'l Paint, L.L.C.*, 547 F. App'x 513 (5th Cir. 2013).

An expert's attempt to conceal plagiarism may also undercut his reliability. Reliability is undermined, for example, when an expert falsely testifies under oath that he has not reviewed any other expert reports, despite having copied his conclusions from another expert report in the same case. *Id.* Courts have also excluded as unreliable experts who gave "deliberately misleading" answers to questions about their reports or falsely swore under oath that they had provided all documents relied upon in creating their reports. *Raymo v. Sec'y of Health & Hum. Servs.*, Case No. 11-0654V, 2014 WL 1092274, at *13 (Fed. Cl. Feb. 24, 2014); *Spiral Direct*, 2017 WL 11457208, at *2.

The court agrees with NaphCare that whether Graham lied about his reliance on the Hoffman Article is an important factor in deciding whether his report must be excluded. (NaphCare Mot. at 60 ("Lying about the plagiarism is key.").) In NaphCare's view, "when given the chance to confess to copying the Hoffman Article, Dr. Graham repeatedly lied under oath." (*Id*. at 59 (citing Graham Dep. at 25:23-27:21).) The court disagrees with that characterization of Graham's deposition testimony.[4] NaphCare's representative asked Graham whether his lawyers

---

[4]       Q: Dr. Graham, did you write both your initial report and rebuttal report?
        A: I did.
        Q: Your lawyers didn't write it for you?
        A: No. My experience has been that lawyers write much better than I do.
        Q: And your lawyers didn't write this report; that's true?
        A: They did not.
        . . . .
        Q: Your assistant didn't write this report?
        A: My assistant?
        Q: (Nods head.)
        A: No. I'm actually a team of one.

or assistant had written the report for him, to which Graham responded that he had written it

himself. (Graham Dep. at 26:1-13.) Graham was not asked whether he copied sections of his

report from other publications, or what sources he relied on in creating his report. (*See id.*)

Graham's report is easily distinguished from the reports excluded by other courts based

on plagiarism. Graham did not copy his case-specific opinions. Instead, the copied sections

provide general, broadly applicable information about alcohol withdrawal and delirium tremens.

(*See* Plagiarism Chart.) Graham also included the Hoffman Article in his list of references. (ECF

No. 233-23, at 3.) The court disagrees with NaphCare's view that Graham should be excluded as

unreliable either because he listed the Hoffman Article "dead last" in his bibliography or because

he failed to use quotation marks, footnotes, or endnotes. (NaphCare Corrected Reply at 27-28,

ECF No. 251.)

---

> Q: So it's fair to say that your initial report and your rebuttal report are your work?
> A: Entirely.
> Q: The opinions expressed in your initial report and your rebuttal report are your opinions, right?
> A: Completely.
> Q: Not the opinions of anybody else?
> A: Other people may share these opinions, but these are my opinions.
> . . . .
> Q: By signing your initial report, you represented that the report is your own work, right?
> A: Oh, I did, yes.
> . . . .
> Q: You stand by the opinions expressed in both your initial report and your rebuttal report, right?
> A: I do.
> Q: You intend to represent the thoughts and opinions in these reports as your work when you testify at trial in this case, right?
> A: Without hesitation, yes.

(Graham Dep. at 25:23-27:21.)

Page 15  – OPINION AND ORDER

NaphCare further argues that Graham's reliability is undercut by his "strategic change" of the word "hyperthermia" to "hypothermia" in the list of alcohol withdrawal symptoms he copied from the Hoffman Article. NaphCare asserts that Graham intentionally changed the word to better match Thomsen's symptoms. (NaphCare Mot. at 57.) The wording change would create doubt as to Graham's reliability had he relied on "hypothermia" as a symptom of alcohol withdrawal to bolster his conclusions. But Graham never mentions "hypothermia" in his conclusions. (*See* Graham Report at 22-25.) Instead, he concludes that "[b]y the early morning of June 28, 2017, 59 hours following his arrest . . . Dale was exhibiting classic signs of DT; he was having hallucinations, he was disoriented, and he was hypertensive and tachycardic." (*Id*. at 23.) Lack of reference to "hypothermia" elsewhere in his opinion suggests that Graham's change of the word "hyperthermia" to "hypothermia" was not strategic. The court concludes that Graham's alleged plagiarism does not undermine the reliability of his ultimate conclusions and therefore will not exclude his opinion on that basis.

### 3.    Vincent Reyes

NaphCare argues that Reyes' calculations of Thomsen's mortality risk from coronary artery bypass surgery should be excluded because those calculations are the products of an unreliable methodology. (NaphCare Mot. at 61.) Reyes used the Society of Thoracic Surgeons' Short-Term Risk Calculator to make his calculations. (Reyes Report at 6-8, 14-16, ECF No. 233-26.) The Risk Calculator requires input of lab values, including the patient's renal function, platelet count, creatine level, and hematocrit level. Because Thomsen's medical records from Washington County Jail did not include values for his renal function, platelet count, creatine level, and hemocrit level, Reyes initially ran the calculation using assumed values for those

variables. He later ran the calculation again, using values from Thomsen's 2011 visit to Oregon Health and Sciences University.

Because neither Reyes nor plaintiff has explained how Reyes arrived at the values he used in his first calculation, the assumption of those values amounts to unsupported speculation and his calculation based on those values is unreliable. *See, e.g.*, *Stephens v. Union Pac. R.R. Co.*, 935 F.3d 852, 856 (9th Cir. 2019) (holding that expert testimony cannot be based "merely on assumptions and speculation"). Reyes' first calculation (Reyes Report at 6-8) must therefore be excluded.

In contrast, Reyes used Thomsen's own lab values for his second calculation. Reyes explained that he assumed Thomsen's 2011 lab values remained accurate at the time of his death because "[t]here was no indication anywhere in any record subsequent to that that there was any anemia, thrombocytopenia, neutropenia, infection, or anything that had changed." (Reyes Dep. at 71:14-19, ECF No. 233-12.) NaphCare argues that Reyes' assumption that Thomsen's 2011 lab values were accurate in 2017 "is preposterous on its face," and points to medical records from 2014 and 2015 that show different lab values. (NaphCare Mot. at 62; NaphCare Reply at 37.) To the extent that NaphCare disagrees with Reyes' conclusion that the 2011 values provided a reasonable estimate of Thomsen's 2017 values, it can attack that conclusion "by cross examination, contrary evidence, and attention to the burden of proof." *Primiano*, 598 F.3d at 564. Exclusion, however, would be improper. *Id.*; *see also Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013) (holding that challenges to expert's assumptions went to credibility, not admissibility, explaining that a court "is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are

impeachable").

**C.**    *Expert Qualifications*

Rule 702 "contemplates a *broad conception* of expert qualifications." *Hangarter*, 373 F.3d at 1018. In the context of medical experts, "it is well-settled that [they] need not have a subspecialty in the particular field about which they testify." *Schroeder v. County of San Bernadino*, Case No. ED CV 118-427-DMG (JCx), 2019 WL 3037923, at *3 (C.D. Cal. May 7, 2019) (citing *Doe v. Cutter Biological, Inc.*, 971 F.2d 375, 385 (9th Cir. 1992) ("Ordinarily, courts impose no requirement that an expert be a specialist in a given field, although there may be a requirement that he or she be of a certain profession, such as a doctor.")). "Similarly, it is a generally accepted principle that courts should not exclude expert testimony simply because 'the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate.'" *Id.* (quoting *Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 782 (3d Cir. 1996)).

But the Ninth Circuit has also cautioned that "[a] person qualified to give an opinion on one subject is not necessarily qualified to opine on others." *Rogers v. Raymark Indus., Inc.*, 922 F.2d 1426, 1431 (9th Cir. 1991). "[L]ack of specialization may go to weight only as long as an expert stays within the *reasonable confines* of his subject area." *Avila v. Willits Envt'l Remediation Tr.*, 633 F.3d 828, 839 (9th Cir. 2011) (emphasis added) (quotation marks omitted).

**1.    Qualifications to opine on policies, procedures, and training at the jail**

NaphCare argues that Bains, Freedman, and Sucher are not qualified to opine on NaphCare's policies, procedures, and training because they lack experience in correctional settings. (NaphCare Mot. at 65-67.) Washington County argues that Reyes, Freedman, Bains,

Sucher, Paulson, and Roscoe are unqualified to offer opinions on Washington County's standard of care or its customs, policies, or practices. (Wash. Cnty. Mot. at 6-7.) Plaintiff does not appear to disagree that Bains, Freedman, Sucher, Reyes, Paulson, and Roscoe are unqualified to opine on standards for operating correctional facilities or on the nonmedical customs, policies, and practices of Washington County. Instead, she argues that her experts are qualified to opine on medical standards applicable to NaphCare, because the medical standard of care is the same in correctional facilities as it is in the community. (Pl.'s Resp. at 47.) She further argues that Paulson and Roscoe are qualified by their correctional experience to opine on issues related to provision of healthcare in a correctional facility. (*Id.* at 50-52.)

Plaintiff's medical experts may properly opine on whether the acts of specific employees of Washington County or NaphCare were consistent with the medical standard of care and whether specific employees had adequate training to take medically appropriate action toward Thomsen. As the court explains below, however, it agrees with NaphCare and Washington County that medical expertise does not qualify an expert to opine on the adequacy of correctional healthcare policies, or to opine on Washington County's nonmedical standards of care, customs, practices, or policies.[5]

---

[5]     Washington County further argues that the opinions of plaintiff's experts related to Washington County's standards, policies, or customs are unreliable because they are based on incomplete information. The court excludes, based on lack of expertise, the portions of plaintiff's experts' reports that improperly opine on the operation of correctional facilities or on the nonmedical standards of care, policies, or customs of Washington County. Accordingly, the court need not address the County's further argument that opinions on those topics should be excluded because they are based on incomplete information. To the extent that Washington County argues that the experts' failure to review Washington County's policy manuals or training materials justifies *further* exclusion of their opinions, that argument is rejected. Plaintiff's experts' "fail[ure] to review certain materials goes to weight, not admissibility." *Arriaga v. Logix Fed. Credit Union*, Case No. CV-18-9128-CBM-(AGRx), 2022 WL 3052318,

###### a.  Amarprit Bains

Bains is a practicing physician certified in internal medicine. He practices hospital medicine at the Portland VA Medical Center and teaches at Oregon Health & Science University. (Bains Report at 1.) Bains has no expertise in providing medical care in correctional facilities. The court therefore excludes the following sections from Bains's report: "Washington County failed to remedy defective training and policies" (Bains Report at 10-11), "NaphCare's policies and procedures were inadequate" (*id.* at 15-18), and the subsection "NaphCare failed to remedy defective policies" (*id.* at 18-20) within the "NaphCare failed to remedy defective training and policies" section.

The court also excludes, based on Bains's lack of correctional expertise, his opinions (1) that alcohol withdrawal is common at the jail and that the expected standard of care was that staff would be appropriately trained to recognize and treat alcohol withdrawal (*id.* at 4); (2) that Deputy Adams' failure to pass along medical information is "representative of a much more systematic pattern of poor oversight and policies by Washington County leadership" (*id.* at 8); (3) regarding lack of formal policy or consistent training for relaying information from loved ones (*id.* at 8-10); and (4) that NaphCare and Washington County "failed to monitor the education provided to jail staff" (*id.* at 13).

\ \ \ \ \

\ \ \ \ \

---

at *3 (C.D. Cal. Apr. 22, 2022); *see also Rapp v. NaphCare*, Case No. 3:21-cv-05800-DGE, 2023 WL 5844724, at *13 (W.D. Wash. Sept. 11, 2023) (holding that expert's supposed failure to review policy manual was "not a proper basis for exclusion"); *Hangarter*, 373 F.3d at 1017 n.14 (holding that expert's selection of documents to review went to weight of his testimony, not to reliability of his methodology).

      **b.**     **Samuel Freedman**

Freedman is a licensed emergency physician with 35 years of experience in emergency medicine. He has also worked as a medical director. (Freedman Report at 2.) Like Bains, Freedman lacks expertise in administration of healthcare in correctional facilities. Accordingly, the court excludes his opinion to the extent that it opines on systemic shortcomings and deficiencies in training, policy, and action both before and after Thomsen's death (Freedman Report at 8), his opinions about NaphCare's contractual obligations (*id.* at 9), his discussion of the need to train jail staff in alcohol withdrawal (*id.* at 9-10); his opinions on whether defendants' response to the auditor's report was proper (*id.* at 11); and his general conclusions about deficient policies, substandard staffing, and resource deployment at the jail (*id.* at 12). From Freedman's rebuttal report, the court excludes his opinion that "IV high dose Librium is not a jail procedure" (Freedman Rebuttal Report at 3, ECF No. 233-29) and his discussion of whether NaphCare took appropriate actions following Thomsen's death (*id*).

      **c.**     **Michel Sucher**

Sucher is a practicing physician whose focus areas are crisis addiction medicine, medical detoxification, and residential treatment. (Sucher Rep. at 2.) He works for a private network of rehabilitation facilities and previously worked as an emergency physician for over 20 years. (*Id.*; Sucher Dep. at 10:10-16, ECF No. 247-14.) Sucher does not, however, have any correctional experience. The court therefore excludes Sucher's nonmedical opinions that Washington County failed properly to monitor NaphCare's contractual compliance (Sucher Report at 6); that there was a lack of appropriate training and education as to nonmedical staff (*id.*); and that there were "numerous violations in the standard of care by Washington County and Washington County

Jail" (*id*. at 5) to the extent he opines on nonmedical standards of care. The court further excludes his opinion that defendants failed properly to assess Thomsen at intake and during his entire jail stay (*id.*), because the standards for intake and monitoring at the jail are specific to the correctional setting.

### d.    Vincent Reyes

Reyes is a licensed cardiologist and has practiced interventional cardiology for 31 years. (Reyes Report at 2.) He has treated patients suffering from alcohol withdrawal and has diagnosed delirium tremens. (Reyes Dep. 9:22-10:11.) The court agrees with Washington County that Reyes' medical expertise does not qualify him to offer opinions on the County's nonmedical standards of care, customs, policies, or practices. Review of his initial and rebuttal reports, however, reveals that Reyes does not opine on those topics. (*See* Reyes Report at 1-4; Reyes Rebuttal Report at 1-4, ECF No. 233-42.) Reyes' reports are confined to opinions on the medical standard of care, Thomsen's medical condition, appropriate treatment, and chances of survival. Each of those topics is within Reyes' expertise as a medical doctor with a specialization in cardiology and experience with alcohol withdrawal. Reyes' lack of correctional experience does not justify excluding any portion of his opinion.

### e.    Reed Paulson

Paulson is a physician with experience in emergency medicine, family medicine, and correctional medicine. His correctional experience includes providing medical care at the Hopi Nation Jail and at Oregon Department of Corrections Coffee Creek Intake Facility. (Paulson Report at 2.) Paulson is qualified by his experience to opine on medical issues unique to correctional healthcare. He is not, however, qualified to opine on the administrative and

operational policies of NaphCare and Washington County. The court therefore excludes his

opinions that failures to properly treat Thomsen result from systemic issues, inadequate training,

and failed oversight, and his discussion of practices and norms within the Jail. (Paulson Report at

2, 5, ECF No. 233-34.)

> ### f.    Lori Roscoe

Roscoe is a registered nurse and nurse practitioner. She is a certified correctional health

professional and has worked in a variety of correctional healthcare roles, including as a health

services administrator, executive director of clinical services, and nurse practitioner. She has

graduate degrees in nursing and administration. (Roscoe Report at 2.)

Washington County argues, and the court agrees, that Roscoe is not qualified to opine on

the County's nonmedical standards, practices, policies, or customs. Roscoe is, however, qualified

by her experience as a nurse and correctional healthcare administrator to opine on whether

specific actions taken by Washington County employees were consistent with the medical

standard of care and whether NaphCare provided adequate training to Washington County

employees. Roscoe's report does not address operational standards of correctional facilities or

the nonmedical customs or practices of Washington County. Her opinions related to Washington

County are within her scope of expertise.

> ### 2.    Qualifications to opine on alcohol withdrawal and cause of death

> ### a.    Stuart Graham

Graham is a forensic pathologist. He is licensed to practice medicine and is certified in

anatomic and clinical pathology, with a subspecialty in forensic pathology. (Graham Report at

2.) According to NaphCare, Graham is unqualified to opine that alcohol withdrawal caused

Thomsen's death, because he "has no expertise in alcohol withdrawal." (NaphCare Mot. at 56-57). As a forensic pathologist, however, Graham's expertise is in identifying cause of death. Opining on Thomsen's cause of death is therefore "within the reasonable confines of his subject area." *Avila*, 633 F.3d at 839. NaphCare further argues that Graham's cause-of-death analysis must be excluded because forensic pathologists perform autopsies and autopsies do not reveal whether the deceased experienced alcohol withdrawal. (NaphCare Mot. at 31-32.) As Graham explained, however, forensic pathologists do not base their conclusions solely on autopsies: other data are considered in analyzing autopsy results and in making cause-of-death determinations. (Graham Dep. at 13:18-14:1.) NaphCare's objections to Graham's qualifications go to the weight, not the admissibility, of his opinion.

### b.    Michel Sucher

Because Sucher has never performed an autopsy, is not qualified to perform an autopsy, and otherwise does not have expertise in identifying cause of death, NaphCare argues that he is unqualified to opine on Thomsen's cause of death. As previously noted, however, Sucher is an addiction specialist and was previously an emergency physician for over 20 years. He has seen patients die and has diagnosed cause of death. (Sucher Dep. at 11:3-6.) Sucher's training and experience qualify him to opine on whether Thomsen died due to alcohol withdrawal. NaphCare's argument that Sucher is unqualified to opine on Thomsen's cause of death because he is not specialized in identifying cause of death is unavailing.

### c.    Gregory Whitman

Whitman is a licensed neurologist whose primary focus is on dizziness, balance disorders, and cognitive impairment. He also has extensive experience treating patients with

alcohol withdrawal. (Whitman Dep. 22:8-16, ECF No. 247-15.) NaphCare argues that Whitman

is not qualified to opine that Thomsen died from alcohol withdrawal because his practice does

not focus on alcohol withdrawal, he is neither a pathologist nor qualified to perform autopsies,

and he is not qualified to opine on survival rates of people with severe coronary artery disease.

(NaphCare Mot. at 63-64.) As Whitman explained, however, "alcohol withdrawal is within the

scope of knowledge of neurologists." (Whitman Dep. at 21:5-6.) Whitman's training as a

neurologist and his extensive experience treating patients with alcohol withdrawal qualify him to

opine that Thomsen's death was most likely the result of untreated alcohol withdrawal.

### d.    Bradford Hansen

Hansen is a retired prison warden with 42 years of experience working in correctional

institutions. (Hansen Report at 2.) Hansen has no medical training. Accordingly, the court agrees

with NaphCare that he is unqualified to opine on either Thomsen's cause of death or his chances

of survival had defendants acted differently. *See, e.g.*, *Garcia v. County of Riverside*, Case No.

CV 5:18-00839 SJO (ASx), 2019 WL 4282903, at *13 (C.D. Cal. June 7, 2019) (holding that

expert with no medical training was not qualified to opine on cause of death). Hansen's report is

excluded to the extent that he opines on Thomsen's cause of death.

### e.    Vincent Reyes

NaphCare argues that Reyes, a cardiologist, is unqualified to opine on whether Thomsen

was either suffering from or died due to alcohol withdrawal, because Reyes does not specialize

in alcohol withdrawal. (NaphCare Mot. at 61.) It is true that being a medical doctor does not

qualify Reyes to opine on all medical topics. *See, e.g.*, *Montera v. Premier Nutrition Corp.*, Case

No. 16-cv-06980-RS, 2022 WL 1225031, at *9 (N.D. Cal. Apr. 26, 2022). Reyes, however, has

diagnosed and examined patients with both alcohol withdrawal and delirium tremens. (Reyes Dep. at 9:1-10:11, ECF No. 247-9.) Reyes' experience and training qualify him to opine on whether Thomsen experienced alcohol withdrawal and delirium tremens and whether Thomsen's heart condition would likely have killed him in the absence of a severe stress event.

### 3.    Qualifications to opine on duties of medical director

In her report, Roscoe opines on the duties of NaphCare's medical director, Dr. Julie Radostitz, to supervise nursing staff, provide training, and maintain standards. (Roscoe Report at 10-13, ECF No. 233-38.) NaphCare argues that Roscoe is unqualified to opine on the duties and standards that apply to Radostitz because Roscoe is not a medical doctor. (NaphCare Mot. at 67.) As other courts have acknowledged, however, nurses may be qualified by training or experience to opine on standards applicable to medical doctors. *See, e.g.*, *Reece v. Shelby County*, Case No. 3:16-cv-00069-GFVT-EBA, 2020 WL 4582410, at *5-6 (E.D. Ky. Aug. 10, 2020) (noting that it was possible for an APRN to "obtain the knowledge, skill, experience, or training required to qualify as an expert on the standard of care required of a doctor supervising PAs and APRNs," but holding that nurse in that case was not qualified because of limitations in her experience (quotation marks omitted)); *Shipp v. Murphy*, 9 F.4th 694, 701, 701 n.3 (8th Cir. 2021) (excluding Roscoe's testimony about standard of care for physician's interactions with patient, but declining to establish "a bright line rule that a nurse practitioner may never offer an opinion on a physician's conduct").

Roscoe has worked as a correctional-facility health services administrator and as an executive director of clinical services. (Roscoe Report at 1.) In that work, Roscoe has been responsible for policy and procedure development, staff supervision, staff education, and

continuous quality improvement programs at correctional facilities. (*Id*. at 2.) Roscoe's extensive training and experience in correctional healthcare administration qualify her to opine on the administrative duties of NaphCare's medical director.

**D.      *Opinions about the Death of Madaline Pitkin***

Washington County, joined by NaphCare, argues that Hansen's opinion must be excluded under Rule 702 to the extent that he discusses the death of Madaline Pitkin, who died in custody at Washington County Jail in 2014. The County argues that opinions related to Pitkin must be excluded because they are unfounded and unsupported, as Hansen was not provided with any pleadings, depositions, or discovery from the *Pitkin* case, and instead bases his opinion on "the limited amount of information" he learned from a newspaper article and deposition testimony of the Washington County auditor. (Wash. Cnty. Mot. at 11-12.) The court understands the County's argument as based in Rule 702(b)'s "sufficient facts or data" requirement.

Ordinarily, an expert's "fail[ure] to review certain materials goes to weight, not admissibility." *Arriaga v. Logix Fed. Credit Union*, Case No. CV-18-9128-CBM-(AGRx), 2022 WL 3052318, at *3 (C.D. Cal. Apr. 22, 2022). But "[r]eliance on incomplete facts and data may make an expert opinion unreliable because an expert must know of facts which enable him to express a reasonably accurate conclusion." *Arjangrad v. JPMorgan Chase Bank, N.A.*, Case No. 3:10-cv-01157-PK, 2012 WL 1890372, at *6 (D. Or. May 23, 2012).

Plaintiff makes no argument that the documents that Hansen reviewed provide sufficient information to allow him to reliably opine on Pitkin's death, nor does she point the court to evidence in the record providing a foundation for those opinions. Plaintiff has not met her burden of showing that Hansen's opinions related to Pitkin's death are based on enough information to

allow him to express reasonably accurate conclusions. Accordingly, the court excludes Hansen's opinion to the extent that he opines on the specific circumstances of Pitkin's death, compares the deaths of Pitkin and Thomsen, or concludes that Washington County failed to learn from the Pitkin death. (Hansen Report at 23-24 (Section F, ¶¶ 2, 3).)

**E.**     ***Roscoe's Supplemental Report***

Plaintiff disclosed Roscoe's supplemental expert report after expert discovery closed on December 16, 2022. (Order Granting Motion for Extension of Discovery and PTO Deadlines, ECF No. 224; Dahab Decl. at 4, ECF No. 247 (stating that supplemental report was produced to all parties on December 17, 2022).) In the supplemental report, Roscoe states that she has reviewed NaphCare training materials and that her previous opinions remain unchanged. She also opines that a blog post in the training materials "almost exactly describes Mr. Thomsen's situation." (Roscoe Supp. Report at 1, ECF No. 247-18.)

Federal Rule of Civil Procedure 26 provides that a party must supplement its disclosure "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect." FED. R. CIV. P. 26(e)(1)(A). Under Rule 26, a supplemental report is proper if it corrects an inaccuracy in a party's original disclosures, or fills a gap based on information that was previously unavailable. *Luke v. Family Care and Urgent Med. Clinics*, 323 F. App'x 496, 500 (9th Cir. 2009).

Plaintiff makes no argument that the supplemental report corrects inaccuracies in a previous report. And although the report does address information (training materials) that were not addressed in Roscoe's initial report, plaintiff makes no argument that those materials were previously unavailable. The supplemental report is improper.

Federal Rule of Civil Procedure 37 requires the court to exclude the improper
supplemental report unless it determines that the improper report was either substantially
justified or harmless. Fed. R. Civ. P. 37(c)(1). Plaintiff argues that the report is "both justified
and harmless" because training is within the scope of Roscoe's initial report. (Pl.'s Resp. at 49.)
The court concludes that, to the extent that Roscoe states that her initial opinion remains
unchanged after reviewing NaphCare's training materials, her supplemental report is harmless.
Her new opinion comparing the blog post to Thomsen's situation, however, is neither justified
nor harmless. NaphCare had no opportunity to depose Roscoe about the new opinion or to rebut
the opinion with its own expert report. The new opinion is excluded.

**F.    *Improper Legal Conclusions and Rule 403 Arguments***

Defendants ask the court to exclude the opinions of Hansen, Freedman, Paulson, and
Roscoe because those experts offer inadmissible legal conclusions. They further ask that, under
Federal Rule of Evidence 403, the court exclude any mention of Madaline Pitkin and any
medical expert opinions related to Washington County. (NaphCare Resp. at 10, ECF No. 242;
Wash. Cnty. Mot. at 10.)

Objections based on relevance and improper legal conclusions "are moot in the summary
judgment context," because they are "duplicative of the summary judgment standard itself." *Sec.
& Exch. Comm'n v. Criterion Wealth Mgmt. Servs., Inc.*, 599 F. Supp. 3d 932, 945 (C.D. Cal.
2022); *see also Cherewick v. State Farm Fire & Cas.*, 578 F. Supp. 3d 1136, 1156 (S.D. Cal.
2022) (overruling objections to improper legal conclusions in expert testimony at summary-
judgment stage as "redundant of the summary judgment standard itself"). The court agrees with
defendants that certain statements in Thomsen's expert reports may qualify as improper legal

conclusions. At this stage, however, the court need not exclude expert opinions on that basis because legal conclusions will not be considered in determining whether there is a genuine dispute of material fact. *See Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006).

"Further, in the summary judgment context, a court need not exclude evidence for danger of unfair prejudice, confusion of issues, or any other the other grounds outlined in Federal Rule of Evidence 403." *Melena v. ASRC Indus. Servs., LLC*, Case No. CV 21-6769 PA (Ex), 2022 WL 423493 (C.D. Cal. 2022) (quotation marks omitted); *Holt v. Noble House Hotels & Resort, Ltd*, 370 F. Supp. 3d 1158, 1164 (S.D. Cal. 2019) ("Federal Rule of Evidence 403 objections are unnecessary at the summary judgment stage because there is no jury that can be misled and no danger of confusing the issues."). The court denies defendants' Motions to Exclude to the extent that they are based in arguments about relevance, improper legal conclusions, and Rule 403, as those arguments are inapplicable in the context of summary judgment.

\ \ \ \ \

\ \ \ \ \

\ \ \ \ \

\ \ \ \ \

\ \ \ \ \

\ \ \ \ \

\ \ \ \ \

\ \ \ \ \

\ \ \ \ \

## CONCLUSION

For the above reasons, the court excludes Freeman's opinion in its entirety and excludes the opinions of Graham, Bains, Reyes, Freedman, Sucher, Paulson, Roscoe, and Hansen only to the extent described above. Thomsen has met her burden of showing that the remaining portions of those opinions are admissible for purposes of summary judgment. NaphCare's Motion to Exclude (ECF No. 232) is GRANTED IN PART and DENIED IN PART; and Washington County's Motion to Exclude (ECF No. 237) is GRANTED IN PART and DENIED IN PART.

DATED: December 15, 2023

_____
JEFF ARMISTEAD
United States Magistrate Judge

Page 31  – OPINION AND ORDER